PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 08-2784/2785/2798/2799/
2818/2819/2831/2881
_____

SHAWN SULLIVAN;
ARRIGOTTI FINE JEWELRY;
JAMES WALNUM, on behalf of themselves
and all others similarly situated,

v.

DB INVESTMENTS, INC; DE BEERS S.A.;
DE BEERS CONSOLIDATED MINES, LTD; DE BEERS
A.G.;
DIAMOND TRADING COMPANY; CSO VALUATIONS
A.G.;
CENTRAL SELLING ORGANIZATION; DE BEERS
CENTENARY A.G.

DAVID T. MURRAY, Appellant in 08-2784
(Pursuant to Fed. R. App. P. 12(a))

SUSAN M. QUINN, Appellant in 08-2785
(Pursuant to Fed. R. App. P. 12(a))

MARVIN L. UNION; TIM HENNING;
NEIL FREEDMAN; KYLIE LUKE; WILLIAM

BENJAMIN COFFEY, Jr., Appellants in 08-2798
(Pursuant to Fed. R. App. P. 12(a))

AARON PETRUS, Appellant in 08-2799
(Pursuant to Fed. R. App. P. 12(a))

JANET GIDDINGS, Appellant in 08-2818
(Pursuant to Fed.R.App.P. 12(a))

FRANK ASCIONE; ROSAURA BAGOLIE;
MATTHEW DELONG; SANDEEP GOPALAN;
MANOJ KOLEL-VEETIL; MATTHEW METZ;
ANITA PAL; DEB K PAL; JAY PAL;
PETER PERERA; RANGESH K. SHAH; ED
MCKENNA; THOMAS VAUGHAN,
Appellants in 08-2819
(Pursuant to Fed.R.App.P. 12(a))

KRISTEN DISHMAN; MARGARET MARASCO,
Appellants in 08-2831
(Pursuant to Fed.R.App.P. 12(a))

JAMES B. HICKS, Appellant in 08-2881
(Pursuant to Fed. R. App. P. 12(a))
_____

Appeals from the United States District Court
for the District of New Jersey
(D.C. Civil No. 2-04-cv-02819)
District Judge: Honorable Stanley R. Chesler
_____

2

No. 08-2785 Argued on January 28, 2010
Nos. 08-2784/2798/2799/2818/2819/2831/2881 Submitted
Under Third Circuit L.A.R. 34.1(a) on January 28, 2010

Before: RENDELL and JORDAN, Circuit Judges, and
AMBROSE*, District Judge.
_____

Reargued En Banc
on February 23, 2011

Before: SCIRICA, RENDELL, AMBRO, FUENTES,
SMITH, FISHER, CHAGARES, JORDAN and VANASKIE,
Circuit Judges.

(Opinion Filed December 20, 2011)
_____

John J. Pentz, III, Esq.   **[ARGUED]**
Class Action Fairness Group
2 Clock Tower Place - Ste. 260G
Maynard, MA   01754
   *Counsel for Non Party-Appellant*

Howard J. Bashman, Esq.   **[ARGUED]**
2300 Computer Avenue - Ste. G-22
Willow Grove, PA   19090


_____


   *Honorable Donetta W. Ambrose, United States District
Court Judge for the Western District of Pennsylvania, sitting
by designation.

George M. Plews, Esq.
Christopher J. Braun, Esq.
Plews Shadley Racher & Braun LLP
1346 N. Delaware Street
Indianapolis, IN   46202
   *Counsel for Non Party-Appellant Susan M. Quinn*

William Bernstein, Esq.
Eric B. Fastiff, Esq.
Lieff, Cabraser, Heimann & Bernstein
275 Battery Street - 30th Fl.
Embarcadero Center West
San Francisco, CA 94111

Joseph D. Cooper, Esq.
Tracy R. Kirkham, Esq.
Cooper & Kirkham
357 Tehama Street - 2nd Fl.
San Francisco, CA   94103
   *Counsel for Plaintiff-Appellee Shawn Sullivan*

Craig C. Corbitt, Esq.
Zelle, Hofmann, Voelbel & Mason
44 Montgomery Street - Ste. 3400
San Francisco, CA   94104

Samuel Issacharoff, Esq.    **[ARGUED]**
New York University Law School
40 Washington Square South
New York, NY  10012

Steven A. Katz, Esq.
Korein Tillery
505 North 7th Street
Suite 3600, United States Bank Plaza
St. Louis, MO  63101

Susan G. Kupfer, Esq.
Glancy, Binkow & Goldberg
One Embarcadero Center - Ste. 760
San Francisco, CA   94111

John A. Maher, Esq.
450 Springfield Avenue
Summit, NJ   07901

Joseph J. Tabacco, Jr., Esq.
Berman, DeValerio, Pease, Tabacco, Burt & Pucillo
425 California Street - Ste. 2100
San Francisco, CA   94104
   *Counsel for Plaintiffs-Appellees Arrigotti Fine Jewelry*
   *Shawn Sullivan and James Walnum*

Jessica Biggio, Esq.
Skadden, Arps, Slate, Meagher & Flom
4 Times Square
New York, NY   10036

Francis Ciani-Dausch, Esq.
Tara S. Emory, Esq.
Steven C. Sunshine, Esq.
Skadden, Arps, Slate, Meagher & Flom
1440 New York Avenue, N.W.
Washington, DC  20005

Matthew P. Hendrickson, Esq.
Skadden, Arps, Slate, Meagher & Flom
4 Times Square, Room 33-228
New York, NY 10036
   *Counsel for Defendant-Appellee DeBeers SA*

Ben Kinzler, Esq.
Diamond Manufacturers & Importers Association of America
Suite 2000
580 Fifth Avenue
New York, NY  10036

Robert J. LaRocca, Esq.
Kohn Swift & Graf
One South Broad Street, Suite 2100
Philadelphia, PA

Joanne Zack, Esq.
Bonio & Zack
15 St. Asaphs Road
Bala Cynwyd, PA  19004
   *Counsel for Non-Party Amicus Appellee*
   *Diamond Manufacturers and Importers Association of America*

Edward W. Harris, III, Esq.
Taft, Stettinius & Holister
One Indiana Square - Ste. 3500
Indianapolis, IN 46204

Robert A. Skirnick, Esq.
Meredity, Cohen, Greenfogel & Skirnick
One Liberty Plaza - 35th Fl.
New York, NY 10006

Jared Stamell, Esq.
Stamell & Schager
One Liberty Plaza -35th Fl.
New York, NY 10006
  *Cou*nsel *for Non Party-Appellees Anco Ind. Diamond Corp.; Amer Diamond Tool & Gauge Inc. And British Diamond Import Co.*

Cecilia L. Gardner, Esq.
Jewelers Vigilance Committee
25 West 45th Street - Ste. 1406
New York, NY   10035
  *Counsel for Non Party-Amicus Appellee Jewelers Vigilance Comm.*

Scott W. Browne, Esq.
Browne & Browne
2380 Eastex Freeway
Beaumont, TX   77703

Kenneth E. Nelson, Esq.
1100 Main Street - Ste. 2900
Kansas, City, MO   64105

Edward F. Siegel, Esq.
27600 Chagrin Blvd. - Ste. 340
Cleveland, OH   44122
  *Counsel for Non Party-Appellants William Benjamin*

*Coffey, Jr., Marvin L. Union, Tim Henning, Neil Freeman and Kylie Luke*

Christpher A. Bandas, Esq.
Bandas law Firm
500 North Shoreline - Ste. 1020
Corpus Christie, TX   78471
   *Counsel for Non Party-Appellant Aaron Petrus*

Robert E. Margulies, Esq.
Margulies Wind
3 Second Street
Plaza 10, Ste. 1201
Jersey City, NJ   07311

Jeffrey L. Weinstein, Esq.
518 E. Tyler Street
Athens, TX   75751
   *Counsel for Non Party-Appellant Janet Giddings*

Ricky E. Bagolie, Esq.
Bagolie Friedman Injury Lawyers
660 Newark Avenue
Jersey City, NJ   07306

Andrea Boggio, Esq.
Bryant University
1150 Douglas Pike - Ste. F
Smithfield, RI   02917
   *Counsel for Non Party-Appellants Frank Ascione,*
   *Rosaura Bagolie, Matthew Delong, Ed McKenna*
   *Peter Perera, Thomas Vaughan*

Robert J. Gaudet, Jr., Esq. **[ARGUED]**
RJ Gaudet & Associates
791 Fifth Avenue
Suite 7230
Seattle, WA  98104
   *Counsel for Non Party-Appellants Sandeep Gopalan,*
   *Manoj Kolel-Veetil, Matthew Metz, Anita Pal, Deb K. Pal,*
   *Jay Pal and Rangesh K. Shah.*

Eric L. Cramer, Esq.
Berger & Montague
1622 Locust Street
Philadelphia, PA  19103
   *Counsel for Non Party-Amicus Appellee*
   *American Antitrust Institute*

Kristen Dishman
16 14th Avenue
Wareham, MA   02571
   *Pro Se*

Margaret Marasco
14 Lakeview Avenue - #85
Lynn, MA   01904
   *Pro Se*

James B. Hicks
Hicks Parks
824 Wilshire Blvd. - Ste. 200
Los Angeles, CA   90017
   *Pro Se*

_____

OPINION OF THE COURT
_____

RENDELL, *Circuit Judge*, with whom *Circuit Judges*
SCIRICA, AMBRO, FUENTES, FISHER, CHAGARES
and VANASKIE, join.


At issue on appeal in this class action litigation is the propriety of the District Court's certification of two nationwide settlement classes comprising purchasers of diamonds from De Beers S.A. and related entities ("De Beers").[1] The settlement provided for a fund of $295 million to be distributed to both the direct and indirect purchasers: the direct purchasers were to receive $22.5 million of the fund, while the indirect purchasers would receive $272.5

_____

[1] The Settlement involved five individual class actions pending in federal court and two other class suits pending in state court. The individual federal suits presently before us are: *Sullivan v. DB Investments, Inc.*, Index No. 04-cv-02819 (D.N.J.); *Null v. DB Investments, Inc.*, Madison Co. No. 05-L-209 (Madison County, Ill. Cir. Ct., removed to S.D. Ill.); *Leider v. Ralfe*, No. 01-CV-3137 (S.D.N.Y.); *Anco Industrial Diamond Corp. v. DB Investments, Inc.*, No. 01-cv-04463 (D.N.J.); and *British Diamond Import Co. v. Central Holdings Ltd.*, No. 04-cv-04098 (D.N.J.). The two other class actions pending in state court pertinent to the Settlement and this set of appeals are: *Hopkins v. De Beers Centenary A.G.*, San Francisco County No. CGC-04-432954 (Cal. Super. Ct.), and *Cornwell v. DB Investments, Inc.*, Maricopa Co. No. CV2005-2968 (Ariz. Super. Ct.).

million. A panel of our Court held that the District Court's ruling was inconsistent with the predominance inquiry mandated by Federal Rule of Civil Procedure 23(b)(3), and remanded the matter for further proceedings. *See Sullivan v. DB Investments, Inc.*, 613 F.3d 134 (3d Cir. 2010), *reh'g en banc granted and vacated by Sullivan v. DB Investments, Inc.*, 619 F.3d 287 (3d Cir. 2010). We then granted the plaintiffs' petition for rehearing en banc and vacated the prior order. Accordingly, we address anew the propriety of the District Court's certification of the direct and indirect purchaser classes pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3), and also consider for the first time the objections raised to the fairness of the class settlement.[2]

We believe that the predominance inquiry should be easily resolved here based on De Beers's conduct and the injury it caused to each and every class member, and that the straightforward application of Rule 23 and our precedent should result in affirming the District Court's order certifying the class. But the objectors to the class certification and our dissenting colleagues insist that, when deciding whether to certify a class, a district court must ensure that each class member possesses a viable claim or "some colorable legal claim," (Dissenting Op. at 10). We disagree, and accordingly, we will reason through our analysis in a more

---

[2] Because the Panel found the certification of the class to be flawed, it did not reach the Rule 23 fairness objections to the settlement, distribution plan, and fee award, or the District Court's resolution of these objections. *See Sullivan*, 613 F.3d at 142 n.6. Because we now conclude that the District Court's certification of the proposed settlement was appropriate, we will also address these issues.

11

deliberate manner in order to explain why the addition of this new requirement into the Rule 23 certification process is unwarranted.

I. Factual & Procedural Background

A. *Present Litigation & Settlement Proceedings*

The allegations in the present case arose from De Beers's undisputed position as the dominant participant in the wholesale market for gem-quality diamonds throughout much of the twentieth century.[3] It is alleged that, beginning in 1890 and continuing through the filing of the Complaints at issue in this appeal, De Beers coordinated the worldwide sales of diamonds by, *inter alia*, executing output-purchase agreements with competitors, synchronizing and setting production limits, restricting the resale of diamonds within certain geographic regions, and directing marketing and advertising. Through its coordinated network of diamond producers, De Beers was able to value diamonds according to certain physical characteristics and to then control the quantity and prices of diamonds in the marketplace by strictly regimenting sales to preferred wholesalers, known as

_____

[3] The vacated Panel Opinion describes the history, progression to power, and eventual market dominance of De Beers and its related entities in greater detail. *See Sullivan*, 613 F.3d at 138-39. For the sake of brevity, we provide a summary.

"sightholders."[4]   Sightholders resold these diamonds to jewelry manufacturers and retailers – either as rough diamonds or as cut, polished, and finished stones – and constituted De Beers's primary channel for distribution of its diamonds.[5]

Between 2001 and 2002, plaintiffs brought suit complaining that De Beers's aforementioned business

---

[4] Sightholders are selected by De Beers's subsidiary Diamond Trading Company ("DTC") based upon specific criteria, "including their financial standing and reliability, their market position, their distribution ability, their marketing ability, and their compliance with Diamond Trading Company Diamond Best Practice Principles." (App'x 1438.)  In 2006, DTC had ninety-three sightholders, nine of which had head offices in the United States and seventy-six of which had sales offices in the country.  (*Id.*) Sightholders sell both rough and polished diamonds, as well as diamond jewelry.  (*Id.*)  By way of example, the retailer Tiffany & Co. is a majority-owner of the South African sightholder Rand Precision Cut Diamonds, which sells polished diamonds and manufactures jewelry for sale in Tiffany stores. (*Id.* 1438-39.)

[5] The process by which De Beers sold its rough diamonds entailed a "diamond pipeline," which began with the sale of rough diamonds and ended with the purchase of retail diamond jewelry by consumers.  The participants in the diamond pipeline included rough stone wholesalers, cutters and polishers of rough diamonds, finished stone wholesalers, diamond jewelry manufacturers and wholesalers, and retailers.

practices contravened state and federal antitrust, consumer protection, and unjust enrichment laws, and constituted unfair business practices and false advertising under common law and relevant state statutes. Specifically, the plaintiffs alleged that De Beers exploited its market dominance to artificially inflate the prices of rough diamonds; this, in turn, caused reseller and consumer purchasers of diamonds and diamond-infused products to pay an unwarranted premium for such products. The initial two price-fixing lawsuits were filed in the United States District Courts for the District of New Jersey and the Southern District of New York in 2001, and five subsequent lawsuits were initiated in federal and state courts in other parts of the country.[6] Three of the lawsuits

---

[6] The theories of recovery in the individual cases are as follows: *Anco Industrial* was filed on behalf of all direct purchasers of rough diamonds pursuant to Clayton Act §§ 4 and 16, 15 U.S.C. §§ 15 and 26, to prevent and restrain violations of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2. *British Diamond* was filed on behalf of direct purchasers of polished diamonds pursuant to Clayton Act §§ 4 and 16, 15 U.S.C. §§ 15 and 26, to prevent and restrain violations of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2. *Cornwell* was filed on behalf of all purchasers of diamonds in Arizona pursuant to Ariz. Rev. Stat. Ann. § 44-1402 for monopolization of the market for diamonds, and under § 44-1403 for establishment, maintenance or use of monopoly. *Hopkins* was filed on behalf of California residents who purchased diamonds in California pursuant to Cal. Bus. & Prof. Code § 16720, *et seq.*, alleging engagement in a continuing unlawful restraint of trade; pursuant to § 17200, *et seq.*, for violation of the unfair competition law; and under California common law for monopolization and attempted

14

were filed in state court in Arizona, California, and Illinois, respectively; the last was then removed to the United States District Court for the Southern District of Illinois. The five suits in federal court were subsequently all transferred to and consolidated in the United States District Court for the District of New Jersey, and are presently before us.

The plaintiffs in the seven cases are best characterized as falling within one of two types of purchaser classes. The first category includes direct purchasers of gem diamonds, who purchased directly from De Beers or one of its

---

monopolization. *Leider* was filed on behalf of consumers who purchased diamonds or diamond jewelry pursuant to the Wilson Tariff Act, 15 U.S.C. §§ 8-11; under § 16 of the Clayton Act, 15 U.S.C. § 26, for injunctive relief in connection with §§ 1 and 2 of the Sherman Act, and for damages for violations of § 2 of the Sherman Act; pursuant to federal and New York state common law for damages and injunctive relief; under N.Y. Gen. Bus. §§ 349-350; and under New York's Donnelly Act and the antitrust laws of fifteen other states and the District of Columbia. *Null* was filed on behalf of all purchasers of De Beers diamonds pursuant to 815 Ill. Comp. Stat. § 505/1, *et seq.*, and § 510/2, alleging unfair methods of competition and unfair or deceptive acts or practices, and, in the alternative, pursuant to the consumer fraud and deceptive practice laws of the various states where purchases of diamonds were made. *Sullivan* was filed on behalf of a class of all persons and businesses in the United States who purchased polished diamonds indirectly from De Beers pursuant to §§ 1 and 2 of the Sherman Act for injunctive relief, and pursuant to state antitrust and deceptive practices acts for monetary relief.

competitors ("Direct Purchaser Class" or "Direct Purchasers"). These plaintiffs advanced claims of price-fixing and monopolization pursuant to §§ 1 and 2 of the Sherman Act, and sought monetary and injunctive relief under §§ 4 and 16 of the Clayton Act. The second category of plaintiffs consists of indirect purchasers of rough or cut-and-polished diamonds; this category of consumers, jewelry retailers and other middlemen acquired diamonds from sightholders or other direct purchasers, rather than directly from De Beers or its competitors ("Indirect Purchaser Class" or "Indirect Purchasers"). While both categories of purchasers alleged the same antitrust injury and sought injunctive relief pursuant to § 16 of the Clayton Act, the Indirect Purchasers sought damages pursuant only to state antitrust, consumer protection, and unjust enrichment statutes and common law.

As it had for well over a half-century, De Beers initially rejected the plaintiffs' assertion that courts in the United States possessed personal jurisdiction over it and its associated entities, arguing that it never transacted business directly in the United States. De Beers refused to appear in the lawsuits, resulting in defaults or default judgments being entered against it in each of the filed cases with the exception of *Cornwell*. While continuing to insist that these default judgments were unenforceable, counsel for De Beers approached plaintiffs' counsel in May 2005 to discuss settlement of the Indirect Purchasers' claims. These discussions yielded an agreement to settle *Sullivan*, *Hopkins*, *Null*, and *Cornwell* (the "Indirect Purchaser Settlement"), with De Beers agreeing to establish a settlement fund of $250 million to be distributed to class members, and further agreeing not to contest certification of a settlement class of

16

indirect purchasers.[7]   The settlement also provided for a stipulated injunction, enjoining De Beers from engaging in certain conduct violative of United States antitrust laws. Pursuant to the settlement, De Beers would consent to the District Court's jurisdiction for the limited purpose of fulfilling the terms of the settlement and enforcement of the injunction.

The District Court entered an order on November 30, 2005, preliminarily approving the Indirect Purchaser Settlement and conditionally certifying a settlement class of Indirect Purchasers pursuant to Federal Rule of Civil Procedure 23(b)(2) – for purposes of entering the stipulated injunction – and 23(b)(3) – in order to distribute the settlement fund to class members.

De Beers then entered into settlement discussions with plaintiffs' counsel for the Direct Purchasers in *Anco* and *British Diamond*, ultimately reaching an agreement in March 2006.  The latter agreement paralleled the Indirect Purchaser Settlement in that De Beers agreed to not contest certification of a Direct Purchaser settlement class, to abide by substantively identical injunctive relief as imposed under the Indirect Purchaser Settlement, and to establish a $22.5 million fund to satisfy the Direct Purchasers' claims.  As part of this settlement, De Beers also agreed to increase the Indirect Purchaser Settlement fund by $22.5 million to accommodate those putative class members characterized as Indirect Purchasers in the lawsuits filed by the Direct Purchasers who had not participated in the Indirect Purchaser Settlement.

---

[7] The *Leider* plaintiffs subsequently reached agreement with the parties to the Indirect Purchaser Settlement to resolve that matter in accordance with the terms of the Settlement.

On March 31, 2006, the District Court modified its November 30, 2005 Order to conditionally certify both the Direct and Indirect Purchaser settlement classes under Rules 23(b)(2) and 23(b)(3), and to preliminarily approve a combined settlement fund for both classes totaling $295 million, of which $22.5 million was allotted to Direct Purchasers and $272.5 million was allocated to the Indirect Purchaser claims. The combined settlement also provided for entry of a stipulated injunction, which required De Beers to, *inter alia*, comply with and abide by federal and state antitrust laws, to limit its purchases of diamonds from third-party producers, to abstain from setting or fixing the prices of diamonds sold by third-party producers, to desist from restricting the geographic regions within which sightholders could resell De Beers diamonds, and barred De Beers from purchasing diamonds in the United States for the principal purpose of restraining supply. Notably, De Beers agreed to subject itself to personal jurisdiction in the United States for purposes of enforcing the combined settlement agreement.

## B. Special Master & Objections

After granting preliminary approval to the combined settlement agreement, the District Court referred the case to a Special Master pursuant to Rules 23, 53, and 54 of the Federal Rules of Civil Procedure to consider and recommend a plan for dissemination of the Notice of Settlement, a distribution plan for members of the Indirect and Direct Purchaser settlement classes, division of the fund between the Indirect Purchaser reseller and consumer subclasses, the amount of incentive awards for named plaintiffs, and the fee requests filed by plaintiffs' counsel. After two years of proceedings, the Special Master authored several lengthy Report and Recommendations finding the settlement fair,

reasonable, and adequate based upon the parties' agreement to seek the certification of the following two nationwide Settlement Classes:

(i) The "Direct Purchaser Class." All natural persons and legal entities located in the United States who purchased any Gem Diamond directly from a Defendant or Defendants' Competitors (including any entity controlled by or affiliated with any such party) from September 20, 1997 to the date of settlement class certification. The class shall exclude Defendants, the officers, directors or employees of any Defendant, any entity in which any Defendant has a controlling interest, any affiliate of any Defendant, Defendants' Competitors, any person or entity which is or was a Sightholder for the time period(s) during which such person or entity had Sightholder status, any federal, state or local governmental entity, and any judicial officer presiding over this Settlement, and any member of the judicial officer's family and court staff; and

(ii) The "Indirect Purchaser Class." All natural persons and legal entities located in the United States who purchased any Diamond Product from January 1, 1994 to the date of settlement class certification, provided that any purchases of any Gem Diamond made directly from a Defendant (including any entity in which any Defendant has a controlling interest and any affiliate of any Defendant) or Defendants' competitors (including any entity controlled by

19

or affiliated with any such party) shall be excluded. The class shall also exclude Defendants, the officers, directors or employees of any Defendant, any entity in which any Defendant has a controlling interest, any affiliate of any Defendant, any federal, state or local governmental entity, and any judicial officer presiding over this Settlement, and any member of the judicial officer's family and court staff.

(App'x 270 (quoting September 4, 2007 Report and Recommendation of Special Master Alfred M. Wolin ("R&R") at 21, App'x 1433-34).) The Indirect Purchaser Class was further subdivided into two subclasses for purposes of effectuating the Settlement Agreement:

(1) The "Indirect Purchaser Reseller Subclass," consisting of all members of the Indirect Purchaser Class who purchased any diamond product for resale; and

(2) The "Indirect Purchaser Consumer Subclass," consisting of all members of the Indirect Purchaser Class who purchased any diamond product for use and not for resale.

(*Id.* 270-71.)[8]

---

[8] The Indirect Purchaser Consumer Subclass is estimated to contain between 67 and 117 million members, while the Indirect Purchaser Reseller Subclass contains an estimated 38,152 members. The Direct Purchaser Class is estimated to contain approximately 130 members. (App'x 275 n.1.)

After reviewing the record, the competing econometric reports furnished by several experts, and other reliable data, the Special Master recommended that, apart from the $22.5 million allocated to the Direct Purchaser Class,[9] the Indirect Purchaser Settlement Fund of $272.5 million should be allocated 50.3%, approximately $137.1 million, to the Resellers Subclass, and 49.7%, approximately $135.4 million, to the Consumers Subclass.[10] (App'x 1508.) Unlike Direct

[9] The Special Master advised that distribution of the Direct Purchaser Settlement Fund be conducted on a pro rata basis and that each Direct Class member receive the Net Settlement amount multiplied by the quotient of the Adjusted Purchases of the claimant divided by the aggregate Adjusted Purchases of all approved direct purchaser claims. The Adjusted Purchases of a claimant would be calculated by multiplying the amount paid for Rough Diamonds by 1.22 (the average Rough to Polished Matrix factor), and adding the total amount paid for Polished Diamonds. (App'x 1533-34.)

[10] The Special Master recommended that the Indirect Purchaser Consumer Subclass receive a pro rata share of the Indirect Purchaser Settlement Fund, calculated by multiplying the Net Consumer settlement fund amount by the quotient of a consumer's total recognized diamond claim divided by the total recognized diamond claims of all consumers. (App'x 1547.) In contrast, a Reseller Subclass member's claim would be calculated in a three step process: (1) all of the claimant's diamond purchases are converted to the common metric of polished wholesale value and adjusted to reflect the number of years each Reseller operated during the class period; (2) claims are weighted by applying the absorption weighting factor derived from a fixed effects regression

21

Purchasers, who purchased diamonds only, Indirect Purchasers generally purchased jewelry and other products containing diamonds; given this, the Special Master attempted to ascertain the cost of the diamonds in the final purchased product separate and apart from the cost of other components. The Special Master further recommended that claims that would result in *de minimis* recoveries from the settlement fund – equating to less than ten dollars[11] – not be paid in light of high administrative costs.[12]

With respect to plaintiffs' counsel's request for

analysis for each type of diamond purchase; and (3) the claimant's pro rata share of the Reseller Subclass settlement fund is the ratio of the claimant's "absorption adjusted purchases" to the sum of all claimants' "absorption adjusted purchases." (*Id.* 1575.)

[11] The Special Master's report noted that Indirect Purchaser Consumer claims aggregating less than $165 for mixed stone jewelry or products, and less than $95 for diamond only jewelry or products, would be considered *de minimis.* (App'x 1547-48.)

[12] Additionally, the Special Master recommended a four-part notification program – entailing direct notice, publication notice, "earned media outreach" in the form of press releases and news reporting, and electronic notice – finding that it provided notice "in a reasonable manner to all class members who would be bound by the proposed settlement." (App'x 1518-27 (quoting Fed. R. Civ. P. 23(e)).) The District Court adopted this recommendation and method of notification in its October 1, 2007 Order.

22

attorneys' fees and reimbursement of litigation expenses, the Special Master recommended a percentage of recovery approach with a lodestar cross-check, and concluded that the request for 25% of the settlement fund in fees, and for under 1% of the fund in expenses, was fair, reasonable, and adequate.[13]   The Special Master further decided that the $220,000 in incentive awards sought on behalf of class representatives was appropriate in light of the benefits conferred upon the class and the risks incurred in engaging in litigation.

In response to the preliminary certification of the Settlement Agreement and the Special Master's recommendations, the District Court received twenty separate objections on behalf of thirty-seven objectors.  All of the objectors were members of the Indirect Purchaser Class; none of the Direct Purchasers objected to the Settlement.[14]  Fifteen of the twenty objections opposed class certification of the settlement, four objected to the stipulated provision for injunctive relief, six opposed the allocation and distribution of the Settlement Funds, and nine objected to the provisions for attorneys' fees.  As required by the Federal Rules, the District Court conducted a Fairness Hearing in the matter on April 14, 2008.  Fed. R. Civ. P. 23(e)(2).

The objectors challenging the propriety of certifying

---

[13]   The District Court rejected the Special Master's recommendation of adding a percentage of the interest earned on the total settlement fund to the total attorneys' fees.

[14] Four objectors were members of the Indirect Purchaser Reseller Subclass and thirty-three objectors belonged to the Indirect Purchaser Consumer Subclass.  (App'x 272.)

the two settlement classes raised two primary arguments. First, the objectors contended that a nationwide class of Indirect Purchasers should not be certified under Rule 23(b)(3) for purposes of administering a monetary settlement of state law claims because significant differences existed among the various antitrust, consumer protection, and unjust enrichment laws of the relevant state jurisdictions. Specifically, the objectors argued that the substantive law of many states prohibits indirect purchasers from recovering damages for antitrust injuries, exposing the class to particularized legal variations and precluding a finding that common questions of law or fact predominated over individual issues.[15]  Second, the objectors challenged the certification of both Direct and Indirect Purchaser classes for purposes of implementing injunctive relief pursuant to Rule 23(b)(2).  The objectors asserted that the market for rough gem diamonds had become competitive during the course of the instant litigation, rendering an injunction to enforce compliance with antitrust laws superfluous, and divesting the Indirect Purchasers of antitrust standing to seek relief.

Other objections challenged the fairness and adequacy of the Settlement and the plan of allocation for the Indirect Purchaser Settlement Fund as between the Reseller and Consumer Subclasses, averring that each class member would

---

[15] A related objection was filed on grounds that the equal allocation of the Indirect Purchaser Settlement Fund without consideration of a claimant's state of controlling law was improper since some states purportedly prohibited recovery by indirect purchasers.  These objectors asserted that class members from states permitting indirect purchaser recovery should be entitled to greater monetary compensation.

collect only $1-2 in exchange for their full release of claims against De Beers if every single putative class member requested compensation; also, they might receive nothing under the *de minimis* provision in the Settlement. Objectors also urged that the award of attorneys' fees to plaintiffs' counsel was excessive and unreasonable in a default judgment case with minimal litigation.

## C. Acceptance and Certification of Class Settlement

In its May 22, 2008 Opinion, the District Court considered and rejected each of the objections. Responding to the Rule 23(b)(3) objections, the Court concluded that differences in state antitrust and consumer protection statutes did not override class commonalities. Observing that "'predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws,'" (App'x 276 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997))), the District Court noted that "at the class certification stage, the Court need not concern itself with whether Plaintiffs can prove their allegations" so long as they "'make a threshold showing that the elements of impact will predominantly involve generalized issues of proof, rather than questions which are particular to each member of the plaintiff class,'" (*id.* 277 (quoting *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 152 (3d Cir. 2002)).) In this regard, the District Court presented the following operative factual and legal inquiries that, in its view, constituted common questions that predominated over individual issues in the litigation:

> (a) Whether Defendants combined or conspired with others to fix, raise, stabilize and maintain the prices of polished diamonds;

25

(b)     Whether Defendants monopolized or combined or conspired with others to monopolize the supply of polished diamonds;

(c)     Whether Defendants' conduct caused the prices of polished diamonds to be maintained at higher levels than would exist in a competitive market;

(d)     Whether Plaintiffs and the Classes are entitled to injunctive relief; and

(e)     Whether Defendants' conduct caused injury to the business or property of Plaintiffs and the other Class and Subclass Members and, if so, the appropriate class-wide measure of damages.

(App'x 276 (alterations omitted).)  The District Court also stressed that all class members shared a common jurisdictional question pertaining to De Beers's refusal to submit to the jurisdiction of United States courts and the potential burden of confirming domestic contacts for purposes of establishing personal jurisdiction.  (*Id.* 279.)

Considering the nature of De Beers's central role in the alleged diamond conspiracy, the Court determined that each class member shared "a similar legal question arising from whether De Beers engaged in a broad conspiracy" aimed at affecting diamond prices in the United States; concurrently, all class members shared common factual issues pertaining to the form, duration, and extent of the conspiracy.  (App'x 278-

26

79.) The Court concluded that the totality of common issues predominated over individual questions, and, as a result, the objectors' assertion that disparities in state law precluded a nationwide class settlement was unavailing. In its analysis, the Court emphasized the expense, complexity, and imprecision of weighing the relative strengths of different state law claims, the policy interest in securing an expedient resolution to the disparate claims of the Direct and Indirect Purchasers, and De Beers's insistence upon a release of all potential damage claims in all fifty states.

With respect to the Rule 23(b)(2) analysis for injunctive relief, the District Court rejected the objectors' assertion that both of the purchaser classes faced no risk of future harm. The Court observed that De Beers had stipulated to the injunction and "waived the right to demand proof of substantive elements of the claims" advanced by plaintiffs, namely, that De Beers's ongoing conduct would continue to anti-competitively increase the price of all diamonds on the market. (App'x 285.) Accordingly, the Court determined that injunctive relief was appropriate and would benefit all classes and subclasses.

Having ruled that the Rule 23(b) elements were satisfied, the District Court then responded to the other objections relating to the fairness and adequacy of the Settlement and the plan of allocation and distribution, as well as to objections pertaining to attorneys' fees. The District Court conducted a fairness evaluation of the final settlement by applying and weighing the fairness factors set forth in *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975), "being mindful of the heightened standard of review in place for a settlement-only class that has not yet been entirely certified." (App'x 288-89.) The Court concluded that the final settlement

27

agreement and the plan of allocation were fair, reasonable, and adequate. The District Court also reviewed the attorneys' fees application pursuant to *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190 (3d Cir. 2000), similarly finding the Special Master's recommendation for 25% of the settlement fund in fees to be fair, reasonable, and adequate.

Accordingly, the District Court entered a final order on May 22, 2008, certifying the Direct and Indirect Purchaser Classes under Rules 23(b)(2) and 23(b)(3). The Direct Purchaser Class consists of all sightholders who purchased rough gem diamonds directly from De Beers between September 20, 1997 and March 31, 2006. The Indirect Purchaser Class includes all Indirect Purchasers who acquired gem diamonds between January 1, 1994 and March 31, 2006, regardless of whether De Beers or one of its competitors supplied the diamonds.[16] The Court's order further included the previously agreed-upon injunction, which is to remain in effect for five years from the date of its issuance. The objectors then filed the appeals presently before us.

## D. Proceedings On Appeal

On appeal, a divided panel of this Court initially determined that the District Court abused its discretion in certifying the nationwide class of litigants. We vacated this Opinion and granted rehearing en banc. While we do not

---

[16] As the Panel Opinion noted, the parties did not explain, nor did the record reveal, any reason for the disparity in the time periods covered by the Settlement between the Indirect and Direct Purchaser classes. *See Sullivan*, 613 F.3d at 143 n.8. We do not consider this difference pertinent to the appeals.

usually discuss the analysis contained in a vacated opinion, we do so here because the Panel's decision reflected, accepted, and elaborated upon one or more of the views advanced by the objectors, with which we take issue. Our dissenting colleagues also embrace certain of these views.

Addressing the objectors' challenge to the District Court's finding of predominance under Rule 23(b)(3), the Panel undertook a wide-ranging fact-finding review of state antitrust statutes, noting that the variance among states "is mainly a function of whether a state has chosen to follow the Sherman Act principles regarding standing laid down by the Supreme Court in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977)." *Sullivan*, 613 F.3d at 146. There, the Supreme Court decided that only direct purchasers possessed standing under the federal Sherman Act to sue for monetary damages incurred from an antitrust injury. The Panel observed that some states follow this framework and prohibit monetary recovery for indirect purchasers, while other states have enacted statutes known as "*Illinois Brick* repealers," which extend antitrust standing to indirect purchasers and consumers.[17] *Id.* As a result, the Panel found that "only some of th[e] jurisdictions recognize the claims for which recovery is sought," and that such distinctions reflected "fundamental policy differences among the several states." *Id.* at 147, 149. Based on its belief that many members of the Indirect Purchaser Class lacked a substantive right to recover damages, the Panel decided that "no question of law or fact

---

[17] Based on its assessment, the Panel found that at least twenty-five states and the District of Columbia possess *Illinois Brick* repealer statutes or have judicially extended antitrust standing to indirect purchasers.

regarding their legal rights is uniform throughout the class," thereby defeating a finding of predominance. *Id.* at 149.

The Panel then considered the various state consumer protection and unjust enrichment claims implicated by the District Court's certification, again noting several variations among jurisdictions: differences in whether indirect purchasers may invoke consumer protection and unjust enrichment statutes to gain antitrust relief; variations in the extent of elements of proof necessary to establish unjust enrichment or consumer fraud; and dissimilarities in whether a plaintiff must lack an adequate remedy at law to bring an equitable claim. *Id.* at 150-51. Based upon these discrepancies, the Panel decided that "evidence of price-fixing and monopolization does not give rise in every state to an unjust enrichment or consumer protection claim for indirect purchasers," defeating predominance and rendering the District Court's certification of a nationwide class an abuse of discretion. *Id.* at 151.

The Panel further observed that the District Court's certification order contravened the Rules Enabling Act, 28 U.S.C. § 2072(b), by extending antitrust remedies not rooted in state substantive law to putative class members. *Id.* The Panel expressly rejected the plaintiffs' argument that De Beers's willingness to stipulate to liability in all fifty states should suffice for the District Court's predominance inquiry, holding instead that such an approach would invite collusive settlements. *Id.* In the same vein, the Panel expressed concern that the District Court sacrificed principles of federalism in favor of obtaining an expedient settlement by certifying the nationwide class "despite the fact that only some of those jurisdictions recognize the claims for which recovery is sought." *Id.* at 152. Finding that certain states

30

categorically deny to indirect purchasers a right to antitrust recovery as a matter of substantive law, the Panel concluded that the instant certification "wrongly allowed the sovereignty of the states to be subordinated to De Beers's desire to resolve all indirect purchaser claims simultaneously." *Id.*

Finally, the Panel rejected the District Court's certification of the Indirect Purchaser Class under Rule 23(b)(2) for the purpose of awarding injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26. Relying upon expert reports written to identify a methodology for calculating damages, the Panel concluded that De Beers's market share fell from approximately 65% in 2000 to 45% in 2006, and determined that, as a result, plaintiffs face "no significant threat of future antitrust harm in the absence of the injunction because . . . the market has become increasingly competitive from 2006 onward." *Id.* at 157-58. Accordingly, the Panel found that plaintiffs lacked antitrust standing under § 16 of the Clayton Act and vacated the District Court's order certifying the injunctive class.

The Panel Opinion remanded the matter to the District Court to consider whether "a more limited class of indirect purchasers is appropriate under Rule 23," and instructed the District Court to more precisely identify "a readily discernible, clear, and complete list of the claims, issues or defenses to be treated on a class basis." *Id.* at 154 (quoting Fed. R. Civ. P 23(c)(2)). The Panel noted that the Court failed to clearly delineate the precise state law claims subject to class treatment and did not explicitly state whether the claims advanced apply to the Indirect Purchasers' antitrust, consumer protection, or unjust enrichment claims, or to some combination of the three. Accordingly, the Panel directed the District Court to "identify with particularity both the

prerequisites for membership in the class and the issues or claims that will be resolved on a class-wide basis." *Id.* at 155.

In response, Appellees Shawn Sullivan, Arrigotti Fine Jewelry, and James Walnum petitioned for rehearing, urging that the Panel Opinion was inconsistent with our precedent governing class action settlements. In support, they raised several arguments. First, they contended that the Panel's demand that all class members assert at least one "uniform" claim in order for disparate state claims to be settled at once contravened our clear holdings in *Warfarin* and *Prudential*. (*See* Pet. of Appellees for Reh'g or Reh'g En Banc 2.) Next, they urged that the Panel's extensive inquiry into the legal viability of plaintiff's claims at the class certification stage improperly adjudicated the merits of the asserted claims and undermined the "strong judicial policy in favor of class action settlement." (*Id.* (citation omitted).) Finally, the Appellees observed that the Panel's methodology supplanted the District Court as primary fact-finder and unilaterally reached factual conclusions based upon evidence unrelated to the subject at issue. (*Id.* 3-4.)

We granted the petition for the entire Court to address these issues.

## II. Jurisdiction And Standard of Review

The District Court exercised federal question jurisdiction over the Direct Purchasers' Sherman Act antitrust claim for damages pursuant to § 4 of the Clayton Act, 15 U.S.C. § 15, and over both the Direct and Indirect Purchasers' claims for injunctive relief under § 16 of the same Act, 15 U.S.C § 26. Original jurisdiction over the federal claims also arose under 28 U.S.C. §§ 1331 and 1337(a). The District

32

Court possessed supplemental jurisdiction over the Indirect Purchasers' state-law antitrust, consumer protection, and unjust enrichment claims pursuant to 28 U.S.C. § 1367. We review final orders of the District Court pursuant to 28 U.S.C. § 1291.

"Our role as an appellate court is to ascertain whether or not the trial judge clearly abused his or her discretion in approving or rejecting a settlement agreement." *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 593 (3d Cir. 2010). A district court abuses its discretion if its "'decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact.'" *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 312 (3d Cir. 2008) (quoting *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 783 (3d Cir. 1995) ("*GM Truck*")). "If the court's analysis on these points is correct, [however,] then 'it is fair to say that we will ordinarily defer to its exercise of discretion' embodied in the findings on predominance and superiority.'" *Linerboard*, 305 F.3d at 149-50 (quoting *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 448 (3d Cir. 1977)); *see also United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union v. ConocoPhillips Co.*, 593 F.3d 802, 807 (9th Cir. 2010) ("We review . . . the underlying determination whether the predominance requirement of Rule 23(b)(3) has been satisfied for abuse of discretion.") (citation omitted). "Whether an incorrect legal standard has been used is an issue of law to be reviewed *de novo*." *Id.* (citation omitted).

The District Court's "determination that the settlement was fair, reasonable, and adequate" is likewise reviewed for abuse of discretion. *In re Cendant Corp. Litig.*, 264 F.3d 201, 231 (3d Cir. 2001).

33

III. Discussion

At issue on appeal is the District Court's approval of the class settlement agreement and certification of the Indirect Purchaser Class pursuant to Rule 23(b)(3) and both the Direct and Indirect Purchaser Classes under Rule 23(b)(2). We begin by discussing the standards for certifying a settlement class and will address the pertinent objections in light of the District Court's – and the vacated Panel's – Opinions. We will then consider the objections pertaining to the fairness of the settlement, the plan of allocation, and the attorneys' fees award, which we have not previously addressed.[18]

A. *Certification Pursuant to Rule 23*

As we have consistently observed, "Rule 23 is designed to assure that courts will identify the common interests of class members and evaluate the named plaintiffs' and counsel's ability to fairly and adequately protect class interests." *In re Comm. Bank of N. Va.*, 622 F.3d 275, 291 (3d Cir. 2010) ("*Comm. Bank II*") (quoting *GM Truck*, 55 F.3d at 799) (alterations omitted). In turn, before approving a class settlement agreement, "a district court first must determine that the requirements for class certification under Rule 23(a) and (b) are met." *In re Pet Food Prods. Liab.*

---

[18] As mentioned above, because the Panel concluded that certification was inappropriate, it did not reach the Special Master's recommendations or the objections to the distribution plan and fee award. *Sullivan*, 613 F.3d at 142 n.6. In light of our finding that class certification is appropriate, we assess these objections for the first time.

*Litig.*, 629 F.3d 333, 341 (3d Cir. 2010). Rule 23(a) contains four threshold requirements, which every putative class must satisfy:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *see also Amchem*, 521 U.S. at 613. Upon finding each of these prerequisites satisfied, a district court must then determine that the proposed class fits within one of the categories of class actions enumerated in Rule 23(b).

As mentioned, Rule 23(b)(2) authorizes class actions seeking injunctive relief in instances where the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2); *see In re Comm. Bank of N. Va.* (*Comm. Bank I*), 418 F.3d 277, 302 n.14 (2005). Separately, certification pursuant to Rule 23(b)(3) seeking monetary compensation is permitted where (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see Collins v. E.I. DuPont de Nemours & Co.*, 34 F.3d 172, 180 (3d Cir. 1994). These twin requirements are commonly referred to as

predominance and superiority. We address the certification of the damages class first before turning to the certification for injunctive relief.

### 1. Predominance of Common Legal or Factual Issues Under Rule 23(b)(3)

The objectors challenge the District Court's Rule 23(b)(3) analysis with regard to the state law claims asserted by the Indirect Purchasers against De Beers. The District Court concluded that differences in state law did not override predominantly common factual and legal issues presented by De Beers's integral role in perpetuating the alleged conspiracy. Rejecting this view, the objectors argue that the existence of substantive variations in the state antitrust laws underlying the Indirect Purchaser damages claims should preclude a court from finding that common issues affecting the class as a whole predominate. They also urge that differences among state consumer protection and unjust enrichment laws would likewise preclude a finding of predominance. Our dissenting colleagues focus on this issue as well, and adopt a specific requirement that every class member has "some colorable legal claim" in order for a district court to certify a class. (Dissenting Op. at 10.) In our view, this requirement would result in a radical departure from what Rule 23 envisions and what our precedent demands, and it founders for many reasons.[19]

#### *a. Legal Framework*

---

[19] The objectors also challenge the District Court's purported failure to identify the state law claims that should receive class treatment under the existing certification order, as we discuss below.

The predominance inquiry "'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation,'" *In re Ins. Broker. Antitrust Litig.*, 579 F.3d 241, 266 (3d Cir. 2009) (quoting *Amchem*, 521 U.S. at 624), and assesses whether a class action "would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated," Fed. R. Civ. P. 23(b)(3) advisory committee's note to 1966 amendment. *See also* 2 William Rubenstein, Alba Conte & Herbert Newberg, Newberg on Class Actions, § 4:25 (4th ed. 2010) ("[T]he predominance test asks whether a class suit for the unitary adjudication of common issues is economical and efficient in the context of all the issues in the suit."). Parallel with Rule 23(a)(2)'s commonality element, which provides that a proposed class must share a common question of law or fact, Rule 23(b)(3)'s predominance requirement imposes a more rigorous obligation upon a reviewing court to ensure that issues common to the class predominate over those affecting only individual class members. *Ins. Broker.*, 579 F.3d at 266. "Hence, we consider the Rule 23(a) commonality requirement to be incorporated into the more stringent Rule 23(b)(3) predominance requirement, and therefore deem it appropriate to 'analyze the two factors together, with particular focus on the predominance requirement.'" *Id.* (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3d Cir. 2004)); *see also Danvers Motor Co., Inc. v. Ford Motor Co.*, 543 F.3d 141, 148 (3d Cir. 2008) ("[T]he commonality requirement is subsumed by the predominance requirement.").

From our case law, we can distill at least three guideposts that direct the predominance inquiry: first, that commonality is informed by the defendant's conduct as to all

37

class members and any resulting injuries common to all class members; second, that variations in state law do not necessarily defeat predominance; and third, that concerns regarding variations in state law largely dissipate when a court is considering the certification of a settlement class. We address each of these guideposts in turn. Then, we turn to case law demonstrating that Rule 23(b)(3) does not, as urged by the objectors and the dissent, require individual class members to individually state a valid claim for relief. Next, we address the flaws inherent in the framework proposed by the dissent. Finally, we discuss why an important by-product of the class action device – settlement of all potential claims – supports the decision we reach here.

### i)  Precedent Regarding Predominance: Defendant's Conduct and Class Members' Injuries

Our precedent provides that the focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct. Our reasoning in *Warfarin* is instructive on this point. The claims asserted there were remarkably similar to the specific claims at issue here. There, we considered the propriety of the certification of a settlement class arising out of DuPont Pharmaceuticals' alleged dissemination of misleading information about a competitor's product. 391 F.3d at 522. The plaintiffs averred that DuPont engaged in anticompetitive conduct that allowed it to maintain a 67% market share and to charge supracompetitive prices, in violation of federal antitrust law, the antitrust statutes of

38

*Illinois Brick* repealer states,[20] the consumer protection and deceptive practices statutes of all fifty states and the District of Columbia, and the common law prohibitions on unjust enrichment and tortious interference of every jurisdiction. *Id.* at 523-25. After reaching a class settlement with the defendant and receiving the district court's preliminary approval, objections were lodged contesting the certification of a single nationwide class of plaintiffs. The objectors argued that such certification was inappropriate due to inconsistencies in state antitrust and consumer fraud statutes' provision of statutory standing to assert antitrust claims and eligibility for treble or punitive damages recovery, and the relative weakness of certain consumer claims. *Id.* at 529-31.

Guided by the Supreme Court's observation that "[p]redominance is a test readily met in certain cases alleging consumer[ ] fraud or violations of the antitrust laws," we stated:

> This case falls squarely into that category: plaintiffs have alleged that DuPont engaged in a broad-based campaign, in violation of federal and state consumer fraud and antitrust laws, to deceive consumers, TPPs, health care professionals, and regulatory bodies into believing that generic warfarin sodium was not an equivalent alternative to Coumadin. These allegations naturally raise several questions of law and fact common to the entire class and which predominate over any issues related to

---

[20] As mentioned, certain states have enacted statutes known as "*Illinois Brick* repealers," which extend antitrust standing to indirect purchasers and consumers. *See supra* n.17.

39

individual class members, including the unlawfulness of DuPont's conduct under federal antitrust laws as well as state law, the causal linkage between DuPont's conduct and the injury suffered by the class members, and the nature of the relief to which class members are entitled.

*Id.* at 528. In light of DuPont's allegedly deceptive "broad-based, national campaign conducted by and directed from corporate headquarters," we emphasized that proof of liability of DuPont's conduct "depends on evidence which is common to the class members" because "liability depends on the conduct of DuPont, and whether it conducted a nationwide campaign of misrepresentation and deception, [and] does not depend on the conduct of individual class members." *Id.* As a result, we affirmed the District Court's ruling that class members shared predominantly common issues as to the conduct of the defendants despite possessing claims arising under differing state laws. *Id.* at 530.[21]

---

[21] Contrary to the objectors' and the Panel's view that *Warfarin*'s analysis is inapplicable because the plaintiffs in that case purportedly shared a common claim under the Delaware Consumer Fraud Act, our holding in *Warfarin* did not address the Delaware statute in analyzing predominance. 391 F.3d at 528-29. Indeed, *Warfarin* did not consider whether every class member even possessed a claim under Delaware law, nor did it undertake a choice-of-law analysis to determine whether all members in the nationwide class could assert a claim under the Delaware statute. Rather, we simply concluded that any claims arising under the varying state laws and the Delaware statute could be proved with common

We applied a similar approach in *Insurance Brokerage*, where, in evaluating a challenge to certification of a settlement class on the basis of predominance, we determined that the elements of a Sherman Act violation for concerted anticompetitive activity focused upon "the conduct of the defendants." 579 F.3d at 268. Noting the presence of several shared questions of law and fact – including, among others, whether the defendants conspired to allocate a particular market, whether the conduct actually reduced competition in the market by consolidating the industry, and whether the conspiratorial conduct raised premiums for all members of the class – we concluded that "common questions abound with respect to whether the defendants engaged in illegal, concerted action." 579 F.3d at 268. As a result, we held that "individual issues d[id] not overwhelm the common ones."[22]  *Id.*; *see also Linerboard*, 305 F.3d at 162 ("[C]ommon issues [ ] predominate here because the inquiry

---

evidence, thereby supporting a finding of predominance. *Id.*

[22] A comparable approach is evidenced in our decision in *Prudential*, where we affirmed the district court's finding of predominance based upon the central issue in the case – a common nationwide scheme of deceptive conduct by the defendant to defraud millions of customers. 148 F.3d at 315. Similarly, in *Linerboard*, we noted that the "critical inquiry will be whether defendants successfully concealed the existence of the alleged conspiracy," and "the fact of *concealment* [ ] is the polestar in an analysis of fraudulent concealment." 305 F.3d at 163 (emphasis in original). Because it was the defendant's conduct that demanded attention, we found that "allegations of proof are all common to the defendants, not the plaintiffs." *Id.*

41

necessarily focuses on defendants' conduct, that is, what defendants did rather than what plaintiffs did.") (citation & quotations omitted); *cf. In re LifeUSA Holding Inc.*, 242 F.3d 136, 145-46 (3d Cir. 2001) (reversing certification of litigation class where plaintiffs' claims arose "not out of one single event or misrepresentation," but out of "non-standardized and individualized sales 'pitches'").

In this regard, we note the dissent's misreading of the Supreme Court's recent opinion in *Wal-mart Stores Inc. v. Dukes*, 131 S. Ct. 2541 (2011) as supporting its thesis that an inquiry into the existence or validity of each class member's claim is required at the class certification stage. To the contrary, *Dukes* actually bolsters our position, making clear that the focus is on whether the defendant's conduct was common as to all of the class members, not on whether each plaintiff has a "colorable" claim. In *Dukes*, the Court held that commonality and predominance are defeated when it cannot be said that there was a common course of conduct in which the defendant engaged with respect to each individual. But commonality is satisfied where common questions generate common answers "apt to drive the resolution of the litigation." 131 S. Ct. at 2551. That is exactly what is presented here, for the answers to questions about De Beers's alleged misconduct and the harm it caused would be common as to all of the class members, and would thus inform the resolution of the litigation if it were not being settled.

Specifically, here, plaintiffs allege that De Beers engaged in anticompetitive activity by exploiting its 65% share of the diamond market and control of the world's supply of rough diamonds to impose rigid constraints on the sale and resale of those diamonds. This conduct resulted in a common injury as to all class members – inflated diamond

42

prices – in violation of federal antitrust law, and the antitrust, consumer protection, or unjust enrichment laws of every state and the District of Columbia.[23] In this respect, as in *Warfarin* and *Insurance Brokerage*, De Beers's asserted price-fixing and monopolization conduct lies at the core of plaintiffs' claims, as do the common injuries which all class members suffered as a result. Based upon our case law, we can distill that "each class member shares a similar *legal* question arising from whether De Beers engaged in a broad conspiracy that was aimed to and did affect diamond prices in the United States." (App'x 278-79 (emphasis added).) Evidence for this legal question would entail generalized common proof as to "the implementation of De Beers'[s] conspiracy, the form of the conspiracy, and the duration and extent of the conspiracy." (*Id.* 278.)

The plaintiffs likewise share common *factual* questions as to whether De Beers "acted in concert to artificially fix, maintain, and stabilize prices and to monopolize trade and commerce in the market for polished diamonds," and whether said activity resulted "in an inflation in the prices of diamonds sold to consumers." (*Id.* 278-79.) These allegations are unaffected by the particularized conduct of individual class members, as proof of liability and liability itself would depend entirely upon De Beers's allegedly

---

[23] No one seriously disputes that De Beers's alleged conduct, if true, was anticompetitive and violated state antitrust laws. Our disagreement with the dissent arises solely out of the question whether certain class members' potential inability to satisfy some states' statutory standing requirements should have precluded the District Court from certifying the settlement class in this case.

43

anticompetitive activities. Indeed, the presence of these questions stemming solely from De Beers's asserted behavior and the fact that all class members purchased diamonds is an apt illustration of why the predominance test is "readily met in certain cases alleging consumer [ ] fraud or violations of the antitrust laws.'"[24] *Ins. Broker.*, 579 F.3d at 266 (quoting *Amchem*, 521 U.S. at 624); *see generally* Fed. R. Civ. P. 23(b)(3) advisory committee's notes to 1966 amendment (providing that "a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action"). Considering this presentation of common issues, a finding that common inquiries predominated over individual questions particular to any putative class member appears reasonably within the discretion of the District Court.

The dissent urges that according to our view, the class is "practically limitless." (Dissenting Op. at 9.) This is plainly incorrect: the limits are found in the conduct of the defendant and the injuries sustained by class members as a result of the conduct. These provide sufficient class contours. The instant class is not made up of "everyone on earth," "regardless of diamond purchases." (Dissenting Op. at 8 n.5.) Instead, each member is a Direct or Indirect Purchaser, harmed by what De Beers did. These class members,

---

[24] As we noted in *Insurance Brokerage*, we do not presume here "that common issues necessarily predominate in every antitrust case." 579 F.3d at 267 n.26 (citing *Hydrogen Peroxide*, 552 F.3d at 321-22). Here, we merely conclude that the District Court was free to determine that common issues of law or fact stemming from De Beers's conduct in this instance satisfied the predominance requirement.

moreover, possess a legally cognizable injury acknowledged in hornbook law, as their injuries are real, and stem not from simply feeling "wronged," as the dissent suggests (Dissenting Op. at 8), but from De Beers's alleged anti-competitive conduct, conduct which antitrust laws forbid.

### *ii) Precedent Regarding Variations in State Law*

Furthermore, our precedent provides that "variations in the rights and remedies available to injured class members under the various laws of the fifty states [do] not defeat commonality and predominance." *Warfarin*, 391 F.3d at 529 (quoting *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 315 (3d Cir. 1998)). This is so because "'a finding of commonality does not require that all class members share identical claims,'" and predominance is not considered deficient merely "because claims were subject to the [varying] laws of fifty states." *Id.* "'Predominance under Rule 23(b)(3) cannot be reduced to a mechanical, single-issue test'"; rather, "'[a]s long as a sufficient constellation of common issues binds class members together, variations in the sources and application'" of applicable laws will not foreclose class certification. *Linerboard*, 305 F.3d at 162-63 (quoting with approval *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000) (rejecting argument that variations in twenty states' laws concerning reliance, waiver, and statutes of limitations defeated predominance)); *see also Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 39 (1st Cir. 2003) ("Rule 23(b)(3) requires merely that common issues predominate, not that *all* issues be common to the class.") (emphasis added). Thus, it is not surprising that we can find no support in our Court's jurisprudence for the proposition that commonality and

predominance are defeated merely because available rights and remedies differ under the several laws that form the basis for the class claims.[25]

We have never required the presentation of identical or uniform issues or claims as a prerequisite to certification of a class. Rather, our jurisprudence evinces a pragmatic response to certifications of common claims arising under varying state laws. In *Prudential*, we addressed the certification of a settlement class arising under federal securities law and varying state law formulations of common law fraud, breach of contract, bad faith, negligent misrepresentation, negligence, unjust enrichment, and breach of state consumer fraud statutes. 148 F.3d at 315. We emphasized our willingness to certify nationwide classes where differences in state law fell "into a limited number of predictable patterns," and any deviations "could be overcome at trial by grouping similar state laws together and applying them as a unit." *Id.* As such, we affirmed the district court's decision to subsume the relatively minor differences in state law within a single

---

[25] Other courts have similarly declined to examine the controlling substantive law pertinent to asserted claims at the class certification stage. *See, e.g.*, *Schumacher v. Tyson Fresh Meats, Inc.*, 221 F.R.D. 605, 612 (D.S.D. 2004) ("Where federal claims and common law claims are predicated on the same factual allegations and proof will be essentially the same, 'even if the law of different states might ultimately govern the common law claims – an issue that need not and is not decided at this juncture – certification of the class for the whole action is appropriate.'") (quoting *Walsh v. Chittenden Corp.*, 798 F. Supp. 1043, 1055 (D. Vt. 1992)) (alteration omitted).

class. *Id.*; *see also Ins. Broker.*, 579 F.3d at 271 (noting that "subclasses are appropriate 'where a class is found to include subclasses divergent in interest'") (citation & alteration omitted).

Similarly, in *GM Truck*, we approved the certification of nationwide (b)(3) litigation classes where "the laws of the 50 states could be reduced to [several] general patterns, providing the framework for sub-classes if the nationwide action had proven unmanageable." 55 F.3d at 817-18 (discussing *In re School Asbestos Litig.*, 789 F.2d 996, 1010 (3d Cir. 1986)). Observing that "we [could not] conceive that each of the forty-nine states [ ] represented here has a truly unique statutory scheme," we determined that a nationwide class "could have been properly certified." *Id.* This alternative to outright rejection of certification of a nationwide class was deemed to be especially fitting because it could "surmount[ ] some of the individual issues while retaining some of the substantive advantages of the class action." *Id.* at 818.

Echoing this approach, our fellow Courts of Appeals have agreed that, for purposes of litigation classes, "if the applicable state laws can be sorted into a small number of groups, each containing materially identical legal standards," then certification of subgroups "embracing each of the dominant legal standards can be appropriate." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1262 (11th Cir. 2004); *see also Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1017 (D.C. Cir. 1986) (R.B. Ginsburg, J.) (holding that class certification is appropriate where state law variations can be grouped by similar legal doctrines).

Where "a sufficient constellation of common issues

binds class members together," *Linerboard*, 305 F.3d at 162-63, differences in state law treatment of indirect purchaser claims likely fall into a handful of clearly discernible statutory schemes. Nothing in our case law or the language of Rule 23 commands that everyone in a class must allege precisely identical or "uniform" causes of action, *see Sullivan*, 613 F.3d at 149, and statutory variations do not defeat predominance in the presence of other exceedingly common issues.[26] Instead, as *Prudential* and *GM Truck* explain, where a defendant's singular conduct gives rise to one cause of action in one state, while providing for a different cause of action in another jurisdiction, the courts may group both claims in a single class action. This tactic in litigation advances the laudatory purposes of the class action device, "preserv[ing] the resources of both the courts and the parties by permitting issues affecting all class members to be litigated in an efficient, expedited, and manageable fashion." *Allison v. Citgo Petrol. Corp.*, 151 F.3d 402, 410 (5th Cir. 1998).

> *iii) Certification of Settlement Classes: Diminished Concern Regarding Variations in State Law*

But we need not rely merely on certifications involving actual litigation of the class issues for the proposition that differing state laws do not defeat

---

[26] We do not reach this conclusion so as to allow district courts to "shirk" the requirements of Rule 23 when certifying the class, as the dissent suggests. (Dissenting Op. at 21 n.13.) We do not ignore the differences in state law, but rather find, based on our precedent, that those differences do not defeat predominance.

48

commonality or predominance. The correct outcome is even clearer for certification of a settlement class because the concern for manageability that is a central tenet in the certification of a litigation class is removed from the equation. Indeed, the class settlement posture of this case largely marginalizes the objectors' concern that state law variations undermine a finding of predominance.

In *Warfarin*, we rejected an objection essentially indistinguishable from the one advanced here, namely, that "variations in and inconsistencies between the state consumer fraud and antitrust laws of the fifty states defeat the commonality and predominance requirements of Rule 23." 391 F.3d at 529. In light of the Supreme Court's guidance that a district court "[c]onfronted with a request for settlement-only class certification" need not inquire whether the case "would present intractable management problems," *Amchem*, 521 U.S. at 620, in *Warfarin*, we delineated a "key" distinction between certification of a class for settlement versus certification for purposes of litigation, 391 F.3d at 529. Specifically, we observed that, in the settlement context, variations in state antitrust, consumer protection and unjust enrichment laws did not present "the types of insuperable obstacles" that could render class litigation unmanageable.[27] *Id.* (citing *Prudential*, 148 F.3d at 315). We emphasized, as a result, that "variations [in state laws] are irrelevant to

---

[27] In conducting the analysis in *Warfarin*, we expressly distinguished the Seventh Circuit's decision in *In re Bridgestone/Firestone Inc.*, 288 F.3d 1012 (7th Cir. 2002), in which certification of a nationwide class arising under the tort laws of all fifty states was sought for purposes of litigation, rather than settlement. 391 F.3d at 529.

certification of a settlement class" since a settlement would eliminate the principal burden of establishing the elements of liability under disparate laws. *Id.*; *see, e.g.*, *Davis v. J.P Morgan Chase & Co.*, 775 F. Supp. 2d 601, 609 (W.D.N.Y. 2011) ("[S]tate-law distinctions impact trial manageability, which is relevant principally with respect to litigation at trial.") (citing *Warfarin*, 391 F.3d at 529-30); *In re Lupron Mktg & Sales Practices Litig.*, 228 F.R.D. 75, 92 (D. Mass. 2005) (finding that "differences in the state consumer protection laws" implicate manageability concerns and do not pose an obstacle to certification of a settlement class).

Hence, our consideration of varying laws in the context of predominance has primarily focused on manageability of a litigation class. This is a particularly important point, as the objectors seem to conflate the predicate predominance analysis for certification of a settlement class with that required for certification of a litigation class, relying exclusively upon cases implicating the manageability obstacles inherent in class litigation. *See, e.g.*, *Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 601 F.3d 1159, 1180 (11th Cir. 2010); *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 724 (5th Cir. 2007). The Panel likewise referenced authority that focused on the manageability issues pertinent to certification of litigation classes in rejecting the settlement class certification. *See Sullivan*, 613 F.3d at 151 (quoting *Clay v. Am. Tobacco Co.*, 188 F.R.D. 483, 501 (S.D. Ill. 1999) (discussing "unmanageable" nature of varying state unjust enrichment laws)).

Because we are presented with a settlement class certification, "we are not as concerned with formulating some prediction as to how [variances in state law] would play out at

trial, for the proposal is that there be no trial." *Ins. Broker.*, 579 F.3d at 269 (internal citations & quotations omitted). As such, we simply need not inquire whether the varying state treatments of indirect purchaser damage claims at issue would present the type of "insuperable obstacles" or "intractable management problems" pertinent to certification of a litigation class.[28] *Comm. Bank I*, 418 F.3d at 299; *Warfarin*, 391 F.3d at 529. The proposed settlement here obviates the difficulties inherent in proving the elements of varied claims at trial or in instructing a jury on varied state laws, and "the difference is key."[29] *Warfarin*, 391 F.3d at 529.

---

[28] We are aware that there may still be circumstances, as we and other Courts of Appeals have noted, where "'[i]n a multi-state class action, variations in state law may swamp any common issues and defeat predominance.'" *Klay v. Humana, Inc.*, 382 F.3d 1241, 1261 (11th Cir. 2004) (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 741 (5th Cir. 1996)). But these decisions are inapplicable here, as the certification orders at issue pertained to litigation classes and were preoccupied with the attendant manageability aspects of certification. More explicitly, the courts expressed unease that if "more than a few of the laws of the fifty states differ, the district judge would face an impossible task of instructing a jury on the relevant law," and noted "the difficulties in trying the [ ] claims on a class basis." *Id.* (citation & quotations omitted). Unlike those situations "where the certification inquiry [is] set against the backdrop of an impending trial," *Ins. Broker.*, 579 F.3d at 269, the settlement context here does not present equivalent concerns.

[29] Unsurprisingly, we are not alone in recognizing the "key" distinction between certification for settlement purposes

Accordingly, while we are cognizant of our responsibility to "protect absentees by blocking unwarranted or overbroad class definitions," *Comm. Bank II*, 622 F.3d at 291, state law variations are largely "irrelevant to certification of a settlement class," *Warfarin*, 391 F.3d at 529.[30]

---

versus litigation, and "courts are more inclined to find the predominance test met [in the settlement context], even when there are differences in applicable state laws." *Ersler v. Toshiba Am., Inc.*, No. CV-07-2304, 2009 WL 454354, at *4 (E.D.N.Y. Feb. 24, 2009) (citing *In re Grand Theft Auto Video Game Consumer Litig.*, 251 F.R.D. 139, 158 (S.D.N.Y. 2008)); *see, e.g.*, *In re Mexico Money Transfer Litig.*, 267 F.3d 743, 746-47 (7th Cir. 2001) (noting that while certification of litigation classes arising under varying consumer fraud statutes is often inappropriate, the same is not true for settlement classes where "no one need draw fine lines among state-law theories of relief"); *In re Inter-Op Hip Prosthesis Liability Litig.*, 204 F.R.D 330, 347 (N.D. Ohio 2001) ("[W]hen taking the proposed settlement [ ] into consideration for purposes of determining class certification, individual issues which are normally present in . . . litigation become irrelevant, allowing the common issues to predominate.") (citation & quotations omitted).

[30] Although we will not here speculate as to the type of "situations where variations in state laws are so significant so as to defeat commonality and predominance even in a settlement class certification," *Warfarin*, 391 F.3d at 530, we are confident that the several common questions of law or fact arising from a "single central issue" – namely, De Beers's alleged anticompetitive conduct and the resulting injury caused to each class member – predominate over any

*iv) Rule 23(b)(3) and our Precedent do not Require that Individual Class Members State a Valid Claim*

At bottom, we can find no persuasive authority for deeming the certification of a class for settlement purposes improper based on differences in state law. The objectors and our dissenting colleagues nevertheless insist that, despite the prevalence of the shared issues of fact and law stemming from the defendant's conduct common as to all class members and each class member's resulting injury, states' inconsistent treatment of indirect purchaser damages claims overwhelms the commonalities. They advocate this because approximately twenty-five states have not extended antitrust standing to indirect purchasers through *Illinois Brick* repealer statutes or judicial edict; likewise, some uncertain number of states do not permit an end-run around antitrust standing through claims based on consumer protection and/or unjust enrichment statutes. (*See* Quinn Supp. Br. on Reh'g En Banc 21-22.) It follows then, they argue, that a large proportion of the Indirect Purchaser Class lacks any valid claims under applicable state substantive law, and, therefore, cannot "predominantly" share common issues of law or fact with those Indirect Purchasers actually possessing valid claims.[31]

issues concerning individual class members, *Prudential*, 148 F.3d at 314 (citation & quotations omitted).

[31] As noted, the Panel conducted an extensive review of relevant state statutes and reached the conclusion that "indirect purchasers do not have a right to recover in all states, and, therefore, no question of law or fact regarding their legal rights is uniform throughout the class." *Sullivan*, 613 F.3d at 149.

In turn, they insist that a district court must undertake a thorough review of applicable substantive law to assure itself that each class member has "at least some colorable legal claim" (Dissenting Op. at 10) or "has a valid claim" (Quinn Supp. Br. at 16) before certifying a settlement.

But this focus is misdirected. The question is not what valid claims can plaintiffs assert; rather, it is simply whether common issues of fact or law predominate. *See* Fed. R. Civ. P. 23(b)(3). Contrary to what the dissent and objectors principally contend, there is no "claims" or "merits" litmus test incorporated into the predominance inquiry beyond what is necessary to determine preliminarily whether certain elements will necessitate individual or common proof. Such a view misreads Rule 23 and our jurisprudence as to the inquiry a district court must conduct at the class certification stage. An analysis into the legal viability of asserted claims is properly considered through a motion to dismiss under Rule 12(b) or summary judgment pursuant to Rule 56, not as part of a Rule 23 certification process. *See Comm. Bank II*, 622 F.3d at 303 ("[T]he Rule 23 requirements 'differ in kind from legal rulings under Rule 12(b)(6).'") (quoting *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001)).

To adopt the position of the dissent and the objectors is to introduce a Rule 12(b)(6) inquiry as to every claim in the class before a class may be certified. But Rule 23 makes clear that a district court has limited authority to examine the merits when conducting the certification inquiry:

> Although an evaluation of the probable outcome on the merits is not properly part of the certification decision, discovery in aid of the certification decision often includes information

54

required to identify the nature of the issues that actually will be presented at trial. In this sense it is appropriate to conduct controlled discovery into the "merits," *limited to those aspects relevant to making the certification decision on an informed basis.*

2003 Amendments to Rule 23 (emphasis added); *see also Hassine v. Jeffes*, 846 F.2d 169, 178 (3d Cir. 1988) ("The ability of a named plaintiff to succeed on his or her individual claims has never been a prerequisite to certification of the class."). A court may inquire whether the elements of asserted claims are capable of proof through common evidence, but lacks authority to adjudge the legal validity or soundness of the substantive elements of asserted claims. Put another way, a district court may inquire into the merits of the claims presented in order to determine whether the requirements of Rule 23 are met, but not in order to determine whether the individual elements of each claim are satisfied.

Citing our holdings in *Hydrogen Peroxide* and *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154 (3d Cir. 2001), the objectors argue that the District Court abused its discretion by failing to establish as part of the certification process that each class member possessed a valid claim under the applicable substantive laws.[32] (*See* Quinn Br. at 17.) But these cases do not stand for this proposition. We explained in *Hydrogen Peroxide* that an examination of the

---

[32] The Panel echoed the objectors' position, concluding after examining the laws of fifty states that many jurisdictions "categorically foreclosed" a legal right to recover on the merits to indirect purchasers. *Sullivan*, 613 F.d at 151 n.14.

elements of plaintiffs' claim is sometimes necessary, not in order to determine whether each class member states a valid claim, but instead to determine whether the requirements of Rule 23 – namely, that the elements of the claim can be proved "through evidence common to the class rather than individual to its members" – are met. 552 F.3d at 311-12. In *Newton*, we similarly stated that a court may "delve beyond the pleadings to determine whether the requirements for class certification are satisfied," and held that a court's rigorous certification analysis may include a "preliminary inquiry into the merits." 259 F.3d at 167 (citations & quotations omitted). But we did not state that an inquiry into the merits was necessary in order to prove that each class member has state a valid claim as a prerequisite to class certification. Rather, the Rules and our case law have consistently made clear that plaintiffs need not actually establish the validity of claims at the certification stage.[33]

---

[33] The marginal role played by the question of "validity" of claims in class settlement certification situations is further evidenced by considering our subsequent *Prudential* decision. *See In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355, 366 (3d Cir. 2001) ("*Prudential II*"). There, we released all state-law claims – including unnamed claims – "arising from the same nucleus of operative facts as the claims" actually considered by the Court without adjudicating the validity of those other allegations. *Id.* We observed that "a judgment pursuant to a class settlement can bar later claims based on the allegations underlying the claims in the settled class action" even where the "precluded claim was not presented, and could not have been presented, in the class action itself." *Id.* (citations omitted). We reasoned that while our "power to release those claims as part of a judgment" may

Moreover, the merits inquiry is particularly unwarranted in the settlement context since a district court need not "envision the form that a trial" would take, *Newton*, 259 F.3d at 167, nor consider "the available evidence and the method or methods by which plaintiffs propose to use the evidence to prove" the disputed element at trial, *Hydrogen Peroxide*, 552 F.3d at 312. In fact, the absence of evidentiary and trial manageability concerns that initially motivated our instruction to conduct a preliminary merits inquiry in the predominance context reinforces the "key" distinction between certification of a litigation and settlement class. *Warfarin*, 391 F.3d at 529. As such, the objectors' focus on the legal strengths and weaknesses of class members' claims misconstrues the requirements of Rule 23.[34] *See Newton*, 259

---

"seem anomalous," "we have endorsed the rule because it 'serves the important policy interest of judicial economy by permitting parties to enter into comprehensive settlements that 'prevent relitigation of settled questions at the core of a class action.'" *Id.* (quoting *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982)). As such, the unidentified prospective claims could be included in the settlement without adjudication of their validity since they arose from the identical fraudulent scheme perpetrated by the defendant.

[34] The objectors' associated argument that the predominance inquiry presupposes that every putative class members possesses at least a single valid cause of action likewise misses the point. While Rule 23 may presuppose that every class member does actually allege a predominantly common claim against a defendant, Rule 23 does not mandate that each

F.3d at 167-69.

Even still, the objectors and the dissent urge that the absence of one particular element for some class members – statutory standing – means that these members cannot state a valid claim, and therefore, the class cannot be certified. While it may be correct that states abiding by *Illinois Brick* require a plaintiff to be a direct purchaser as one element of an antitrust or consumer protection claim, the possibility that some of the Indirect Purchasers in the instant class might be unable to establish this element at trial is beside the point. This element, often confusingly denoted as a statutory standing requirement, is not jurisdictional.[35] Statutory standing is distinct from jurisdictional standing in that "Article III standing is required to establish a justiciable case or controversy within the jurisdiction of the federal courts," whereas "lack of antitrust standing affects a plaintiff's ability to recover, but does not implicate the subject matter jurisdiction of the court." *Gerlinger v. Amazon.com Inc.*, 526 F.3d 1253, 1256 (9th Cir. 2008) (citation omitted); *see e.g.*, *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003)

---

of these claims must be shown capable of prevailing on the merits at the certification stage.

[35] To further clarify, we use the term "statutory standing" to refer to the possession of a viable claim or right to relief, not to a jurisdictional requirement. *See generally Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) ("It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction," and "jurisdiction is not defeated by the possibility that the averments might fail to state a cause of action") (citations and alterations omitted).

(noting that "statutory standing under the antitrust laws is not a prerequisite to federal subject matter jurisdiction"); *Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774, 778 (7th Cir. 1994) ("[D]espite the suggestive terminology, 'antitrust standing' is not a jurisdictional requirement and is therefore waivable."). Accordingly, statutory standing is simply another element of proof for an antitrust claim, rather than a predicate for asserting a claim in the first place.

Here, the supposed lack of one element necessary to prove a violation on the merits – statutory standing – does not establish a concomitant absence of other predominantly common issues. *See Prudential*, 148 F.3d at 315 (affirming a district court's certification of a settlement class despite the fact that some objectors challenged the settlement on the grounds that some plaintiffs could not establish reliance – a necessary element of their state-law fraud claims). This is especially true in the settlement context where no proof on the merits need be adduced. *See Linerboard*, 305 F.3d at 162-63 ("'[T]he mere fact that such concerns [of individualized factual and legal determinations] may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones.'") (quoting *Mowbray*, 208 F.3d at 296). Common questions as to the nature of De Beers's "conduct under federal antitrust laws as well as state law" and "the causal linkage between [De Beers's] conduct and the injury suffered by the class members" may still be found to predominate. *See Warfarin*, 391 F.3d at 528; *see also Pet Food*, 629 F.3d at 342 ("[T]he predominance requirement was satisfied because the same set of core operative facts and theory of proximate cause apply to each member of the

class.") (internal quotations omitted).[36]

### v) The Dissent's Proposed Framework

The dissent's proposed framework mistakenly places the cart before the horse by requiring the District Court to establish the validity of the disputed elements of the asserted claims – namely, the viability of indirect purchaser actions under state substantive laws – prior to certifying the class. Under this approach, the dissent seems to require that class members show that they can state a valid claim for relief. But the Rule 23 inquiry does not, and should not, involve a Rule (12)(b)(6) inquiry.[37]

---

[36] The Panel analyzed the antitrust claims separately from the consumer protection and unjust enrichment claims, seemingly concluding that plaintiffs could only prevail if each putative class member alleged either a "uniform" antitrust cause of action, a "uniform" consumer protection cause of action, or a "uniform" unjust enrichment claim. *Sullivan*, 613 F.3d 146, 150. We will not read into Rule 23 this heightened threshold requirement that plaintiffs must allege an identical cause of action, when all that is required is that common issues of law or fact predominate over questions particular to individual class members.

[37] The dissent describes this requirement in varied ways: under their view, class members who, "according to the plain terms of controlling law have no claim at all" (Dissenting Op. at 16 n.11), have "no legal claim" (*Id*. at 1), have "no cause of action," (*Id*. at 4), have a claim "clearly lacking a colorable basis" (*Id*. at 15), or have a claim "nonexistent as a matter of substantive law" (*Id*. at 13), are barred from partaking in this class action settlement. The problem with this requirement,

Were we to require district courts to ensure that "each member of a settlement class has a valid claim" in order to establish predominance, (Quinn Supp. Br. at 16), or that each class member has a "colorable legal claim," district courts would be obligated at the class certification stage to, *sua sponte*, conduct a thorough Rule 12(b)(6) analysis of every statutory and common-law claim to ensure that each plaintiff – including absent class members – possesses a valid cause of action or a "colorable claim" under the applicable federal or state substantive law. Such an inquiry into the merits goes beyond the requirements of Rule 23, for Rule 23 does not require a district court to determine whether class members individually have a colorable claim – one that "appear[s] to be true, valid, or right. (Dissenting Op. at 10 n.8.) In addition to exceeding the plain requirements of Rule 23, in nationwide class settlements, such as the one here, and even if limited to a statutory standing inquiry, this analysis would necessitate an intensive, fifty-state cataloguing of differences in state law at an early stage of the proceedings, and without the benefit of a developed record.[38] Despite the dissent's

_____

however, is that in order to separate class members possessing an "existent" legal claim from those possessing a "nonexistent" one, district courts would have to perform a Rule 12(b)(6) inquiry into each class member's claim.

[38] At the same time, it is by no means clear that the dissent's proposed analysis could be cabined to only consider the differing statutory standing requirements in the process of evaluating the validity of claims. As discussed *supra*, statutory standing for indirect purchasers is treated as but one element of a cause of action, rather than a jurisdictional requirement, as the dissent mistakenly suggests. If a district

61

view, Rule 23 does not require such an intensive cataloguing of each class member's claim in order to establish predominance. Even more troublesome, this merits analysis might not actually answer the salient question of whether common issues of fact or law actually predominate over individual ones.

Moreover, district courts undertaking the scrupulous review of state laws could not ensure the validity of each individual claim without first settling upon the precise state law governing each of the putative class members' claims. This choice-of-law analysis would be particularly difficult in a nationwide class action where an array of factors beyond the residence of the class members must be considered, including, *inter alia*, the location of the parties and the purchased items, and the place of contracting and performance. *See generally Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 467 (3d Cir. 2006). The Seventh Circuit rightly noted that "choice-of-law issues in nationwide class actions are rarely so uncomplicated that one can delineate clear winning and losing arguments at an early stage in the litigation"; "the legal uncertainty resulting from the complicated choice-of-law issues" would unduly complicate the process for establishing predominance under Rule 23. *Mirfasihi v. Fleet Mortg. Corp.*, 450 F.3d 745, 750 (7th Cir.

---

court were required to evaluate the statutory standing element to assess a claim's viability, logic and consistency suggest that the court should also consider other aspects of a claim for Rule 12(b)(6) and other deficiencies. This approach would delay proceedings in the trial court, as it would require the parties to engage in ill-timed, protracted merits litigation at the class certification stage.

2006). As a result, many courts find it "inappropriate to decide choice of law issues incident to a motion for class certification." *See, e.g.*, *In re Kirschner Med. Corp. Sec. Litig.*, 139 F.R.D. 74, 84 (D. Md. 1991); *Singer v. AT&T Corp.*, 185 F.R.D. 681, 691 (S.D. Fla. 1998) ("It is well-established that consideration of choice of law issues at the class certification stage is generally premature.").

Even were a district court to properly ascertain the applicable law after conducting the choice-of-law inquiry, it would likely encounter unsettled legal questions, further undermining its ability to assess the viability of some class members' claims and increasing the costs of administration. By way of example, in *Warfarin*, we remarked on the "unsettled question of law as to whether Tennessee's antitrust statutes . . . cover only violations occurring in intrastate commerce or extend to cover violations occurring in interstate commerce as well." 391 F.3d at 530 n.12. Relegating the issue to a footnote, we did not think it necessary to pry into the legal merits of the Tennessee claims in approving the class settlement. In another instance, the Fifth Circuit confronted the unresolved question of whether Louisiana antitrust law granted standing to indirect purchasers of consumer products as part of the class certification process, and asked the Louisiana Supreme Court to accept certification of the question. *See Free v. Abbott Labs, Inc.*, 176 F.3d 298, 298-99 (5th Cir. 1999). When the state court declined, the Fifth Circuit was "le[ft] to fathom Louisiana's unsettled antitrust law." *Id.* By requiring district courts to assess the validity of unsettled state law claims at the certification stage, we would needlessly introduce additional legal uncertainty

into a certification process that does not demand it.[39]

───────────

[39] Application of the proposed inquiry to the instant matter demonstrates the likely obstacles the District Court would encounter under this approach. The objectors present Ohio's statutory regime as emblematic of the impropriety of the type of class settlement certification at issue here. Citing the Ohio Supreme Court's decision in *Johnson v. Microsoft Corp.*, 834 N.E.2d 791 (Ohio 2005), they urge that Ohio law prohibits all indirect purchaser claims asserting violations of Ohio antitrust law, common law claims for unjust enrichment where a purchaser cannot establish that he conferred a benefit upon a defendant, and claims alleging violations of the Ohio Consumer Sales Practices Act predicated upon monopolistic pricing practices. (Quinn Br. at 60-61.) As a result, they insist that, "[d]irectly contrary to the district court's [certification], an Ohio class member does not have a valid claim under Ohio law." (*Id.* at 61.) The objectors contend that a similar problem exists for other *Illinois Brick* states.

This inference is flawed for several reasons. First, the objectors fail to engage in the type of choice-of-law exercise necessitated by their proposed approach – the evaluation of whether an Ohio class member is asserting a claim pursuant to Ohio law or pursuant to the law of a repealer state or a state affording an alternative basis for recovery. Undoubtedly, this analysis would present significant hurdles and potentially alter the presumed outcome. Second, although *Johnson* provides that an indirect purchaser lacking an antitrust claim under *Illinois Brick* cannot circumvent this limitation by relying upon the Ohio consumer protection statute, the Ohio Supreme Court did not, nor could it, preclude consumer protection claims predicated on fraud or deception. As the plaintiffs point out, the claims settled here include allegations

We raise the following questions to further demonstrate the error of the proposed framework adopted by our dissenting colleagues. If the dissent's "colorable legal claim" test is a threshold inquiry for commonality, why should the court not consider every potential disqualifier from one's having a "colorable legal claim?" For example, in any class certification case, should the court consider whether all potential class members complied with applicable pre-notice requirements under the relevant substantive law? Should the court consider whether every potential class member exhausted her administrative remedies under the relevant substantive law? Should the court evaluate whether each class member's claim complies with the applicable statute of limitations? The answers to these questions most certainly implicate whether a litigant, in a class action or otherwise, has a "colorable legal claim." These questions, moreover, show how flawed, from an administrative, logical, and practical

---

of fraud and deception separate from the antitrust allegations, suggesting that some avenue of recovery arising from the same defendant conduct remains available to indirect purchasers even in Ohio. (*See* Pls.' Br. in Response to Quinn's Response to Class Counsel's Mot. for Leave to File Record Excerpts 13-14.) Finally, if the court is to evaluate the viability of plaintiffs' statutory standing element under Ohio law at the class certification stage, the objectors presented no sensible reason why the court should not likewise inspect the viability of every other aspect of an antitrust, consumer protection, or unjust enrichment claim, such as statutes of limitation, conditions precedent to suit, and the like. We do not doubt that such an exhaustive analysis would produce absurd results and cause undue delay in our trial courts.

standpoint, the dissent's and objectors' approach really is. No class would ever be certified because it would be impossible to demonstrate that every class member has a "colorable legal claim." (Dissenting Op. at 10.) More than this, it would gut commonality, for, most certainly, individual issues would then predominate. There would simply be no class that could meet this commonality and predominance test.

### vi) Settlements

Finally, were we to mandate that a class include only those alleging "colorable" claims, we would effectively rule out the ability of a defendant to achieve "global peace" by obtaining releases from all those who might wish to assert claims, meritorious or not. We need not take judicial notice of the fact that plaintiffs with non-viable claims do nonetheless commence legal action. Here, in an effort to avoid protracted litigation and future relitigation of settled questions in federal and state courts across numerous jurisdictions, De Beers pursued a global settlement and demanded a release of potential damage claims in all fifty states. *See Prudential*, 148 F.3d at 326 n.82 (noting that release of all claims "serves the important policy interest of judicial economy by permitting parties to enter into comprehensive settlements that prevent relitigation of settled questions at the core of a class action") (citation & quotations omitted). Specifically, De Beers sought "global peace" in a settlement covering plaintiffs in every federal and state case, as well as potential plaintiffs who had not yet filed cases in either federal or state court. *See generally Klein v. O'Neal, Inc.*, 2009 WL 1174638, at *3 (N.D. Tex. Apr. 29, 2009) ("In a class action settlement setting, defendants seek and pay for global peace-i.e., the resolution of as many claims as possible."); *In re Vioxx Prods. Liability Litig.*, 574 F. Supp.

66

2d 606, 613 (E.D. La. 2008) (quoting *In re Guidant Corp. Implantable Defibrillators Prods. Liability Litig.*, MDL No. 05-1708, 2008 WL 682174, at *3 (D. Minn. 2008) (noting that the parties "contemplated a global settlement covering Plaintiffs from both the MDL and state cases, and included Plaintiffs whose cases had been filed or transferred to the MDL, Plaintiffs whose cases were filed outside the MDL in state court proceedings, and potential Plaintiffs who had not yet filed their cases")). The parties entered a mutual agreement and sought certification of a settlement class with the aim of avoiding countless individual suits in diverse jurisdictions.

Our dissenting colleagues disparage the concept of "global peace" as if it were an impermissible objective in using the class action device. From a practical standpoint, however, achieving global peace is a valid, and valuable, incentive to class action settlements. Settlements avoid future litigation with all potential plaintiffs – meritorious or not. If the dissent's position were adopted, there would be no settlements, collusive or otherwise. First of all, litigating whether a claim is "colorable" and defending who is in and who is not in the class would be an endless process, preventing the parties from seriously getting to, and engaging in, settlement negotiations. And, as discussed above, the "individualized" nature of the task would doom the class certification process from the outset. Second, since releases would necessarily be limited to the qualifying class members, those ultimately excluded would no doubt go right back into court to continue to assert their claims. No defendants would consider settling under this framework, for they could never be assured that they have extinguished every claim from

67

every potential plaintiff.[40]

As applied here, the objectors' approach would subject De Beers to numerous individual suits brought by claimants excluded from the class, undermining "the strong presumption in favor of voluntary settlement agreements, which we have explicitly recognized with approval." *Ehrheart*, 609 F.3d at 594 (citing *Pennwalt Corp. v. Plough*, 676 F.2d 77, 79-80 (3d Cir. 1982)). "This presumption is especially strong in class actions and other complex cases . . . because they promote the amicable resolution of disputes and lighten the increasing load of litigation faced by the federal courts." *Id.* (citations omitted). By contrast, requiring a class to assert uniform or identical questions of law or fact and to preemptively demonstrate their legal viability "would seriously undermine the possibility for settling any large, multi district class action." *Prudential II*, 261 F.3d at 367. Apart from imposing immense administrative costs, the extraordinary requirement that class members individually possess a "colorable legal claim" would make it increasingly difficult to approve nationwide class settlements entailing predominantly common issues but arising under varying state

---

[40] Of course, some global settlements may nevertheless be rejected for failing to meet the requirements of Rule 23. In *Ortiz v. Fibreboard Corp*., 528 U.S. 815 (1999), the Supreme Court rejected a global settlement in a mandatory class action based on a limited fund theory under Rule 23(b)(1)(B). There, the plaintiffs seeking class certification failed to demonstrate that the fund available to pay claims was limited beyond the fund amount agreed to by the parties. There, the requirements of Rule 23(b)(1)(B) were not met; here, the requirements of Rule 23(b)(3) are met.

laws. The resulting framework would likely siphon the various state law claims from federal class actions, and defendants seeking to settle "in such suits would always be concerned that a settlement of the federal class action would leave them exposed to countless suits in state court despite settlement of the federal claims." *Id.*; *see also Pet Food*, 629 F.3d at 342 ("[A]bsent class certification, the Court may be faced with litigating over 100 individual lawsuits all of which would arise out of the same set of operative facts.").

Rather than "concentrating the litigation of the claims" in a superior single action, Fed. R. Civ. P. 23(b)(3)(C), this would serve to frustrate "[t]he core purpose of Rule 23(b)(3)," which "is to vindicate the claims of consumers and other groups of people whose individual claims would be too small to warrant litigation," *Amchem*, 521 U.S. at 617.

### b. Rules Enabling Act & Federalism Concerns

The objectors further contend that the District Court's certification of the settlement class was flawed because it "recognized as valid, for purposes of Rule 23, claims that are not recognized as valid under applicable state law." (Quinn Supp. Br. at 28.) Accordingly, they argue, the order ran afoul of the Rules Enabling Act, which provides that the rules of procedure "shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b).[41] We cannot agree.

---

[41] The Panel agreed with this characterization, holding that "the order contravenes the Rules Enabling Act" because it "extends antitrust remedies that, in many instances, have no root in state substantive law." *Sullivan*, 613 F.3d at 149. The Panel rejected the argument that De Beers's willingness to stipulate to liability obviated this concern, noting that a court

In *Prudential*, we approved a district court's certification of a proposed settlement despite objections that the certification modified or abridged state law rights. 148 F.3d at 324 (discussing 962 F. Supp. 450, 461-62 (D.N.J. 1997)). We agreed with the district court that "approval of a settlement under Rule 23 merely recognizes the parties' voluntary compromise of their rights and does not itself affect their substantive state law rights." *Id.* (citation & alterations omitted). As a result, we also agreed with the district court's assessment that the proposed settlement could not violate the Rules Enabling Act since a "court's approval of a voluntary settlement, by nature a compromise of rights, does not affect substantive state rights." *Prudential*, 962 F. Supp. at 462.

It is well established that "settlement agreements are creatures of private contract law." *See, e.g.*, *Bauer v. Trans. Sch. Dist. of City of St. Louis*, 255 F.3d 478, 482 (8th Cir. 2001). "A district court is not a party to the settlement, nor may it modify the terms of a *voluntary* settlement agreement between parties." *Ehrheart*, 609 F.3d at 593 (emphasis added). Thus, a district court's certification of a settlement simply recognizes the parties' deliberate decision to bind themselves according to mutually agreed-upon terms without engaging in any substantive adjudication of the underlying causes of action. In the absence of a finding that plaintiffs are actually entitled to relief under substantive state law, we reiterate that a court does not "abridge, enlarge, or modify

---

was obligated even in the settlement context to ensure that all of Rule 23's requirements were met and could not "effectively grant[ ] relief to individuals to whom De Beers had no antitrust liability." *Id.* The dissent repeats this argument.

any substantive right" by approving a voluntarily-entered class settlement agreement. § 2072(b).

In the same vein, we disagree with the contention that the District Court violated principles of federalism by extending to the plaintiffs a substantive right that they could not have asserted in state court.[42] As an initial matter, the District Court's approval of the parties' settlement should not be considered a recognition or expansion of substantive rights unavailable in a particular state.[43] *See supra.* In this regard,

---

[42] The Panel agreed with this argument, noting that certain states' "categorical refus[al] to allow indirect purchasers to bring a price-fixing claim" was "not trivial" and represented "fundamental policy differences among the several states." *Sullivan*, 613 F.3d at 152, 148. The Panel concluded that these state interests were in effect "subordinated to De Beers's desire to resolve all indirect purchaser claims simultaneously" and "in a quest to clear the queue in court." *Id.* at 152 (citation & quotations omitted).

[43] The dissent concludes that approving class certification here endorses the enlargement of substantive rights because had some class members brought these claims individually in state court, they would "be immediately shown the exit." (Dissenting Op. at 30.) This is incorrect, for the state court would not automatically dismiss them without a motion from De Beers. More significantly, nothing would prevent De Beers from settling those claims in lieu of moving to dismiss them, and doing so in that scenario would not be an enlargement of substantive rights.
In responding to this point, the dissent equates an objection to class certification with a motion to dismiss, but such

71

the disputed certification order did not subordinate the states' interests, as it did not in fact validate any asserted claims purportedly rejected by the states.[44]

Moreover, consideration of the policy imperatives underlying *Illinois Brick* confirms that the District Court's certification of a settlement class here did not infringe upon federalism principles. *Illinois Brick*'s restriction on indirect purchaser recovery was motivated by prudential concerns for manageability; it does not reflect a categorical policy judgment that indirect purchasers do not merit antitrust protection. As we previously highlighted, the *Illinois Brick*

treatment demonstrates the very flaw in its position. Class certification and motions to dismiss involve two distinct (and different) standards, and the former does not permit as extensive an inquiry into the merits as the latter does. (*See* Dissenting Op. at 30 n.21.)

[44] The dissent decries this position, contending that including Indirect Purchasers in the class who could not, on an individual basis, state a claim for recovery impermissibly modifies the rights of those Indirect Purchasers who could recover individually. In so asserting, the dissent assumes that the size of the settlement fund would be the same if the Indirect Purchasers who cannot recover individually were excluded from the class. Surely this cannot be the case, for the settlement amount to which De Beers has agreed must be based in large part on the number of potential class members and on securing global peace. Had those Indirect Purchasers who could not recover individually been excluded, we seriously doubt that the Indirect Purchaser settlement fund would still be $272.5 million.

Court offered "three policy reasons for its holding":

> (1) a risk of duplicative liability for defendants and potentially inconsistent adjudications could arise if courts permitted both direct and indirect purchasers to sue defendants for the same overcharge; (2) the evidentiary complexities and uncertainties involved in ascertaining the portion of the overcharge that the direct purchasers had passed on to the various levels of indirect purchasers would place too great a burden on the courts; and (3) permitting direct and indirect purchasers to sue only for the amount of the overcharge they themselves absorbed and did not pass on would cause inefficient enforcement of the antitrust laws by diluting the ultimate recovery and thus decreasing the direct purchasers' incentive to sue.

*Howard Hess Dental Labs Inc. v. Dentsply Intern., Inc.*, 424 F.3d 363, 369-70 (3d Cir. 2005) (citing *Illinois Brick*, 431 U.S. at 730-35, 740-43).[45]  Nevertheless, the Supreme Court

---

[45] Other Courts of Appeals have recognized a similar functional focus in the Supreme Court's decision.  *See, e.g.*, *Freedom from Religion Found., Inc. v. Chao*, 433 F.3d 989, 991 (7th Cir. 2006) ("An example of the prudential limitations on standing is the judge-made 'indirect purchaser' doctrine of antitrust law," which is premised on minimizing complicated litigation), *rev'd on other grounds*, *Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587 (2007); *County of Oakland v. City of Detroit*, 866 F.2d 839, 852 (6th Cir. 1989) ("The question of whether a plaintiff has standing

acknowledged that its aversion to administering indirect purchaser recoveries undoubtedly "denie[d] recovery to those indirect purchasers who may have been actually injured by antitrust violations." *Illinois Brick*, 431 U.S. at 746.[46]

Here, contrary to the dissent's and the objectors' argument, the District Court's certification order did not undermine these prudential considerations. De Beers's agreement to a specified recovery payment – and the interrelated removal of a need to ascertain and prove the amount of passed-on overcharges – marginalizes the first two *Illinois Brick* concerns for duplicative liability and complexity in ascertaining the passed-on overcharges. The third prudential concern is similarly inapposite since the Direct Purchaser Class pursued and approved a separate settlement agreement and there is no indication that the Indirect Purchaser Settlement undermined "the direct purchasers' incentive to sue." *Dentsply*, 424 F.3d at 370.

to sue under the antitrust laws depends largely on prudential considerations.").

[46] States on both sides of the indirect purchaser restriction have likewise appreciated the pragmatic origins of and purposes served by *Illinois Brick*. *See, e.g.*, *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 624 (Minn. 2007) (noting that antitrust standing "has prudential limits based on remoteness of injury and complexity of proof"); *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 449 (Iowa 2002) ("[T]he *Illinois Brick* court was wholly concerned with the complexity of litigation and the possibility of multiple liability."); *Abbott Labs, Inc. v. Segura*, 907 S.W.2d 503, 506-07 (Tex. 1995) (discussing the prudential policy concerns underlying *Illinois Brick*).

Indeed, the immediate relief offered by the instant settlement appears to offer the most "[ ]efficient enforcement of the antitrust laws," *id.*, when compared to the highly uncertain result the plaintiffs would encounter by engaging in protracted litigation against a party with a long track record of avoiding the jurisdiction of courts in the United States. *See generally* Comment, The Diamond Cartel, 56 Yale L.J. 1404, 1411 (1947) (discussing De Beers's avoidance of effective antitrust prosecution in light of "the twin difficulties of obtaining jurisdiction over the foreign corporations and of retaining within the court's reach tangible assets sufficient to enforce a decree").

Accordingly, we reject the assertion that the District Court inappropriately subordinated state sovereignty in certifying the class.

### c. Identification of Class Claims<br>Pursuant to Rule 23(c)(1)(B)

Apart from our disagreement with the objectors' arguments regarding commonality and predominance, we similarly reject the view that the District Court's Order in this case failed to satisfy all of Rule 23(c)(1)(B)'s substantive requirements.

As we have explicated, Rule 23(c) provides that a certification order "must include (1) a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified, and (2) a readily discernible, clear, and complete list of the claims, issues or defenses to be treated on a class basis." *Hydrogen Peroxide*, 552 F.3d at 320-21 (citation & quotations omitted); *see also* Fed. R. Civ. P. 23(c)(1)(B) ("An order that certifies a class action must

define the class and the class claims, issues, or defenses. . . .ʺ). The District Court's Order "easily meets the requirements of Rule 23(c)(1)(B) with respect to the definition of the class itself." *Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 188 (3d Cir. 2006). The Court properly delineated the parameters of the Indirect Purchaser Class, defining class members as any purchasers of any diamond product in the United States except for those who purchased directly from De Beers or its competitors. (App'x 270.)

As to the second prong of the above test, the contention is raised that the Court's Order did not "explicitly define which claims, issues, or defenses are to be treated on a class basis." *Wachtel*, 453 F.3d at 189. We disagree with this characterization, as the settlement posture of this class action makes our decision on this front particularly simple. As we noted in *Wachtel*, a "critical" purpose of Rule 23(c)(1)'s requirement of a "full and clear articulation of the litigation's contours at the time of class certification" was the "need [ ] to determine how the case will be tried" through presentation of "a 'trial plan' that describes the issues likely to be presented at trial and tests whether they are susceptible to class-wide proof." 453 F.3d at 186 (quoting Fed. R. Civ. P. 23(c)(1)(A) advisory committee's note) (quotations omitted). In the settlement context, however, this concern evaporates, "for the proposal is that there be no trial." *Comm. Bank II*, 622 F.3d at 291 (citing *Amchem*, 521 U.S. at 620). As such, we agree with the Seventh Circuit's sentiment that "[g]iven the settlement, no one need draw fine lines among [the various] theories of relief." *Mexico Money*, 267 F.3d at 747.

The District Court's Order identified six common legal or factual issues it reasonably found to "predominate" over

individual questions and susceptible to class treatment, (*see* App'x 276); the Court also expressly included in its Opinion a background section titled "Underlying Claims, Cases & Parties," which laid out in depth all the claims asserted in each individual suit to be resolved by the class settlement, (App'x 263-65). *See also supra* note 6. It is undisputed that the Settlement Agreement resolves and releases each and every one of these asserted claims and issues, obviating any need to "cobble together" some uncertain category of issues to be tried as a class. *Wachtel*, 453 F.3d at 189. "[N]o particular format is necessary in order to meet the substantive requirement of [Rule 23(c)], and we will not set aside substantively conforming certification orders purely over matters of form." *Id.* at 188 n.10. The District Court's Opinion "facilitate[d] meaningful appellate review of [this] complex certification decision[ ]" by providing us with ample guidance as to the "contours" of the settlement." *Id.* at 186.[47]

---

[47] We find additional support for our conclusion from the First Circuit's recent ruling in *In re Pharmaceutical Industry Average Wholesale Price Litigation*, 588 F.3d 24 (1st Cir. 2009). There, the Court remarked that "Rule 23(c)(1)(B) was added . . . to help appellate courts reviewing an order better understand the district court's decision," and to allow "appellate courts, attorneys, and parties [to] proceed with more information and mutual understanding." *Id.* at 40 (citing *Wachtel*, 453 F.3d at 186-87). As a result, the Court upheld a district court's certification order that "plainly defined the class and the class claims, issues, and defenses in sufficient detail," "devoted many pages to the class's factual allegations against the defendant," "carefully analyzed the proposed class's suitability for certification, again explaining the issues common to the class," and also "discussed the state

Accordingly, we conclude that the District Court did not run afoul of the requirements of Rule 23(c)(1)(B) and properly certified the two classes of claims.

## 2. Injunctive Relief Pursuant to Rule 23(b)(2)

In addition to certifying the Direct and Indirect Purchaser Classes under Rule 23(b)(3), the District Court further certified the purchaser classes pursuant to Rule 23(b)(2) for the purpose of awarding injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26.[48] (App'x 285.) Plaintiffs alleged that, in the absence of injunctive relief, De Beers's anticompetitive conduct would continue to cause the

_____

consumer protection statutes underlying the class's claims, noting differences among them." *Id.* Likewise here, the District Court clearly defined the class, listed six common claims and issues, devoted significant discussion to the factual allegations, analyzed the class's suitability for certification by explaining the predominantly common issues, and noted the differences among the various statutes implicated in the claims. As succinctly stated by our fellow Court of Appeals, "[t]hat is enough." *Id.* at 41.

[48] 15 U.S.C. § 26 reads in pertinent part:

> Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust law . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity.

entire membership of all classes to pay artificially inflated prices. The objectors counter that class members lack antitrust standing to seek injunctive relief because they cannot demonstrate a significant threat of injury from an impending violation of the antitrust laws. In support, they point to expert reports submitted in 2008 for the targeted purpose of identifying a common methodology benchmark for calculating damages; these reports suggested that the market for rough diamonds became more competitive in the interim between mid-2006 and 2008, in concert with De Beers's weakening position in the market.[49] In making this argument, the objectors reject the District Court's conclusion that De Beers's willful entry into the settlement removed the plaintiffs' burden to establish the likelihood of future injury. (*See* App'x 285.)

In contrast to the damages provision of § 4 of the Clayton Act, "'Section 16 has been applied more expansively, both because its language is less restrictive than that of § 4 . . . and because the injunctive remedy is a more flexible and adaptable tool for enforcing the antitrust laws than the damage remedy. . . .'"[50] *McCarthy v. Recordex Serv., Inc.*, 80

---

[49] After evaluating the mentioned expert reports, the Panel agreed with the objectors that plaintiffs no longer faced "a significant threat of future antitrust harm in the absence of the injunction," and, therefore, lacked antitrust standing under § 16 of the Clayton Act. *Sullivan*, 613 F.3d at 157-58.

[50] Section 16 provides in pertinent part:

> Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened

F.3d 842, 856 (3d Cir. 1996) (quoting *Schoenkopf v. Brown & Williamson Tobacco Corp.*, 637 F.2d 205, 210 (3d Cir. 1980)). Because actions seeking injunctive relief under § 16 do "not present the countervailing considerations – such as the risk of duplicative or ruinous recoveries and the spectre of a trial burdened with complex and conjectural economic analyses," plaintiffs need not "satisfy the direct purchaser requirement as a condition of seeking injunctive relief." *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 400 (3d Cir. 2000) (*Warfarin I*) (quoting *Mid-West Paper Prods Co. v. Continental Group, Inc.*, 596 F.2d 573, 594 (3d Cir. 1979)) (quotations omitted). Instead, to establish the need for injunctive relief, plaintiffs must generally demonstrate three uncomplicated prerequisites: "a threat of loss"; that the injury in question "is of the type the antitrust laws were intended to prevent"; and "a significant threat of injury from a violation of the antitrust laws." *Id.* at 399 (citations & quotations omitted; alterations added).

Despite this burden, it is well established that "parties to a suit have the right to agree to anything they please in reference to the subject matter of their litigation, and the court, when applied to, will ordinarily give effect to their agreement, if it comes within the general scope of the case made by the pleadings." *Sansom Comm. by Cook v. Lynn*, 735 F.2d 1535, 1548 (3d Cir. 1984) (quoting *Pac. R.R. v.*

---

loss or damage by a violation of the antitrust laws, . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity.

15 U.S.C. § 26.

*Ketchum*, 101 U.S. 289, 297 (1879) (quotations & alterations omitted)).  In turn, "[a]s the Supreme Court has recognized, a district court may 'provide broader relief in an action that is resolved before trial than the court could have awarded after a trial.'"  *In re Agent Orange Prod. Liability Litig.*, 818 F.2d 179, 185 (2d Cir. 1987) (quoting *Local No. 93, Int'l Assoc. of Firefighters v. City of Cleveland*, 478 U.S. 501, 525 (1986) (alterations omitted).  Accordingly, district courts are afforded wide discretion to give effect to joint compromises that timely advance the interests of the parties without wasteful litigation.[51]  In exercising this discretion, the District Court here could reasonably approve a mutually agreed-upon stipulation enjoining conduct within the Court's jurisdiction regardless of whether the plaintiffs could have received identical relief in a contested suit by satisfying each of the aforementioned requirements at trial.

Yet because of the class nature of the instant suit, the District Court's approval of the stipulated injunction borne out of a class settlement did need to satisfy an additional test.  Specifically, Rule 23(b)(2) authorizes class certification only when "the party opposing the class has acted or refused to act

---

[51] Unsurprisingly, a paucity of case law addresses the issue of whether parties to a lawsuit may consent to the issuance of an injunction that is agreeable to all parties without a court's asking whether the prerequisites of Rule 23(b)(2) have been satisfied.  This dearth of precedent is to be expected since it would be highly illogical for a defendant to dispute an injunction to which it in fact agreed, and for a plaintiff beneficiary to object to an injunction entered for its benefit.  Curiously, the latter situation is presented here.

on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2).[52] Important to the analysis "is that the relief sought . . . should benefit the entire class," and "the putative class [must] 'demonstrate that the interests of the class members are so like those of the individual representatives that injustice will not result from their being bound by such judgment in the subsequent application of principles of res judicata.'" *Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 59 (3d Cir. 1994) (quoting *Hassine*, 846 F.2d at 179). "[I]njunctive actions, seeking to define the relationship between the defendant and the 'world at large,' will usually satisfy the requirement." *Id.*

Here, we have no difficulty concluding that Rule 23(b)(2)'s requirement that De Beers's alleged conduct be "generally applicable to the class" was satisfied. Indeed, much of our discussion of "predominance" in the previous section of this Opinion specifically emphasized the common elements of the complained of conduct that are equally applicable to "the class as a whole." *See supra*. As the District Court discussed, the plaintiffs alleged that De Beers's anticompetitive behavior "caused the entire membership of all classes to pay artificially inflated prices," and that, in the

---

[52] "This rule applies when the putative class seeks injunctive or declaratory relief, and 'does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages,'" as with a certification pursuant to Rule 23(b)(3). *Beck v. Maximus, Inc.*, 457 F.3d 291, 301 (3d Cir. 2006) (quoting Fed. R. Civ. P. 23(b)(2) advisory committee's note).

absence of injunctive relief, all classes would continue to pay artificial premiums. (App'x 285.) These claims demonstrate shared interests between the members of the putative class, and, these allegations, if proven, would support injunctive relief respecting the class as a whole. Likewise, the parties' mutual decision to settle claims "on grounds generally applicable to the class" complies with the text of Rule 23(b)(2) and should be respected.

In reaching this decision, we also reject the objectors' request that we engage in fact-finding as to whether all class members could show an imminent threat of prospective antitrust injury. Due to the settlement posture of this case, which controls, we need not concern ourselves with this issue. Moreover, the District Court never addressed the question of whether changes in the market negatively affected De Beers's ability to extract higher rents from diamond sightholders and subsequent purchasers.[53] Without the benefit of the District

---

[53] The objectors urge, based on the damages methodology expert reports, that De Beers's market share fell to approximately 46% in 2006, and, therefore, posed little continuing threat of future antitrust harm. (Quinn Br. 19.) Although the experts mentioned that De Beers lost its dominant share of an increasingly competitive market, the experts never opined – as the objectors contend – that plaintiffs face no significant threat of future antitrust harm. Were we to conduct our own independent analysis, we might draw a very different conclusion as to De Beers's asserted ability to inflict future harm: we might decide that De Beers's ongoing leadership position – considering its purported 46% market share in the diamond market – afforded it ample opportunity to influence diamond prices, posing an ongoing

Court's factual findings on the matter in any event, "[w]e deem it inappropriate to treat this question without any evidence having been presented on [it] and without the benefit of the findings and opinion of the district judge. *Merola v. Atl. Richfield Co.*, 515 F.2d 165, 173 (3d Cir.

---

and significant threat of antitrust injury. *See generally United States v. Continental Can Co.*, 378 U.S. 441, 459 (1964) (discussing defendant's "dominant position" based upon a 43%-46% market share in a highly concentrated industry). The objectors place far too much stock in De Beers's purported market share, ignoring one of the basic tenets in assessing market power: "Obviously no magic inheres in numbers; the relative effect of percentage command of a market varies with the setting in which that factor is placed." *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 612 (1953).

Curiously, the objectors and the Panel also rejected the plaintiffs' contention that the injunction entered by the District Court in 2006 – an injunction directly tailored to fostering competition – played any role in the increasingly competitive market. *Sullivan*, 613 F.3d at 157. The Panel opined that although the mid-2006 competitive increases "roughly coincided with the District Court's issuance of the injunction," this coincidence did not support the reasonable deduction that the injunction "played a meaningful role in producing those competitive gains." *Id.* at 157-58. An equally logical inference would be that increased competition approximating the issuance of the injunction evidenced the efficacy of the relief. That said, we will abstain from extrapolating broad legal conclusions of market competitiveness from data narrowly focused on damages methodology.

1975).

At bottom, we hold that the District Court acted within its discretion in accepting De Beers's stipulation to the injunctive relief.

*B. Fairness of the Class Action Settlement & the Plan of Allocation*

Apart from contesting the certification of the settlement class, the objectors raise two other arguments as to the fairness and adequacy of the proposed settlement. First, they quarrel with the District Court's approval of the settlement as a whole under Federal Rule of Civil Procedure 23(e)'s requirement that the settlement be "fair, reasonable, and adequate." (*See* Bagolie Br. at 18-28.) Second, the objectors dispute the fairness and adequacy of the settlement's plan of allocation for a portion of the settlement. Specifically, they urge that the proposed Indirect Purchaser Settlement distribution is "patently unfair" and presents "an intra-class conflict of interest that renders Class Counsel, as well as the class representative, inadequate." (*See* Murray Consol. Br. at 13; Quinn Br. at 63-64; Petrus Br. at 12-13.) We address each objection in order.

1. Approval of the Settlement

Before approving a class settlement agreement, a district court must find that the requirements for class certification under Rule 23(a) and (b) are met, and must separately "determine that the settlement is fair to the class under [Rule] 23(e)." *Ins. Broker.*, 579 F.3d at 257. Rule 23(e) provides that a proposed settlement may only be approved "after a hearing and on finding that it is fair,

85

reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). In this process, "trial judges bear the important responsibility of protecting absent class members," and must be "assur[ed] that the settlement represents adequate compensation for the release of the class claims." *Pet Food*, 629 F.3d at 349 (citation & quotations omitted); *see also Ehrheart*, 609 F.3d at 593 (stressing that "[t]he purpose of Rule 23(e) is to protect the unnamed members of the class," and that a "district court acts as a fiduciary" for absent class members) (citing *Warfarin*, 391 F.3d at 534). "[W]here settlement negotiations precede class certification, and approval for settlement and certification are sought simultaneously, district courts should be even 'more scrupulous than usual' when examining the fairness of the proposed settlement." *Warfarin*, 391 F.3d at 534 (quoting *GM Truck*, 55 F.3d at 805).

In assessing the fairness of a proposed settlement, we have articulated nine well-established primary factors for a district court to consider in conducting its inquiry:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Pet Foods*, 629 F.3d at 350 (quoting *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975)). (internal quotation marks and alterations omitted).

Furthermore, a district court may consider several other factors "illustrative of additional inquiries that in many instances will be useful for a thoroughgoing analysis of a settlement's terms," *id.*:

> [T]he maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved— or likely to be achieved—for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

*Id.* (quoting *Prudential*, 148 F.3d at 323). The "settling parties bear the burden of proving that the *Girsh* factors weigh in favor of approval of the settlement" throughout this

analysis.[54]  *Id.* (citation omitted).  "Because of the district court's proximity to the parties and to the nuances of the litigation, we accord great weight to the court's factual findings" in conducting the fairness inquiry.  *Prudential*, 148 F.3d at 317.

The District Court in this instance engaged in a thorough review of the *Girsh* factors, holding that the relevant considerations on balance weighed in favor of a finding of fairness under Rule 23(e).  We conclude that the Court did not abuse its discretion in finding the settlement to be fair, reasonable, and adequate.

### a. Complexity, Expense, and Likely Duration of the Litigation

The first *Girsh* factor "captures the probable costs, in both time and money, of continued litigation."  *Warfarin*, 391 F.3d at 536 (citation omitted).  The District Court found that this litigation "would have been difficult, as multiple parties, multiple claims, extensive jurisdictional problems, and complicated discovery would be involved."  (App'x 289.)

---

[54] We have separately observed that "an initial presumption of fairness" may apply when reviewing a proposed settlement where: "(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected."  *Warfarin*, 391 F.3d at 535 (quoting *In re Cendant Corp. Litig.*, 264 F.3d 201, 232 (3d Cir. 2001) ("*Cendant*").  The District Court did not consider or rely upon this presumption in assessing fairness.  Because we find no error in the Court's thorough analysis, we will likewise disregard this presumption.

The Court further discussed the likelihood of extensive motion practice as to jurisdiction, the lifting of default judgments, statute of limitations issues, and the concern for protecting foreign litigants in United States courts. (*Id.* 289-90.)

We agree with the District Court's conclusion that litigation of the numerous legal and factual issues discussed would have inevitably contributed to the expense and duration of the proceedings. Faced with the uncertainty arising from the existing defaults and De Beers's ongoing denial of personal jurisdiction, the settlement provided substantial and immediate relief to the class without further expense. Moreover, extended motion practice "would not only further prolong the litigation but also reduce the value of any recovery to the class." *Warfarin*, 391 F.3d at 536. Accordingly, this first factor favors the settlement.

### b. *The Reaction of the Class to the Settlement*

The second *Girsh* factor "attempts to gauge whether members of the class support the settlement," by considering the number of objectors and opt-outs and the substance of any objections. *Prudential*, 148 F.3d at 318. The District Court determined that the reaction of the class was overwhelmingly positive,[55] and noted that all twenty of the objections

_____

[55] The Court noted that, as of March 31, 2008, it had received 433,891 claims forms from all classes – nine from members of the Direct Purchaser Class and 433,882 from the Indirect Purchaser Class, with 431,380 from the Consumer Subclass and 2,502 from the Reseller Subclass. (App'x 291.) The Court also stated that five requests for exclusion had been received from the Direct Purchaser Class and 139 from

pertained to the Indirect Purchaser Class, with all but four objections relating to the consumer subclass, which consists of between 67 and 117 million members. (App'x 290-91.) We agree with the District Court's observation that the minimal number of objections and requests for exclusion are consistent with class settlements we have previously approved, and we are satisfied that the District Court acted within its discretion in finding this factor to favor settlement.

### c. The Stage of the Proceedings and the Amount of Discovery Completed

The third *Girsh* factor "captures the degree of case development that class counsel had accomplished prior to settlement," and allows the court to "determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *Warfarin*, 391 F.3d at 537 (citation, quotations & alterations omitted). The District Court thoroughly discussed the development of this case prior to settlement, highlighting the extensive factual discovery of industry participants, consumers, and experts in the field; the retention of economic experts; the review of publicly available information; the experiences of counsel who had previously sued De Beers for price-fixing; and the analysis of proceedings relating to De Beers's other contractual entanglements in the field. (App'x 292.) The Court further

---

the Indirect Purchaser Class (66 from the Reseller Subclass and 69 from the Consumer Subclass). (*Id.*) The Court received no objections from any direct purchasers and also noted that notice was provided to the United States Attorney General and the Attorney Generals of all fifty states, with none seeking to participate in the proceedings. (*Id.* 290-291, 1449-1450.)

observed that several of the individual suits had been in litigation for years before negotiation of the settlement, and emphasized that classes had been certified in several individual suits after significant factual investigation and legal development. (*Id.*) The Court committed no error in concluding that counsel adequately appreciated the merits of the case prior to reaching a settlement, and we agree that this factor favors approval of the settlement.

### d. The Risks of Establishing Liability

The fourth *Girsh* factor "examine[s] what the potential rewards (or downside) of litigation might have been had class counsel decided to litigate the claims rather than settle them." *Cendant*, 264 F.3d at 237. As already highlighted, the District Court discussed at length the various difficulties plaintiffs would likely encounter in attempting to collect on default judgments in foreign jurisdictions, observing that the Court's monetary judgments would likely be perceived as "beyond its authority" and "effectively void." (App'x 294-95.) The objectors' misguided contention that no risk of establishing liability exists entirely disregards the potential drawbacks of litigating and attempting to collect in foreign jurisdictions, including the extensive motion practice and expense such an uncertain tactic would entail. We are also influenced by De Beers's track record of rejecting United States jurisdiction over its legal affairs and the fact that De Beers has continued to deny any wrongdoing even in reaching a settlement agreement in this matter. Accordingly, we discern no error in the District Court's conclusion that this factor favors settlement.

### e. The Risks of Establishing Damages

As with the fourth *Girsh* factor, "this inquiry attempts to measure the expected value of litigating the action rather than settling it at the current time." *Cendant*, 264 F.3d at 238-39 (citation & quotations omitted). The District Court found that entry of a default judgment against De Beers would prompt the court to "conduct such hearings or order such references as it deems necessary and proper" to ascertain the amount of damages since the damages had not presently been established with certainty. (App'x 296 (quoting Fed. R. Civ. P. 55(b)).) The expert reports submitted by the various parties indicated that these proceedings would likely entail a "battle of the experts," with each side presenting its figures and defenses to the other side's proposals. (*Id.* 297.) Because of the "uncertainty attendant to such a battle," the District Court determined this factor to weigh in support of settlement, (*id.*), and the objectors do not contest this finding on appeal. Accordingly, we find no flaw in the District Court's decision that the additional "risk in establishing damages" counsels in favor of approval of the settlement. *Cendant*, 264 F.3d at 239.

### f. The Risks of Maintaining the Class Action Through Trial

The sixth *Girsh* factor "measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial" in light of the fact that "the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the class action." *Warfarin*, 391 F.3d at 537 (internal quotations & citation omitted). Class certification is tenuous, as a "district court retains the authority to decertify or modify a class at any time during the litigation if it proves to be unmanageable." *Id.* (citation omitted). As we have discussed *supra*, although the

size and variety of issues implicated in this nationwide class action do not present an obstacle to certification of a settlement class, "there is a significant risk that such a class would create intractable management problems if it were to become a litigation class, and therefore be decertified." *Id.* Accordingly, we agree with the District Court that the considerable risk of maintaining the class action through trial weighed in favor of settlement.[56]

### g. *Ability of Defendants to Withstand a Greater Judgment*

The seventh *Girsh* factor considers "whether the defendants could withstand a judgment for an amount significantly greater than the settlement." *Warfarin*, 391 F.3d at 537-58 (citation, quotations, & alteration omitted). The District Court observed that "little fact-finding has been done on this issue," and noted that the parties did not dispute De Beers's ability to withstand a greater judgment. (App'x 298-

---

[56] The objectors aver that drawing a distinction between settlement and litigation classes "would create two standards for class certification" although "the federal rules do not provide for such a difference." (Bagolie Br. at 25.) This argument patently disregards our clear and consistent precedent on the subject. While the standards for class certification are the same for both settlement and litigation classes, certification in the former context need not consider "whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial." *Comm. Bank II*, 622 F.3d at 291 (citing *Amchem*, 521 U.S. at 620). This added risk is of utmost significance in determining whether a settlement would best serve the interests of the class.

99.) Even so, the Court found this factor to neither favor nor disfavor the proposed settlement because "it would be extremely difficult, if not impossible, to collect a judgment from De Beers." (*Id.*) The objectors contend that the District Court made insufficient findings as to De Beers's market capitalization, which suggested an ability to withstand a much higher judgment, and, therefore, should have weighed this factor against the settlement. (Bagolie Br. at 26-27).

In comparing the value of settlement versus trial, we must be careful to judge the fairness factors "against the realistic, rather than theoretical, potential for recovery after trial." *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 461 (S.D.N.Y. 2004). In this regard, a finding that an immediate settlement is preferable to the high unlikelihood of collecting a theoretical judgment against De Beers appears entirely reasonable. Moreover, a defendant's ability to withstand a much higher judgment does not necessarily "mean that it is obligated to pay any more than what the [class members] are entitled to under the theories of liability that existed at the time the settlement was reached." *Warfarin*, 391 F.3d at 538. That said, "[t]he proponents of a settlement bear the burden of proving that the *Girsh* factors weigh in favor of approval," and we have previously found that defendants' speculative ability to pay "substantially more than they did under the Settlement" cut against approval, "albeit only moderately." *Cendant*, 264 F.3d at 241.

At bottom, we agree that, "in any class action against a large corporation, the defendant entity is likely to be able to withstand a more substantial judgment, and, against the weight of the remaining factors, this fact alone does not undermine the reasonableness of the instant settlement." *Weber v. Gov't Empl. Ins. Co.*, 262 F.R.D. 431, 447 (D.N.J.

94

2009). As such, we find no error in the District Court's conclusion that De Beers's ability to withstand a greater judgment does not necessarily undermine the fairness of the settlement.

> *h. The Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and All Attendant Risks of Litigation*

The final two *Girsh* factors consider "whether the settlement represents a good value for a weak case or a poor value for a strong case." *Warfarin*, 391 F.3d at 538. The reasonableness of a proposed settlement is assessed by comparing "the present value of the damages plaintiffs would likely recover if successful [at trial], appropriately discounted for the risk of not prevailing . . . with the amount of the proposed settlement." *Prudential*, 148 F.3d at 322. Notably, in conducting the analysis, the court must "guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." *GM Truck*, 55 F.3d at 806 (citations omitted).

Applying this framework, the District Court described the methodology utilized by the Indirect Purchaser Consumer Subclass's expert, who theorized that the average overcharge for diamond sales was 4.85% and the total worldwide overcharge equalled $4.99 billion; the United States consumes approximately 50% of the diamonds and diamond jewelry worldwide, rendering the overcharge to the U.S. market equal to $2.49 billion. (App'x 300.) Accordingly, the proposed $272.5 million Indirect Purchaser Settlement Fund represented 10.93% of this overcharge. (*Id.*) The expert further posited that although the Direct Purchaser Class

95

recovery could not be precisely quantified in the absence of data as to the exact amount of non-De Beers sales to Direct Purchasers, the value could reasonably be estimated. Placing the total value of United States imports of rough diamonds during the Direct Purchaser Class Period at $4.3 billion, the expert estimated that at least 46% – or approximately $2 billion – of the rough diamond sales were excluded sales; applying the 4.85 weighted overcharge percentage to that $2 billion, the expert theorized that the overcharge percentage was near $100 million. (*Id.*) As such, the proposed $22.5 million recovery represented more than 20% of the single damages. (*Id.*) The District Court found this estimate reasonable and the objectors do not protest this methodology.

Instead, the objectors contend that the District Court abused its discretion in overvaluing the settlement by considering only estimated *single* damages in its "best possible recovery" inquiry, rather than comparing the settlement amount to the *treble* damages that are an automatic component of antitrust damages recovery in many jurisdictions. (Bagolie Br. 28, 32-43.) Although the objectors correctly note that the District Court compared the settlement recovery to single damages in evaluating the propriety of the settlement's monetary component, (App'x 301), we do not agree with the objectors that this methodology constituted legal error.

Some disagreement exists in the case law as to whether the reasonableness of a settlement amount should be evaluated by comparison to the potential single damages of a class or the trebled damages authorized in certain jurisdictions. *Compare County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1324 (2d Cir. 1990) ("[T]he district judge correctly recognized that it is inappropriate to

96

measure the adequacy of a settlement amount by comparing to a trebled base recovery figure."), *Carnegie v. Household Intern., Inc.*, 445 F. Supp. 2d 1032, 1035 (N.D. Ill. 2006) ("[N]umerous courts have held that in determining a settlement value, the potential for treble damages should not be taken into account."), and *Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 376 (D.D.C. 2002) ("[T]he standard for evaluating settlement involves a comparison of the settlement amount with the estimated single damages."), *with In re Auction Houses Antitrust Litig.*, 2001 WL 170792, at *7 (S.D.N.Y. Feb. 22, 2001) ("[T]here are few perceptible justifications of the single damages standard for the determination of the fairness of antitrust class actions," which "places the settlement court, [acting] as a fiduciary for the absent class members, in a position in which it may be forced to approve a settlement that no non-representative plaintiffs would accept"), and *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D 197, 210 n.30 (D. Me. 2003) ("[I]f a settlement reflects a potential damage recovery, it should logically reflect the other parts of that recovery (trebling and attorneys' fees) that the statute awards automatically.").

That said, "we know of no authority that *requires* a district court to assess the fairness of a settlement in light of the potential for trebled damages."[57] *Comm. Bank II*, 622 F.3d at 312 (emphasis in original); *see also Rodriguez v. West*

---

[57] Peculiarly, the objectors at once argue "that treble damages *could* be considered in assessing" fairness while also presuming without cause that a fairness inquiry "*necessarily* involves consideration of treble damages." (Bagolie Br. 38-39 (emphasis added).)

97

*Publishing Corp.*, 563 F.3d 948, 964-65 (9th Cir. 2009) ("We have never precluded courts from comparing the settlement amount to both single and treble damages. By the same token, we do not require them to do so in all cases."). Rather, "courts generally determine fairness of an antitrust class action settlement based on how it compensates the class for past injuries, without giving much, if any, consideration to treble damages."[58] *Rodriguez*, 563 F.3d at 964; *see also City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 458-59 (2d Cir. 1974) ("[T]he vast majority of courts which have approved settlements . . . have given their approval . . . based on an estimate of single damages only."), *overruled on other*

---

[58] We agree with our fellow Court of Appeals that, in reaching a private consensual settlement, the "parties, counsel, mediators, and district judges naturally arrive at a reasonable range for settlement by considering the likelihood of a plaintiffs' or defense verdict, the potential recovery, and the chances of obtaining it, discounted to present value." *Rodriguez*, 563 F.3d at 965. Our principal role in this engagement "is to protect the unnamed members of the class." *Ehrheart*, 609 F.3d at 593. As such, we must remain cognizant that our "'intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties.'" *Rodriguez*, 563 F.3d at 965 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998)); *see also GM Truck*, 55 F.3d at 805 (same). No assertion of collusion, fraud, or overreaching is advanced or evidenced in the settlement at issue here.

*grounds as recognized by U.S. Football League v. Nat'l Football League*, 887 F.2d 408, 415-16 (2d Cir. 1989). Without delving into the debate over whether single or treble damages are the proper variable of comparison, we cannot label the District Court's adherence to the commonly accepted procedure for assessing the fairness, adequacy, and

reasonableness of a settlement an abuse of discretion.[59] Moreover, many of the state law claims asserted would not provide for treble damages recovery.

Finding no abuse in the District Court's conclusion that the proposed settlement offered a reasonable recovery, particularly "when accounting for the additional relief provided by the injunction," (App'x 301), we are also not persuaded that the Court erred in assessing the reasonableness of the settlement in light of all of the attendant risks of litigation. *Girsh*, 521 F.2d at 157. The District Court found

---

[59] The objectors also allege legal error in the District Court's estimate of the "best possible recovery" for the Indirect Purchaser Class by reference to the class as a whole, rather than by making separate findings as to estimated damages for the Consumer and Reseller subclasses. (Bagolie Br. at 27.) This argument falls short. The Special Master – whose findings were accepted by the District Court – thoroughly considered several expert reports and econometric models submitted by various counsel discussing the proper share of damages within the Indirect Purchaser class. The Special Master established an appropriate distribution of the Indirect Purchaser fund based upon estimated damages to both the Consumer and Reseller subclasses, and the objectors have not demonstrated the inaccuracy of this analysis. (*See* App'x 1473-1508.)

the "magnitude of the potential risks in litigation, including likely profound difficulties enforcing United States default judgments in the relevant foreign countries, establishing personal jurisdiction, and establishing liability," to compare unfavorably to the recovery offered by the proposed settlement. (App'x 301-02.) Based on this assessment, we find the District Court's conclusion that these final factors weigh in favor of the settlement compelling.

On balance, we conclude that the District Court did not abuse its discretion in finding the Settlement as a whole fair, adequate, and reasonable.

2. Plan of Allocation

The objectors next aver that the previously discussed differences in state law mandate a differential allocation in the percentage of recovery within the Indirect Purchaser Consumer Settlement Fund, which should "account for the[ ] varying strengths and weaknesses" of consumer claims as informed by the applicable state law treatments of indirect purchaser causes of action. (Murray Br. at 15-18.) Accordingly, they contend that the District Court should utilize subclasses in accounting for the varied rights to recovery caused by *Illinois Brick* disparities in state laws. (Quinn Answer to Pet. for Reh'g En Banc at 11.)

A district court's "principal obligation" in approving a plan of allocation "is simply to ensure that the fund distribution is fair and reasonable as to all participants in the fund." *Walsh v. Great Atl. & Pac. Tea Co., Inc.*, 726 F.2d 956, 964 (3d Cir. 1983). In prior instances where objectors challenged the fairness of intra-class allocation of settlement funds, we have explained that "where a class is found to

100

include subclasses divergent in interest," the use of subclasses may be appropriate and "is designed to prevent conflicts of interest in class representation." *Ins. Broker.*, 579 F.3d at 271. We have likewise noted the potential drawbacks of subclassing, including the potential "'Balkanization' of the class action," and creation of "a huge obstacle to settlement if each subclass has an incentive to hold out for more money." *Id.* (quoting *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 202 (3d Cir. 2005) ("*Cendant Sec.*")). We accord "substantial deference to district courts with respect to their resolution of this issue" because such decisions "require[ ] a balancing of costs and benefits that can best be performed by a district judge." *Ins. Broker.*, 579 F.3d at 271. "Where the district court has declined to certify a subclass" and treats all class members as falling within a single class for purposes of a fund allocation, "we will ordinarily defer to its decision unless it constituted an abuse of discretion." *Id.* (quoting *Cendant Sec.*, 404 F.3d at 202) (quotations & alterations omitted).

In *Insurance Brokerage*, the objectors asserted that the district court abused its discretion in failing to require the establishment of subclasses where "the increased recovery of one sub-class was achieved at the expense of another subclass's diminished recovery." *Id.* at 270. There, the plan of allocation tied reimbursement "to the extent of damages incurred on certain policies of insurance," and was "allocated in such a way that policyholders who likely incurred the most damage are entitled to a larger proportion of the recovery than those whose injuries were less severe." *Id.* at 272-73. Although we observed that the proposed subclasses "ha[d] some appeal" in remedying an unequal division of the settlement fund, we deferred to the district court's thorough

explanation that the objectors had failed to evidence "divergent or antagonistic interests between the three groups," and had not established that "these groups have claims of varying merit." *Id.* at 272 (citation & quotations omitted). Indeed, despite the factual disparities in the type of insurance at issue, the district court had highlighted that "all of the class members shared a unified interest in establishing [ ] liability for engaging in anticompetitive conduct which increased the cost of premium for all policyholders," undermining the showing of divergent interests. *Id.* at 273. We further noted that the plan of allocation "was carefully devised to ensure a fair distribution of the settlement fund," and "merely created a structure for ensuring that reimbursement [was] tied to the extent of damages incurred." *Id.* at 272. Accordingly, we found the settlement allocation fair and within the district court's discretion. *Id.*

We reached a different conclusion in *Pet Food*. 629 F.3d at 353. There, the district court carefully examined the fairness of the total settlement fund, but did not discuss whether an allocation of the fund to a sub-segment of claims – namely, to consumers who had received refunds outside of the settlement – was inadequate and rendered the settlement unfair and unreasonable to those who had received nothing on account of their claims. 629 F.3d at 353 (noting that although "we do not doubt the able District Court properly determined that the fund was a fair and adequate settlement of all the claims advanced by plaintiffs in this case[,] . . . [w]e are unable to determine whether the $250,000 allocation was a fair and adequate settlement of the Purchase Claims"). There, we decided that the district court lacked sufficient information to decide whether the allocation to certain claimants was fair, and, thus, we remanded for further

proceedings.  *Id.* at 356.

Like the progressive settlement contemplated in *Insurance Brokerage*, the settlement at issue here provides for a pro rata distribution to all class members, and does not distinguish based upon any variables, such as the applicable state law of claimants' states of residence or location of purchase.  While the District Court here did not specifically evaluate the pro rata allocation through the fairness lens, it did consider the differential allocation question in conducting the predominance analysis, noting the imprecision inherent in weighing class member claims "based on the relative strength of different state law claims."  (App'x 279.)  The District Court further noted in its Rule 23(a) analysis that the various "individual classes were represented by separate counsel during settlement negotiations, allowing for 'adequate structural protections to assure that differently situated plaintiffs negotiate for their own unique interests.'"  (App'x 220 (quoting *Warfarin*, 391 F.3d at 533).)  Moreover, the Court observed that there were no intra-class conflicts since all putative members experienced injury caused by De Beers, all sought recovery for overpayment caused by allegedly anticompetitive behavior, and all shared common interests in establishing damages and injunctive relief.  (*Id.* at 220-21.)

It may be entirely reasonable to apply the same damages calculation to claimants from all states because, as the district court in *Warfarin* observed, "[i]t is purely speculative that claimants from indirect purchaser states could anticipate a greater recovery than claimants from other states."  *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 260 (D. Del. 2002); *see also Cendant*, 264 F.3d at 250 (given the "speculative" nature of such an inquiry, differences in the liability standards between § 11 and § 10(b) securities

103

claims did *not* warrant differential plan of allocation).  And only by engaging in the type of fact-intensive merits and choice-of-law analyses that we have rejected could a district court attempt to assay the "varying strengths and weaknesses" of asserted state claims.  (*See* Murray Br. at 15-18.)  We can find no support in our case law for differentiating within a class based on the strength or weakness of the theories of recovery.   Accordingly, we decline to require such an analysis.

Moreover, it is noteworthy that each putative class member suffered the same alleged injury as a result of De Beers's anticompetitive conduct, irrespective of the vagaries of applicable state laws.  Recognizing this, the plan of allocation here "adjust[s] diamond purchases to a common measure," allowing an "apples to apples" comparison "of the relative amount of damages suffered by various claimants within the classes and subclasses and permits distribution pro rata based on the relative amounts of damages suffered." (App'x 1530.)  Courts "generally consider plans of allocation that reimburse class members based on the type and extent of their injuries to be reasonable," *In re Corel Corp. Inc. Sec. Litig.*, 293 F. Supp. 2d 484, 493 (E.D. Pa. 2003), and we are mindful that "district courts have broad supervisory powers over the administration of class action settlements to allocate the proceeds among the claiming class members equitably," *McCoy v. Health Net, Inc.*, 569 F. Supp. 2d 448, 469 (D.N.J. 2008).   The record here confirms that the District Court carefully considered expert advice in accepting the plan of allocation, and "[t]his kind of decision is intensely fact-based, falling within the purview of the District Court's decision." *Cendant*, 264 F.3d at 254.  In light of the foregoing analysis, we cannot conclude that the District Court abused its

discretion in accepting the carefully negotiated plan of allocation.

Lastly, the objectors contend that the settlement's minimum claim payment requirement of $10 provides inadequate settlement relief, as it will eliminate the rights of many class members without providing any compensation. (Petrus/Giddings Br. at 12.) They urge that a minimum payment provision contradicts the purpose of the class action mechanism to provide recovery even where the amount is "paltry." (*Id.* at 16 (quoting *Yang v. Odom*, 392 F.3d 97, 106 (3d Cir. 2004)).) We disagree and find no abuse in the District Court's decision to approve the minimum claim payment threshold.

As other courts have observed, "*de minimis* thresholds for payable claims are beneficial to the class as a whole since they save the settlement fund from being depleted by the administrative costs associated with claims unlikely to exceed those costs and courts have frequently approved such thresholds, often at $10." *In re Gilat Satellite Networks, Ltd.*, No. CV-02-1510, 2007 WL 1191048, at *9 (E.D.N.Y. Apr. 19, 2007); *see, e.g.*, *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 463 (S.D.N.Y. 2004) (noting that the minimum recovery requirement is a common procedure that addresses "the undeniable fact that claims-processing costs money, which comes out of the settlement fund"); *Mehling v. New York Life Ins. Co.*, 248 F.R.D. 455, 463 (E.D. Pa. 2008) (approving settlement plan with $50 minimum payment). The District Court adopted the Special Master's considered decision that "administrative costs to make *de minimis* payments are too large to justify the small payments," and the objectors have offered only conclusory counter-allegations. (App'x 1531). Indicative of the disingenuous nature of their

responses is the objectors' assertion that "[i]n exchange for their release, millions of class members [will] receive no money." (Quinn Br. at 63-64.) This argument fails to acknowledge the injunctive relief offered by the settlement, however, which is intended to benefit all class members regardless of individual monetary recovery.[60]

Furthermore, the objectors appear to ignore a key rationale underlying the class action mechanism. In addition to providing individual class members with payments, "'[t]he policy at the very core of the class action mechanism'" is to provide sufficient incentive to prosecute an action "'by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor,'" *Yang*, 392 F.3d at 106 (quoting *Amchem*, 521 U.S. at 617). In this instance, the representative parties and their counsel were properly incentivized to bring and prosecute this action through settlement, resulting in a net benefit to the class. As a result, based upon the evidence offered before the Special

---

[60] The objectors' related argument that the *de minimis* provision will deprive 57 million consumers of monetary recovery even if they file a claim is equally weak. (Giddings/Petrus Br. 9.) This contention unfairly presumes that every single putative class member will timely submit claims forms, rendering every member's *pro rata* recovery below $10. By contrast, the evidence accepted by the Special Master demonstrated that "consumer claim filing rates rarely exceed seven percent, even with the most extensive notice campaigns." (App'x 1550 (citation & quotations omitted).) In the absence of any credible evidence subjecting the objectors' position, we cannot conclude that the District Court abused its discretion in adopting the distribution plan.

Master and the arguments alleged herein, we cannot conclude that the District Court abused its discretion in approving this element of the plan of allocation.

## C. Objections to the Fee Award

The objectors likewise aver that the District Court abused its discretion in awarding attorneys' fees that they urge are excessive. (Quinn Br. at 65; Hicks Prelim. Op. Br. at 7; Petrus/Giddings Br. at 12.) They contend that class counsel will receive in excess of $73 million – equal to approximately 25% of the $293 million principal settlement fund – despite this being a default judgment case, which entailed minimal motions practice and discovery. Additionally, considering the large number of putative class members and the alleged lack of risk undertaken by class counsel in prosecuting this case to settlement, the objectors urge that the award is unjustified under our jurisprudence. We disagree.

Our case law makes clear that a "robust" and "thorough judicial review of fee applications is required in all class action settlements," *In re Diet Drugs*, 582 F.3d 524, 537-38 (3d Cir. 2009) (citation & quotations omitted), but that "the amount of a fee award . . . is within the district court's discretion so long as it employs correct standards and procedures and makes findings of fact not clearly erroneous," *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 299 (3d Cir. 2005) (citation & quotations omitted). *See also Ursic v. Bethlehem Mines*, 719 F.2d 670, 675 (3d Cir. 1983) ("[T]he district court has discretion in determining the amount of a fee award . . . in view of [its] superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters.") (quoting

107

*Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983)).

Attorneys' fees requests are generally assessed under one of two methods: the percentage-of-recovery ("POR") approach or the lodestar scheme. "The former applies a certain percentage to the settlement fund," while "[t]he latter multiplies the number of hours class counsel worked on a case by a reasonable hourly billing rate for such services." *Diet Drugs*, 582 F.3d at 540 (citation, quotations, & alterations omitted). The POR method "is generally favored in common fund cases because it allows courts to award fees from the fund 'in a manner that rewards counsel for success and penalizes it for failure.'" *Rite Aid*, 396 F.3d at 300 (citation & quotations omitted). The lodestar method, which is more commonly utilized in statutory fee-shifting cases and "where the expected relief has a small enough monetary value that a percentage-of-recovery method would provide inadequate compensation," *Diet Drugs*, 582 F.3d at 540-41, is then used "to cross-check the reasonableness of a percentage-of-recovery fee award," *AT&T Corp.*, 455 F.3d at 164.[61] Because the case at issue entailed a common fund, the District Court applied the POR method and utilized a lodestar cross-check. (App'x 310.). The objectors do not dispute the

---

[61] The lodestar crosscheck "is performed by dividing the proposed fee award by the lodestar calculation, resulting in a lodestar multiplier." *AT&T Corp.*, 455 F.3d at 164. The multiplier endeavors "to account for the contingent nature or risk involved in a particular case," and may be adjusted "to account for particular circumstances, such as the quality of representation, the benefit obtained for the class, [and] the complexity and novelty of the issues presented." *Id.* at 164 n.4 (citations & quotations omitted).

propriety of this approach, and we find no fault with this decision.

In determining the appropriate percentage fee award, the District Court then devoted detailed consideration to each of the ten factors that we identified in *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190 (3d Cir. 2000),[62] and *Prudential*, 148 F.3d 283,[63] finding, *inter alia*, that the complexity and duration of the litigation, the time and skill committed to the

---

[62] The *Gunter* factors are as follows:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

223 F.3d at 195 n.1.

[63] The *Prudential* factors are:

> (8) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations, (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained, and (10) any innovative terms of settlement.

*Diet Drugs*, 582 F.3d at 541 (citing *Prudential*, 148 F.3d at 338-40).

litigation, the ever-present risk of nonpayment from De Beers's tenuous status in the United States, the absence of substantial objections, and the achievement of both monetary and injunctive relief without any governmental investigation or assistance all weighed in favor of approving the Special Master's recommended 25% attorneys' fee award. (App'x 311-21.) The objectors do not contend that the District Court applied incorrect legal standards or procedures or that the Court improperly "brushed over our required analysis." *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 735 (3d Cir. 2001). Rather, they disagree with the Court's factual findings as to two of the factors; they contend that we should find an abuse of discretion because this case is "'neither legally nor factually complex and did not require significant motion practice or discovery' by class counsel." (Quinn Br. at 65 (quoting *Cendant PRIDES*, 243 F.3d at 743).)

Because of the objectors' narrow focus before us and the District Court's thorough analysis of each of the *Gunter* and *Prudential* factors, we will only address the specific objections raised herein. As an initial matter, the objectors neglect to mention the primary reason for our finding of error in *Cendant PRIDES* – the principal case advanced in support of their position. There, we criticized the district court's failure to "explicitly consider any of [the *Gunter*] factors," and its neglect to "'make its reasoning and application of the fee-awards jurisprudence clear.'" *Cendant PRIDES*, 243 F.3d at 734-35 (quoting *Gunter*, 223 F.3d at 196). We engaged in our own analysis of the propriety of the fee award only because the district court failed to consider the fee award factors that we had deemed "essential to a proper exercise of discretion." *Id.* at 735; *see also Ne. Women's Ctr. v. McMonagle*, 889 F.2d 466, 475 (3d Cir. 1989) ("[A]n

110

appellate court, which relies on a cold record, is even more poorly positioned to assess the nature and quality of the legal services performed at the trial court level."). We have no such concern here, as the District Court clearly set forth its reasoning for the fee award. Indeed, the objectors never explain exactly where in its lengthy analysis the District Court misapplied the *Gunter* factors; the objectors simply dislike the conclusion reached by the Court. *See generally McMonagle*, 889 F.2d at 475 ("[T]he appellate court may not upset a trial court's exercise of discretion on the basis of a visceral disagreement with the lower court's decision.") (citation & quotations omitted).

Moreover, the District Court's factual findings as to the complexity and demands of this case further distinguish the instant circumstances from *Cendant PRIDES* and do not suggest an abuse of discretion. As we discussed in *Rite Aid*, the *Cendant PRIDES* counsel "only spent approximately 5,600 hours on the action," "Cendant had conceded liability and no risks pertaining to liability or collection were pertinent." 396 F.3d at 304 (discussing *Cendant PRIDES*, 243 F.3d at 735). These factors are absent in this case. Contrary to the objectors' contention, the Special Master and District Court both observed that counsel devoted nearly 39,000 hours to litigating this matter in the various federal and state courts and to the subsequent negotiations and disputes pertaining to the settlement itself. The Court noted that, apart from addressing complicated legal questions and the secrecy surrounding the diamond industry, plaintiffs' counsel was forced to litigate against opposition from intervenors and amicus curiae, engaged in protracted settlement negotiations lasting approximately one year, and ultimately confronted the difficult settlement, distribution,

111

and injunctive issues addressed in this appeal. (App'x 317-18.) Given the complexity of the legal and factual issues implicated and the difficult questions raised in the post-settlement process, we find no abuse of discretion in the District Court's conclusion that the complexity and duration of the litigation supported the requested fee.[64]

---

[64] The objectors' further contention that the size of the percentage fee award should decrease in light of the large size of the overall settlement, (Quinn Br. at 66), is premised on several of our opinions in which we stated that "the percentage of a recovery devoted to attorneys' fees should decrease as the size of the overall settlement or recovery increases." *Cendant*, 264 F.3d at 284 n.55 (citations & quotations omitted). We so ruled because "in many instances the increase in recovery is merely a factor of the size of the class and has no direct relationship to the efforts of counsel." *Id.* In particular, we have vacated large fee awards "'when much of the settlement apparently resulted from the work of state regulators and a multi-state insurance task force.'" *Ride Aid*, 396 F.3d at 303 (quoting *Prudential*, 148 F.3d at 338-342). But "there is no rule that a district court must apply a declining percentage reduction in every settlement involving a sizable fund," and we have approved large settlements where "class counsel's efforts played a significant role in augmenting and obtaining an immense fund." *Id.* Ultimately, "the fact-intensive *Prudential/Gunter* analysis" must trump all other considerations. *Id.*

Here, plaintiffs' counsel prosecuted this matter through settlement with no certainty as to their ability to enforce any judgment against De Beers. The District Court's fact-intensive *Gunter* analysis found that plaintiffs' counsel deftly and efficiently handled this complex matter and played a

Furthermore, unlike in *Cendant PRIDES*, the risk of nonpayment here remained ever-present throughout the litigation and settlement proceedings. The objectors dispute that counsel faced such risk after agreeing to settle and the depositing of the settlement amount into an escrow account. It is unclear, however, whether an agreement to settle after inception and prosecution of a matter should play a role in a court's evaluation of the risk of nonpayment; indeed, our case law has "never addressed whether courts must reconsider the risk of nonpayment as the action evolves." *Diet Drugs*, 582 F.3d at 543. Although we previously approved a district court's evaluation of risk "as of 'the inception of the action and not through the rosy lens of hindsight,'" we emphasized that our endorsement took into consideration the district court's "more comprehensive" reevaluation of the risk over the course of the proceedings. *Id.* (quoting *In re Diet Drugs*, 553 F. Supp. 2d 442, 478 (E.D. Pa. 2008)). There, we did not directly resolve whether a district court should reassess risk throughout a litigation, but found the risk of nonpayment to be ongoing, noting that while a settlement agreement and "the escrow funds undoubtedly reduced the risk of nonpayment, those funds were but one part of an intricate agreement" and the efforts of counsel could still "have been for naught." *Id.*

Here, we are similarly satisfied that counsel faced a legitimate risk of nonpayment throughout the litigation. The District Court found that De Beers possessed few assets in the United States against which a judgment could be enforced

significant role in the outcome. Accordingly, we disagree that the size of the overall settlement bears no relationship to the efforts of counsel and will defer to the District Court's considered judgment.

113

and effectively dodged jurisdiction in the United States for over fifty years, evidencing a cognizable risk of nonpayment at the inception stage. (App'x 319.) Although the District Court's order did not address the prospects for nonpayment post-settlement, it is evident that De Beers never conceded liability or admitted any wrongdoing, and that the escrow funds "were but one part of an intricate agreement" that – as demonstrated by the Panel's original decision to reject settlement class certification – continued to pose a genuine risk of nonpayment to counsel. As such, the objectors' "view of the risk of nonpayment is more myopic than the Court's," *Diet Drugs*, 582 F.3d at 543, and we are not persuaded that the District Court abused its discretion in finding this factor to favor the requested fee.

Finally, the objectors' assertion that the award improperly exceeds the awards in similar cases is equally unavailing. In *Cendant PRIDES*, we discussed fee awards in class actions in which the settlement fund exceeded $100 million and which relied upon the POR method, finding that "the attorneys' fee awards ranged from 2.8% to 36% of the total settlement fund." 243 F.3d at 737. Similarly, in *Rite Aid*, we found no abuse of discretion in a district court's reliance on three studies that demonstrated an average percentage fee recovery in large class action settlements of 31%, 27-30%, and 25-30%. 396 F.3d at 303. Here, the District Court determined that the 25% fee requested by counsel fell within this range. (App'x 320.)

We are cognizant that a comparison of this award to fees ordered in other cases is a complex analytical task, in light of variations in the efforts exerted by attorneys and the presence of complex legal and factual issues. That said, we have emphasized "that a district court may not rely on a

114

formulaic application of the appropriate range in awarding fees but must consider the relevant circumstances of the particular case." *Cendant PRIDES*, 243 F.3d at 736. Although this case may have lacked some of the contested motion practice and extensive discovery elicited in some of the other cases receiving similar percentage awards, *see id.* at 740-41, the case presented other challenges, including "De Beers'[s] denial of jurisdiction [and liability], the secrecy of the diamond industry, and unavailability of ordinary discovery methods, the substantial risk of non-collection of a U.S. judgment in foreign countries and the historic injunction obtained." (February 15, 2008 Report and Recommendation of Special Master on Incentive Awards, Cost Reimbursement & Attorneys' Fee Awards at 31.) The District Court here properly considered the relevant *Gunter* and *Prudential* factors, and determined that the case presented all of the factors we had recognized as supporting a higher award: "complex and/or novel legal issues, extensive discovery, acrimonious litigation, and tens of thousands of hours spent on the case by class counsel." (App'x 320 (quoting *Cendant PRIDES*, 243 F.3d at 741).)

Because the District Court employed the "correct standards and procedures" and its findings of fact are not clearly erroneous, we do not find an abuse of discretion in its calculation of the attorneys' fee award. *Rite Aid*, 396 F.3d at 299.[65]

---

[65] We also reject the sole objection pertaining to the District Court's decision to grant incentive awards to class representatives. "Incentive awards are not uncommon in class action litigation and particularly where . . . a common fund has been created for the benefit of the entire class."

## IV. Conclusion

For the foregoing reasons, we will affirm the District Court's Order.

---

*Lorazepam*, 205 F.R.D. at 400 (internal quotations omitted). "The purpose of these payments is to compensate named plaintiffs for the services they provided and the risks they incurred during the course of class action litigation," and to "reward the public service of contributing to the enforcement of mandatory laws." *Bredbenner v. Liberty Travel, Inc.*, No. 09-905, 2011 WL 1344745, at *22 (D.N.J. Apr. 8, 2011) (citations & quotations omitted). Contrary to the objectors' contention, the District Court – relying upon the Special Master's more detailed findings – discussed the role played by the several class representatives and the risks taken by these parties in prosecuting this matter. (App'x 326-27; R&R on Awards at 42-46.) We find no error in the District Court's decision.

116

*Sullivan v. DB Investments, et al.,*
Nos. 08-2784/2785/2798/2799/2818/2819/2831/2881

SCIRICA, *Circuit Judge*, concurring.

I fully concur in the Court's opinion. I write separately to address this case in the wider context of the evolving law on settlement classes.

Ever since the Supreme Court's landmark decisions in *Amchem Products Inc. v. Windsor*, 521 U.S. 591 (1997) and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), one of the most vexing questions in modern class action practice has been the proper treatment of settlement classes, especially in cases national in scope that may also implicate state law. Grounded in equitable concepts of structural and procedural fairness for absent plaintiffs—competent and conflict-free representation, fair allocation of settlement, absence of collusion—*Amchem* and *Ortiz* set down important standards and guidelines for settlement classes.[1]

---

[1] The class action device has a venerable pedigree in equity practice. As early as the seventeenth century, English chancery courts employed bills of peace to facilitate representative suits analogous to "common question" suits under Rule 23(b)(3). Geoffrey C. Hazard, Jr. et al., *An Historical Analysis of the Binding Effect of Class Suits*, 146 U. Pa. L. Rev. 1849, 1861-65 (1998). Inchoate class actions continued in the American legal system until codified under Rule 23 in Federal Rules of Civil Procedure in 1938. *Id.* at

Despite initial uncertainty the opinions might pose formidable obstacles for settling massive, complex cases, this has not, for the most part, proved to be the case. Nonetheless, class settlement in mass tort cases (especially personal injury claims) remains problematic, leading some practitioners to avoid the class action device—most prominently in the recent $4.85 billion mass settlement of 50,000 claims arising out of use of the drug Vioxx. In fact, some observers believe there has been a shift in mass personal injury claims to aggregate non-class settlements. "The *Zyprexa* and *Ephedra* settlements, as well as the more recent *Guidant* and *Vioxx* settlements, suggest that the MDL process has supplemented and perhaps displaced the class action device as a procedural mechanism for large settlements." Thomas E. Willging & Emery G. Lee III, *From Class Actions to Multidistrict Consolidations: Aggregate Mass-Tort Litigation after* Ortiz, 58 U. Kan. L. Rev. 775, 801 (2010); *see also* Thomas E. Willging & Shannon R. Wheatman, *Attorney Choice of Forum in Class Action Litigation: What Difference Does It Make?*, 81 Notre Dame L. Rev. 591, 636 tbl. 12 (2006) (presenting evidence that, in sample, 41% of cases denied

---

1878-1942. The 1966 amendments to Rule 23 substantially modified earlier practice and ushered in a class action "revolution" by introducing most of the current aspects of class action litigation, particularly the broad provisions of 23(b)(3) and the concomitant procedural safeguards requiring predominance and notice. Stephen B. Burbank, *The Class Action Fairness Act of 2005 in Historical Context: A Preliminary View*, 156 U. Pa. L. Rev. 1439, 1484-89 (2008).

class certification ended in non-class settlement). This is significant, for outside the federal rules governing class actions,[2] there is no prescribed independent review of the structural and substantive fairness of a settlement including evaluation of attorneys' fees, potential conflicts of interest, and counsel's allocation of settlement funds among class members.[3]

Because of the pivotal role and ensuing consequences of the class certification decision, trial courts must conduct a "rigorous analysis" of Rule 23's prerequisites. *Wal-Mart Stores, Inc. v. Dukes*, --- U.S.---, 131 S. Ct. 2541, 2551-52 (2011); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 315-21 (3d Cir. 2008); *In re Initial Pub. Offerings Secs. Litig.*, 471 F.3d 24, 31-42 (2d Cir. 2006).[4] The same

---

[2] Bankruptcy may also provide a vehicle for some measure of compensation to mass claimants (creditors) and for resolution of liability.

[3] Nevertheless, some MDL transferee judges have treated the MDL proceedings as quasi class actions and restricted contingent fee agreements in non-class aggregate settlements under their equitable and supervisory powers. *See In re Vioxx Prods. Liab. Litig.*, 650 F. Supp. 2d 549, 558-62 (E.D. La. 2009); *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, MDL No. 05-1708 (DWF/AJB), 2008 WL 682174 (D. Minn. Mar. 7, 2008); *In re Zyprexa Prods. Liab. Litig.*, 424 F. Supp. 2d 488, 491 (E.D.N.Y. 2006).

[4] For a litigation class, the key decision is whether or not to certify the class. Once a class is certified, the dynamics of the case change dramatically. For many plaintiffs, denial of

analytical rigor is required for litigation and settlement certification, but some inquiries essential to litigation class certification are no longer problematic in the settlement context. A key question in a litigation class action is manageability—how the case will or can be tried, and whether there are questions of fact or law that are capable of common proof. But the settlement class presents no management problems because the case will not be tried. Conversely, other inquiries assume heightened importance and heightened scrutiny because of the danger of conflicts of interest, collusion, and unfair allocation. *See Amchem*, 521 U.S. at 620 ("[O]ther specifications of the Rule [23]—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context.").

In conducting a "rigorous analysis" under Rule 23, lower courts have applied the strictures laid down in *Amchem* and *Ortiz*, and added some of their own. So far, the developing jurisprudence appears to have justified the judgment of the Judicial Conference's Committee on Rules of Practice and Procedure and Advisory Committee on Civil

certification may sound the death knell of the action because the claims are too small to be prosecuted individually. For many defendants, class certification may create hydraulic pressure to settle, even for claims defendants deem non-meritorious. For these reasons, the Supreme Court adopted Federal Rule of Civil Procedure 23(f) to permit a discretionary interlocutory appeal from the grant or denial of class certification.

Rules to defer consideration of a variant rule for settlement class actions.

Rule 23(a) sensibly provides that every certified class must share common questions of law or fact. For (b)(3) classes, common questions must predominate over individual questions, claims must be typical, and the class action device must be superior to other available methods for fairly and efficiently adjudicating the controversy. Naturally, there is some overlap in the requirements for commonality, typicality, and predominance—all of which must be shown.

Commonality for a settlement class should be satisfied under the standard for supplemental jurisdiction first set forth in *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725 (1966), allowing joinder of claims deriving from a common nucleus of operative fact. *See also Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, --- U.S. ---, 130 S. Ct. 1431, 1443 (2010) (Scalia, J., plurality opinion) ("A class action, no less than traditional joinder (of which it is a species), merely enables a federal court to adjudicate claims of multiple parties at once, instead of in separate suits."). Variation in state law should not necessarily bar class certification. The focus in the settlement context should be on the conduct (or misconduct) of the defendant and the injury suffered as a consequence. The claim or claims must be related and cohesive and should all arise out of the same nucleus of operative fact. The "common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the

5

validity of each one of the claims in one stroke." *Dukes*, 131 S.Ct. at 2551. The interests of the class members should be aligned.

The nature of the predominance analysis reflects the purpose of the inquiry, which is to determine whether "a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615 (quoting Fed. R. Civ. P. 23 advisory committee note). This is important even though, in the settlement context, a court need not worry about the challenge of litigating the claims to a verdict in a single proceeding. If the class presented a grab-bag of unrelated claims, a trial court would be unable to ensure that absent class members' interests were protected. The question, then, is what kind of common issues a settlement class must share to satisfy commonality and predominance.

In certain areas, such as antitrust, common issues tend to predominate because a major focus is the allegedly anticompetitive conduct of the defendant and its downstream effects on plaintiffs. *See In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 268 (3d Cir. 2009). Commonality and predominance are usually met in the antitrust settlement context when all class members' claims present common issues including (1) whether the defendant's conduct was actionably anticompetitive under antitrust standards; and (2) whether that conduct produced anticompetitive effects within the relevant product and geographic markets. *See id.* at 267.

Even when a settlement class satisfies the predominance requirement, the inclusion of members who have a questionable chance of a favorable adjudication may present fairness concerns that demand the district court's attention. Trial courts must enforce the Rule 23(a) and (b) requirements in order to obtain a "structural assurance of fair and adequate representation for the diverse groups and individuals affected." *Amchem*, 521 U.S. at 627. In discharging this responsibility, district courts have a number of ways to address fairness concerns.[5] Due to the context-

---

[5] Trial courts can certify subclasses in situations where divergent interests implicate fair allocation—a situation not presented here, as all indirect class members have aligned interests. Certifying subclasses may be proper "[w]here a class is found to include subclasses divergent in interest." *In re Ins. Brokerage Antitrust Litig*, 579 F.3d at 271 (quoting Fed. R. Civ. P. 23(c) advisory committee note). Even the conflicts in *Amchem* were amenable to resolution through sub-classes. *See Ortiz*, 527 U.S. at 856 (explaining that *Amchem* requires "a class divided between holders of present and future claims" to be "divi[ded] into homogeneous subclasses . . . with separate representation to eliminate conflicting interests of counsel"). Objector Quinn, in her answer to the petition for rehearing, states that subclasses would adequately address the *Illinois Brick*-based disparities in this case; she does not argue that it would be categorically improper to afford class treatment to indirect purchasers governed by *Illinois Brick*. *See* Quinn Answer at 11. The District Court here examined whether indirect purchasers'

7

specific nature of these judgments, district courts should be afforded a broad ambit of discretion.

For viable settlement classes, *Amchem* and *Ortiz* made clear that expediency could not negate the requirements of Rule 23, which serve to protect absent class members. *See Amchem*, 521 U.S. at 621 ("Subdivisions (a) and (b) [of Rule 23] focus court attention on whether a proposed class has sufficient unity so that absent members can be fairly bound by decisions of class representatives. That dominant concern persists when settlement, rather than trial, is proposed."). The principal danger of collusion lies in the prospect that class counsel, induced by defendants' offer of attorneys' fees, will "trade away" the claims of some or all class members for inadequate compensation. There is also the possibility that a settlement will not serve the interests of all of the class members, which may be in tension. In *Amchem*, for instance, the Court concluded the settlement was not demonstrably fair—there was insufficient allocation to asbestos claimants who were seriously injured (e.g. mesothelioma) and insufficient protection of non-impaired plaintiffs. 521 U.S. at 625-28. The Court worried that the claims of the exposure-only class members were being released without adequate protection. *Id.*; *see also In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 148 F.3d 283, 315 (3d Cir. 1998) ("*Prudential*") (identifying and distinguishing *Amchem*'s

interests diverged depending on the law applied to their claims, and found such differences to be irrelevant in the context of this settlement. I find no abuse of discretion in such a conclusion.

concerns); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litig.*, 55 F.3d 768, 784-86 (3d Cir. 1995) (providing summary of the debate regarding propriety of mass tort settlements prior to *Amchem*).

These observations elucidate the issues of predominance and fairness present in this case. Here, the objectors contend certain claims (claims under state-law following *Illinois Brick*) are not viable--that is, they fail to state a cause of action.[6] For this reason, objectors believe that defendants are barred from settling these claims in a settlement class action because of the predominance requirement. Under objectors' view of Rule 23, trial courts would be obligated at the settlement class certification stage to decide which state's law would govern for that particular plaintiff, and whether a plaintiff has stated a valid cause of action, even if no defendant has raised a Rule 12(b)(6) objection—the usual way to contest the validity of a claim. Objectors contend they seek to protect absent class members, but fail to explain how absent class members—all of whom claim injury—are harmed by the defendants' willingness to settle all potential claims.

This interpretation also presents significant administrative problems. Objectors view the indirect purchaser class as composed of members who either have valid claims under the laws of states with *Illinois Brick*

---

[6] Objectors also claim that variance on state claims (based on consumer protection and unjust enrichment laws) defeats predominance as well.

repealers or members who have invalid claims under the laws of non-repealer states. But a claim cannot be declared invalid without proper analysis, which would require a choice-of-law examination for each class member's claim. Such analyses may pose difficulties in cases where the residence of the class member is not the sole consideration; modern choice-of-law standards often consider an array of factors particular to individual plaintiffs. Consequently, individual 12(b)(6) inquiries for settlement class certification could present serious difficulties in administration and greatly increase costs and fees, and may deplete rather than increase the recovery of even successful plaintiffs.[7]

---

[7] The purported "overbreadth" of the putative class at issue here is qualitatively different from the Supreme Court's concerns in *Amchem*. Under *Amchem* the significance of variations in state laws is properly assessed in terms of the interests of absent class members. The proposed *Amchem* settlement, extinguishing claims for different injuries with different onsets incurred at different times due to conduct of different defendants, undercompensated exposure-only claims and those with mesothelioma. Here, objectors contend some class members do not have a valid cause of action, but these class members with non-repealer state law claims have lost nothing through inclusion in the class. Objectors speculate inclusion of non-repealer state law claims necessarily diminishes the settlement accrued to class members whom they contend have undisputedly valid claims. But they provided no support for their assertion. In *Amchem* the objectors provided evidence of intraclass conflicts detrimental

Issues of predominance and fairness do not undermine this settlement. All plaintiffs here claim injury that by reason of defendants' conduct—market manipulation and fraud—has caused a common and measurable form of economic damage. They seek redress under federal antitrust laws and state antitrust, consumer protection, and unjust enrichment laws. All claims arise out of the same course of defendants' conduct; all share a common nucleus of operative fact, supplying the necessary cohesion. Class members' interests

---

to class members. For example, 15% of the proposed *Amchem* settlement's mesothelioma claims arose in California, where the average recovery for a mesothelioma claim was more than double their maximum recovery in the settlement. *Amchem*, 521 U.S. at 610 n.14.

The objectors have not shown that plaintiffs suffering identical economic injuries due to a single course of conduct on the part of the defendant have conflicting interests solely because some class members may have stronger claims depending upon variation in state law. Objectors assume that the non-repealer state claims have zero settlement value and that defendants would contribute the same amount to the common settlement fund regardless of how many claims the settlement may extinguish. But the settlement of the considerable bulk of claims against the defendants for a prior course of conduct may be of substantially greater value to defendants than a settlement of only the strongest claims against them. And, unlike in *Amchem*, objectors have not shown the inclusion of more claims was achieved by grossly underpaying some class members.

11

are aligned. The entire DeBeers settlement class consists of members with some pleaded claim (but not necessarily the exact same one) arising out of the same course of allegedly wrongful conduct such that shared issues of fact or law outweigh issues not common to the class and individual issues do not predominate. As the class structure and settlement assure fairness to all class members, there appears to be nothing in Rule 23 that would prohibit certification and settlement approval.

Moreover, the focus on the alleged insufficiency of some members' claims is misplaced. Settlement of a class action is not an adjudication of the merits of the members' claims. It is a contract between the parties governed by the requirements of Rule 23(a), (b), and particularly (e),[8] and

---

[8] Rule 23(e) is especially relevant in this context because it governs the settlement, dismissal, or compromise of a class action. It requires court approval of any agreement, and establishes five procedural requirements that must be satisfied:

> (1) The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.
> (2) If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.
> (3) The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.

establishes a contractual obligation as well as a contractual defense against future claims. Here, class members and DeBeers want to settle all state and federal claims arising out of defendant's alleged misconduct. *Amchem* recognized the legitimacy of such a settlement under Rule 23, setting forth applicable parameters. The court's responsibility is to supervise and assume control over a responsible and fair settlement. Those requirements have been met here.

A responsible and fair settlement serves the interests of both plaintiffs and defendants and furthers the aims of the class action device. Plaintiffs receive redress of their claimed injuries without the burden of litigating individually. Defendants receive finality. Having released their claims for consideration, class members are precluded from continuing to press their claims. Collateral attack of settlements and parallel proceedings in multiple fora are common realities in modern class actions—features that can imperil the feasibility of settlements if defendants lack an effective way to protect

> (4) If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.
> (5) Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval.

Fed. R. Civ. P. 23(e).

13

bargained-for rights. *See Prudential*, 314 F.3d at 104-05. If the indirect-purchaser claims at issue here were excluded, nothing would bar the plaintiffs from bringing them as separate class actions or as aggregate individual actions, leaving defendants "exposed to countless suits in state court" despite the settlement. *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355, 367 (3d Cir. 2001) ("*Prudential II*"). (Here, prior to removal and MDL consolidation, it appears an Illinois state court certified a nationwide litigation class asserting indirect-purchaser claims under the laws of all 50 states.) Perhaps a defendant will be willing and able to defend or settle all of these actions separately, or perhaps it won't. Either way, the costs (direct and indirect) and risks of continuing litigation will be greater. A defendant, therefore, may be motivated to pay class members a premium and achieve a global settlement in order to avoid additional lawsuits, even ones where it might be able to file a straightforward motion to dismiss for failure to state a claim.[9]

Finally, new limitations such as those proposed by objectors would, I believe, undercut the policy goals of the

---

[9] Facing liability for alleged misconduct, a defendant may desire global settlement for several possible reasons: (1) redressing plaintiffs' injuries; (2) the possibility of liability; (3) the direct costs of defending suits, often in multiple fora; (4) the risk of financially unmanageable jury verdicts which may threaten bankruptcy; (5) the effects of pending or impending mass litigation on its stock price or access to capital markets; (6) the stigma of brand-damaging litigation; and (7) maintaining financial stability.

14

Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4, and the Multidistrict Litigation Statute, 28 U.S.C. § 1407, both of which are designed to encourage the consolidation of mass claims national in scope—and in the case of CAFA, with particular reference to class actions based on state law claims. Of course, district courts must fully enforce the requirements of Rule 23. But the limitations objectors propose here "would seriously undermine the possibility for settling any large, multi district class action." *Prudential II*, 261 F.3d at 367.[10]

---

[10] In *Prudential II*, we affirmed the grant of an injunction enjoining a state-court action brought by policyholders who were members of the *Prudential* class to the extent the state-law claims were based on or related to claims released in the class action. We agreed with the district court that allowing the policyholders to prosecute their civil actions in state court "would allow an end run around the Class settlement by affording them (and other class members who might later attempt the same strategy) an opportunity for relitigation of the released claims." 261 F.3d at 367 (internal quotation marks omitted). We noted that the position urged by the policyholders "would seriously undermine the possibility for settling any large, multi district class action. Defendants in such suits would always be concerned that a settlement of the federal class action would leave them exposed to countless suits in state court despite settlement of the federal claims. . . . [S]uch state suits could number in the millions." *Id.* It is for this reason that releases of all claims—whether state or federal—have been held valid, "provided they are based on

The class action device and the concept of the private attorney general are powerful instruments of social and economic policy. Despite inherent tensions, they have proven efficacious in resolving mass claims when courts have insisted on structural, procedural, and substantive fairness. Among the goals are redress of injuries, procedural due process, efficiency, horizontal equity among injured claimants, and finality. Arguably a legal system that permits robust litigation of mass claims should also provide ways to fairly and effectively resolve those claims. Otherwise, mass claims will likely be resolved without independent review and court supervision.[11]

---

the same factual predicate." *Prudential*, 148 F.3d at 326 n.82. So long as a sufficient factual predicate exists, a release can even bar later claims which could not have been brought in the court rendering the settlement judgment. *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 377 (1996).

[11] The final draft of the American Law Institute's *Principles of the Law of Aggregate Litigation* points out the current lack of judicial oversight over non-class aggregate settlement. § 3.15 cmt. a (2010). It notes that, unlike class settlements, "[n]on-class aggregate settlements are governed primarily by ethical rules and are rarely subject to court review or approval for fairness" and so advocates "a fresh look . . . at how non-class aggregate settlements should be regulated." *Id.* In particular, it proposes a rule to provide each plaintiff a nonwaivable right to challenge in court a settlement that is allegedly "not procedurally and substantively fair and reasonable." § 3.18(a). The ALI *Principles* analogizes these

proposed requirements to those applied to class settlements. § 3.17 cmt. e.

*Sullivan v. DB Investments, Inc.*, (Nos. 08-2784/2785/2798/
2799/2818/2819/2831/2881)
JORDAN, *Circuit Judge*, joined by SMITH, *Circuit Judge*,
 dissenting


         This is the Majority's considered view of the law: in
certifying a class action, it makes no difference whether the
class is defined to include members who lack any claim at all.
As my colleagues in the Majority see it, "were we to mandate
that a class include only those alleging 'colorable' claims, we
would effectively rule out the ability of a defendant to
achieve 'global peace' by obtaining releases from all those
who might wish to assert claims, meritorious or not." (Slip
Op. at 66.)  So, "come one, come all," regardless of
substantive legal rights.  That remarkable declaration sets the
class action ship in our Circuit badly adrift.

         To be clear, the problem with the enormous,
nationwide class most particularly at  issue in this case is not
that it may include people with marginal or dubious claims.
The class of indirect purchasers of De Beers diamonds
actually presents a far more troubling problem than that.  It
includes people who have no legal claim whatsoever.  That is
clear on the face of the statutory and decisional law of several
states whose laws are invoked as the basis for this class
action,[1] and no one has been able to mount a cogent argument

---

         [1] More precisely, we are dealing here with a set of
class actions, since the settlement involves the resolution of
several cases, as the Majority opinion notes.  For ease of
reference, however, I will often refer to these matters in the
singular.

1

to the contrary. Despite the Majority's elaborate construction and dismantling of straw man arguments about commonality and predominance, those state laws ought to stand as an insurmountable barrier to any proper certification of a nationwide indirect purchaser class. By treating the dictates of state law as irrelevant, to be passed over in the name of "global peace," the Majority has endorsed the fabrication of substantive rights where none before existed. This is, in short, a bad day for Rule 23, for federalism, and for those who thought the Rules Enabling Act was a restraint on judicial legislating. I therefore dissent.

## I.    Where We Agree

The Majority devotes much attention to the question of whether "commonality and predominance are defeated merely because available rights and remedies differ under the several laws that form the basis for the class claims." (Slip Op. at 45-46.) In addressing that question, the Majority inaccurately characterizes the now-vacated panel opinion as having required "that everyone in a class must allege precisely identical or 'uniform' causes of action."[2] (Slip Op.

---

[2] The Majority is oddly persistent in this confusion. Despite the clear language in the panel opinion and repeated assurance in this dissent that class members need not all share a "uniform cause of action" to satisfy the requirements of Rule 23, the Majority continues to say by implication and assertion that the panel opinion suggested that all members of the class must assert a "uniform" cause of action or "identical … issues or claims." *See* Slip Op. at 46 ("We have never required the presentation of identical or uniform issues or claims as a prerequisite to certification of a class."); *id.* at 48

2

at 48 (citing *Sullivan v. DB Investments, Inc.*, 613 F.3d 134, 149 (3d Cir. 2010), *reh'g en banc granted and vacated by Sullivan v. DB Investments, Inc.*, 619 F.3d 287 (3d Cir. 2010)). But the panel opinion made no such statement, nor have the objectors claimed that all class members must share a "uniform cause of action." The only "uniformity" required by the panel opinion, or argued for by the objectors, is that at least some "question of law or fact regarding [class members'] legal rights [be] uniform throughout the class." *Sullivan*, 613 F.3d at 149. Insisting that there be a uniform question of law or fact is nothing more than an application of the Rule 23(a)(2) requirement that there be "questions of law or fact common to the class." The Majority's assertion that the panel demanded there be uniform causes of action – a requirement far different than requiring uniform questions – is unfounded and should not detain us any longer.

On this much we can agree: that, as the Majority says, "where a defendant's singular conduct gives rise to one cause of action in one state, while providing for a different cause of action in another jurisdiction, the courts may group both claims in a single class action." (Slip Op. at 48.) If that were

---

("Nothing in our case law or the language of Rule 23 commands that everyone in a class must allege precisely identical or 'uniform' causes of action … and statutory variations do not defeat predominance in the presence of other exceedingly common issues." (internal citations omitted)); *id.* at 60 n.36 ("The Panel … seemingly conclude[ed] that plaintiffs could only prevail if each putative class member alleged either a 'uniform' antitrust cause of action, a 'uniform' consumer protection cause of action, or a 'uniform' unjust enrichment claim.").

3

the case before us, we would have unanimity. The problem, though, is that the defendants' singular conduct here gives rise to causes of action in some states while providing for no cause of action at all in others. Under these circumstances, there can be no grouping of claims into a single class action, because, by definition, some would-be class members have no claim. As a result, and as discussed in the following section, there can be no common questions of law or fact with respect to that subset of would-be class members and, therefore, neither the commonality requirement of Rule 23(a)(2) nor the predominance requirement of Rule 23(b)(3) can be satisfied.

## II. Commonality And Predominance Under Rule 23

The objectors[3] have challenged the commonality of the indirect purchaser class, stating that "putative class members who do not even have an arguable cause of action under applicable law do not qualify for inclusion in a class action for failure to satisfy [the] Rule 23(a)(2) requirement of 'questions of law or fact common to the class.'" (Supplemental Brief of Appellant Susan M. Quinn on Rehearing En Banc at 11-12 (quoting Fed. R. Civ. P. 23(a)(2).) While they initially couched their arguments about commonality in terms of predominance under Rule 23(b)(3), the objectors' position has always been that common questions of law or fact do not predominate because there simply are no questions of law or fact common to the entire

---

[3] Both before the panel and the en banc court, objector Susan M. Quinn has taken the lead on the issues of commonality and predominance, and my references to the arguments of the objectors come from her briefs.

class of indirect purchasers. (*See, e.g.*, Brief for Appellant Susan M. Quinn at 32 ("The evidence supporting a lack of commonality is abundant."); *id.* at 38 ("[T]he question of antitrust conspiracy is not common to the class."); *id.* at 44 ("The district court did not even determine that there was a common question involving unjust enrichment."); *id.* at 45 ("The district court did not find a common question regarding [the consumer protection/deceptive trade practice] claims.").) The panel opinion thus addressed the objectors' arguments in that light, holding that there was no predominance because there were no questions of law or fact common to the entire class. *Sullivan*, 613 F.3d at 148 ("[T]here can be no certification of a nationwide class of state indirect purchaser plaintiffs because there is no common question of law or material fact.").

Ultimately, though, whether the objectors' argument is framed as a Rule 23(a)(2) commonality challenge or a Rule 23(b)(3) predominance challenge is immaterial.[4] As noted by

---

[4] Although the parties do not particularly press the issue in their briefs, an argument can be made that the proposed class might also fail to meet the requirements of Rule 23(a)(4), which provides that a court may certify a class only if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). By proposing a class that consists of individuals who have no cause of action under state or federal law, the class representatives have diluted the recovery for those who actually have claims. Moreover, the class representatives also unnecessarily incur the cost of giving notice under Rule 23 to individuals who have no right to relief, as well as the cost of compensating class counsel for undertaking unnecessary tasks

the Majority, we have said before that "'we consider the Rule 23(a) commonality requirement to be incorporated into the more stringent Rule 23(b)(3) predominance requirement, and therefore deem it appropriate to analyze the two factors together.'" (Slip Op. at 37 (quoting *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 266 (3d Cir. 2009)).) Whatever label we hang on the objectors' argument, it always has been clear that their basic contention is that there are no questions of law or fact common to all class members, which necessarily means that common questions do not predominate. Whether coined as a Rule 23(a)(2) problem or as a Rule 23(b)(3) problem, the determinative question of commonality is the same.

The Majority spends little time explaining what makes questions "common," but the principle they seem to espouse

---

associated with such notice. *Cf. In the Matter of Aqua Dots Prods. Liability Litig.*, No. 10-3847, 2011 WL 3629723, at *3 (7th Cir. 2011) ("A representative who proposes that high transaction costs (notice and attorneys' fees) be incurred at the class members' expense to obtain a refund that is already on offer is not adequately protecting the class members' interests." (citing *Thorogood v. Sears, Roebuck & Co.*, 627 F.3d 289, 293-94 (7th Cir. 2010))). Those costs reduce the total amount of recovery available to the appropriate members of the proposed class (*i.e.*, individuals who may assert an antitrust claim under federal or state law). In other words, a class representative who unnecessarily increases the cost of litigating a class action by including improper plaintiffs in the class definition is at risk of being found to not "adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).

6

is that questions are common when the "defendant's conduct was common as to all of the class members" and when "all of the class members were harmed by the defendant's conduct." (Slip Op. at 38.)  Based on that, the Majority asserts that, as to the indirect purchaser class, "each class member shares a similar *legal* question arising from whether De Beers engaged in a broad conspiracy that was aimed to and did affect diamond prices in the United States" (Slip Op. at 43 (internal quotation marks omitted)) and shares "common *factual* questions as to whether De Beers 'acted in concert to artificially fix, maintain, and stabilize prices and to monopolize trade and commerce in the market for polished diamonds.'" (Slip Op. at 43 (quoting App. 278-79).)  Those questions are common to the class, according to the Majority, because the "allegations are unaffected by the particularized conduct of individual class members, as proof of liability and liability itself would depend entirely upon De Beers's allegedly anticompetitive activities." (Slip Op. at 43.)

In seeking to justify its "welcome all comers" approach to class certification, the Majority has produced an internally inconsistent definition of commonality.  On the one hand, as just noted, the Majority emphasizes that "proof of liability and liability itself would depend entirely upon De Beers's allegedly anticompetitive activities" (Slip Op. at 43), as if no reference need be made to the status of individual class members.  Indeed, if one examines what the Majority identifies as "common *factual* questions" and "similar *legal* question[s,]" it is apparent that no reference to anyone but De Beers is called for, which means that the class is entirely unbounded.  Everyone in the world could share in a class

7

defined on those lines.[5]  On the other hand, evidently recognizing the problem with a commonality definition that looks only at De Beers's activities, the Majority adds as something of an afterthought that, well yes, there must be some limiting feature of the class and that feature is injury; class members must have been injured by De Beers's unlawful conduct.  (Slip Op. at 38.)

Of course, as soon as one acknowledges that commonality requires a consideration of whether class members have sustained injury, one ought also have to acknowledge, by logic grounded in hornbook law, that "injury" is not an abstraction but rather refers to a concrete and legally cognizable injury.  A definition of commonality that says, in effect, "if you feel wronged, you have a claim" is a giant step away from precedent and the underlying premise of Rule 23, which is designed to efficiently handle claims recognized by law, not to create new claims.  *Cf. Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 130 S. Ct. 1431, 1442 (2010) ("Congress authorized ... promulgat[ion] [of] rules of procedure subject to its review, 28 U.S.C. § 2072(a), but with the limitation that those rules 'shall not abridge, enlarge or modify any substantive right,' § 2072(b).").  Never before has any court, to my knowledge, tried to take the position effectively adopted by the Majority here, namely that, in deciding commonality, one need not be

---

[5] If one were actually to accept a test that looked solely at the behavior of the alleged wrongdoer, it would make no difference who was in the class.  Thus, in this case, it would be appropriate to certify a class consisting of everyone on earth, regardless of diamond purchases, since the supposedly common questions would stay the same.

8

concerned with whether the alleged injuries of class members are legally cognizable.[6]

In stark contrast to the Majority's practically limitless definition of commonality is the measured definition provided by the Supreme Court in its recent decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011). The Court there clarified the meaning of "commonality" under Rule 23, saying that the concept is "easy to misread." *Id.* at 2551. In a passage particularly apropos of the Majority's new rule, the Supreme Court said:

> [A]ny competently crafted class complaint literally raises common 'questions,' For example: Do all of us plaintiffs indeed work for Wal-Mart? Do our managers have discretion over pay? Is that an unlawful employment practice? What remedies should we get?

---

[6] While trying to distance itself from the consequences of its own ruling today, the Majority asserts that the "[indirect purchaser] class members … possess a legally cognizable injury acknowledged in hornbook law, as their injuries are real, and stem not from simply feeling 'wronged,' as the dissent suggests …, but from De Beers's alleged anti-competitive conduct, conduct which antitrust laws forbid." (Slip Op. at 44-45.) If only my colleagues in the Majority actually applied that assertion, this dissent would be unnecessary, since the assertion concedes that (1) recovery should be preconditioned on the existence of an injury that is legally cognizable, and (2) whether an injury is legally cognizable depends on the operative substantive law.

Reciting those questions is not sufficient to obtain class certification.

*Id.* (internal quotation marks and citations omitted). Emphasizing a point that the Majority ignores, the Court explained that "'[w]hat matters to class certification … is not the raising of common 'questions' – even in droves – but, rather the capacity of a classwide proceeding to generate *answers* apt to drive the resolution of the litigation.'" *Id.* (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132 (2009)). In other words, common questions must have answers that "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* Thus, as defined by *Dukes*, "common questions" are those that, because they have answers that will affect the validity of all class members' claims, can be said to be legally relevant.[7]

A necessary corollary of that definition is that, for there to be any common questions, all class members must have at least some colorable legal claim.[8] Otherwise, it is

---

[7] Similarly, if predominance means anything, it must mean that the resolution of *something* will actually affect *somehow* the claims of all class members. The claims might vary among the class members, but, at a minimum, some legal right to recover has to be held by everyone in the class.

[8] A colorable claim is one that at least "appear[s] to be true, valid, or right." BLACK'S LAW DICTIONARY 301(9th ed. 2009). Requiring a district court to consider whether a claim appears to be valid before certifying class, when the court is expressly apprised of good reasons to doubt the same, does

---

nonsense to speak of "resolv[ing] an issue that is central to the validity of each one of the claims …." *Id.* It cannot be sufficient, as the Concurring Opinion in this case suggests, simply for each class member to have "some pleaded claim." (Concurrence Slip Op. at 12.) Merely pleading a claim is not enough, because "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must … prove that there are in fact … common questions of law or fact. … [S]ometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Dukes*, 131 S. Ct. at 2551 (internal quotation marks omitted); *see In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 316 (3d Cir. 2008) ("[T]he requirements set out in Rule 23 are not mere pleading rules. The court may delve beyond the pleadings to determine whether the requirements for class certification are satisfied." (internal quotation marks and citations omitted)). As the panel opinion explained it, "to obtain certification of an indirect purchaser class, plaintiffs would have to show that all class members share a right to recover for antitrust harms, such that one or more common issues affect all members' claims."[9] *Sullivan*, 613 F.3d at 154.

not transform the Rule 23 inquiry into one under Rule 12(b)(6), as I discuss *infra*.

[9] To the extent that the quoted statement, read in isolation, might suggest a rule that all class members had to share an antitrust claim, the context of the statement – coming after a discussion of other types of statutory or common law claims that might give rise to common questions – makes it clear that the panel was requiring only that all class members' right to recover arise from the same harm or injury – something unambiguously required under Supreme Court

11

*Dukes*'s instruction that, for questions to be "common" in the sense contemplated by Rule 23, their answers must affect the validity of claims, does not set forth a new principle.[10]  In *Amchem Products, Inc. v. Windsor*, the

precedent.  *See, e.g.*, *Dukes*, 131 S.Ct. at 1551 ("Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." (internal quotation marks omitted)).

[10] The following passage in the American Law Institute's *Principles of the Law of Aggregate Litigation* articulates this basic principle:

> The legal and factual issues involved in any individual civil claim are a function of applicable substantive law. … Factual issues concern disputes about whether the evidence at trial demonstrates, under the applicable standard of proof, the existence of a given element. … A factual issue may rise to the level of a common issue if … a common body of evidence to be presented on behalf of multiple claimants at trial is capable of proving the existence of a material fact as to all such claimants.

ALI, Principles of Law: *Aggregate Litigation* § 2.01(b)(2010).  Thus, the treatise supports the proposition that in order to satisfy Rule 23(b)(3)'s commonality requirement, there must be some "material" issue. Materiality is a "function of applicable substantive law." *See id.*; *In re Lemington Home for the Aged*, 659 F.3d 282, 290 (3d Cir. 2011) ("A material fact is '[a] fact[] that might affect the outcome of the suit under the governing law.'" (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986))).

Supreme Court, in a discussion of predominance, said that the common questions that matter are those "that qualify each class member's case as a genuine controversy." 521 U.S. 591, 623 (1997). It seems self-evident that there can be no "genuine controversy" with respect to plaintiffs whose claims are nonexistent as a matter of substantive law. Likewise, in *Hydrogen Peroxide*, we noted that Rule 23 requires plaintiffs to show that the elements of their claim are "capable of proof at trial through evidence that is common to the class rather than individual to its members." 552 F.3d at 311-12. Again, for plaintiffs who lack any claim, there are certainly no elements of a claim that are "capable of proof," either common or individual. Accordingly, in assessing commonality or predominance, an inherent step is deciding that class members possess at least some legal basis for asserting a claim.

By misconstruing Supreme Court precedent, the Majority denies that district courts have either the need or the power to take that essential step. My colleagues declare that "[a] court may inquire [at the class certification stage] whether the elements of asserted claims are *capable* of proof through common evidence, but lacks authority to adjudge the legal validity or soundness of the substantive elements of asserted claims." (Slip Op. at 55 (emphasis added).) However, the Majority's position is contrary to what the Supreme Court has just said in *Dukes*:

---

By necessary implication, if certain members of the proposed class cannot assert a claim under either federal or state law, then there can be no common questions of law or fact that are "material."

13

A statement in one of our prior cases, *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974), is sometimes mistakenly cited … : "We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." But in that case, the judge had conducted a preliminary inquiry into the merits of a suit, not in order to determine the propriety of certification under Rules 23(a) and (b) (he had already done that, *see id*. at 165), but in order to shift the cost of notice required by Rule 23(c)(2) from the plaintiff to the defendants. To the extent the quoted statement goes beyond the permissibility of a merits inquiry for any other pretrial purpose, it is the purest dictum and is contradicted by our other cases.

131 S. Ct. at 2552. Thus, any suggestion that a district court is prevented from "adjudging the legal validity or soundness of the substantive elements of asserted claims" at the class certification stage is clearly mistaken after *Dukes*. That should already have been clear, however, from our statement in *Hydrogen Peroxide* that "[a] concern for merits-avoidance should not be talismanically invoked to artificially limit a trial court's examination of the factors necessary to a reasoned determination of whether a plaintiff has met her burden of establishing each of the Rule 23 class action requirements." 552 F.3d at 318 n.17 (internal quotation marks omitted).

14

The Majority repeatedly suggests that requiring adherence to substantive law would "introduce a Rule 12(b)(6) inquiry as to every claim in the class." (Slip Op. at 54.) More specifically, my colleagues in the Majority say that, if my approach were followed, "district courts would be obligated at the class certification stage to, *sua sponte*, conduct a thorough Rule 12(b)(6) analysis of every … claim to ensure that each plaintiff … possesses a valid cause of action … ." (Slip Op. at 61.) That characterization is incorrect. Rather, I advocate a procedure essentially identical to the one that occurred here: A district court is approached with a class complaint requesting relief under a variety of state statutes. Because of differences among those statutes, it is clear that some class members are entirely without a cognizable claim. Objectors bring those issues to the district court's attention. Because "such variances … are so significant as to defeat commonality and predominance even in a settlement class certification," *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 529-30 (3d Cir. 2004) (hereinafter "*Warfarin Sodium II*"), the district court should deny certification. Assuming the parties revise the class to eliminate claims clearly lacking a colorable legal basis, and assuming the class otherwise satisfies Rule 23, the district court could then certify the class.[11]

---

[11] There are at least two other problems with the Majority's assertion that "[t]o adopt the position of the dissent and the objectors is to introduce a Rule 12(b)(6) inquiry as to every claim in the class before a class may be certified." (Slip Op. at 59.) First, it ducks the difficulty at the center of this case, which is not and never has been about merely dubious claims. Claims that are of doubtful quality still have,

Note that the court in this hypothetical has neither performed a Rule 12(b)(6) inquiry, nor conducted an

as the adjective indicates, some doubt about them, which means they still retain at least some superficial possibility of being valid. Such claims, because they cling to that possibility, will typically not need to cause a district judge any agita in addressing the certification of a class for settlement purposes. The central problem in this case, however, goes beyond factual disputes or debatable points of law. The problem here is that there are class members who, according to the plain terms of controlling law, have no claim at all, not even a dubious one. We are not rightfully at liberty to ignore that, nor was the District Court. The second problem with the Majority's parade-of-horribles rhetoric in response to the suggestion that class members should actually have claims (*see* Slip Op. at 60-66) is that objectors have always been entitled to raise a legal challenge to claims being included in a class, even a settlement class. *Cf. Hydrogen Peroxide*, 552 F.3d at 320 ("[A] district court exercising proper discretion in deciding whether to certify a class will ... make findings that each Rule 23 requirement is met or not met, having considered all relevant evidence and arguments presented by the parties."). In other words, district courts have always been required to ensure that the requisites of Rule 23 have been met, and that includes an obligation to address the non-frivolous arguments and objections that are put to them. A court does not need to assess *sua sponte* every potential problem, nor need it engage in "an intensive cataloguing of each class member's claim" (Slip Op. at 62), but it must give objections their due.

16

individualized assessment of claims. [12] It has simply engaged in a straightforward analysis of the applicable law. This is by

---

[12] The Majority's recoiling at the individualized assessment of claims also reflects a failure to appreciate that some such assessment does typically take place at some point during the settlement process. The parties share a common interest in ensuring that individuals falling outside the class do not share the benefits of the settlement. For that reason, a class member here must submit a proof of claim demonstrating his or her purchase of a diamond within the relevant time period. As is often the case, parties to an antitrust settlement want to ensure that individuals seeking a share of the settlement actually bought a product with an allegedly inflated price, demonstrating their membership in the class. *See Warfarin Sodium II*, 391 F.3d at 525. Some settlements create elaborate systems for evaluating not only the validity but the severity of each class member's injury. *See In re Prudential Sales Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 295-96 (3d Cir. 1998). These proofs of claim are rarely evaluated by the court. "Although the court has general supervisory powers over settlements, it usually does not handle the actual administration. As a rule, the administration is delegated either to a special master or to the plaintiff's counsel or a committee of counsel." 4 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 11:33 at 68-69 (4th ed. 2002). It is universally recognized that the special master, committee, or other body created to administer the settlement agreement is responsible for evaluating the validity of claims and calculating the individualized recovery of a particular class member. *See* David F. Herr, *Manual for Complex Litigation* § 21.661 (4th ed. 2011) ("The administrator or special master may be

no means unusual in considering the certification of a settlement class. In *Prudential*, the plaintiffs "compiled a series of charts setting forth comprehensive analyses of the various states' laws potentially applicable to their common law claims." 148 F.3d at 315 (internal quotation marks omitted). There, we concurred with the district court's conclusion that "the elements of the[] common law claims are substantially similar and any differences fall into a limited number of predictable patterns." *Id.*

In short, I have proposed only what the law has heretofore always required: one must actually have a legal claim before getting in line for a legal recovery. When objections are raised that persuasively demonstrate that a portion of a proposed class does not have any such claim, courts of law are obliged to follow the law. That is the circumstance we face, as was detailed at length in the panel opinion and is again described briefly herein.

## III.    Some Class Members Lack A Claim

As noted by the Majority, the indirect purchasers in the consolidated actions "sought damages pursuant only to state antitrust, consumer protection, and unjust enrichment statutes and common law." (Slip Op. at 16.) Unlike the direct purchasers, the indirect purchasers did not seek damages under federal law, because, pursuant to the Supreme Court's decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977),

---

charged with reviewing the claims and deciding whether to allow claims that are late, deficient in documentation, or questionable for other reasons.").

only direct purchasers may bring an antitrust claim under federal law.

Although most states have traditionally followed federal law in interpreting their own state antitrust laws, some have enacted "*Illinois Brick* Repealers," rejecting the rule that only direct purchasers may recover for an antitrust violation. *See, e.g.*, CAL BUS. & PROF. CODE § 16750(a). By contrast, others have expressly followed *Illinois Brick* and declared unequivocally that, in their states, indirect purchasers lack standing to bring a claim. *See, e.g., Johnson v. Microsoft Corp.*, 834 N.E.2d 791, 798 (Ohio 2005). Several states have been even more precise, explaining that indirect purchasers lack standing to bring what is effectively an antitrust claim, regardless of how the claim is labeled, so that recovery is precluded even if, for example, it is sought under a consumer protection act ("CPA") or the common law. *See, e.g.*, *Abbott Labs., Inc. (Ross Labs. Div.) v. Segura*, 907 S.W.2d 503, 507 (Tex. 1995) ("We will not interpret the [Texas CPA] in a manner that rewards creative pleading at the expense of consistent application of legal principles. … Our holding today only forecloses the recovery of damages for seeking a prohibited antitrust recovery under the masquerade of our [CPA]."); *Johnson*, 834 N.E.2d at 801 (holding that Ohio antitrust statute "provides the exclusive remedy for" claims predicated upon "monopolistic pricing practices," and thus dismissing claims under Ohio's CPA and common law). In at least some states, then, indirect purchasers are absolutely precluded from bringing an antitrust claim, no matter how they dress it up.[13]

---

[13] For a more detailed discussion of which states preclude claims entirely, *see Sullivan*, 613 F.3d at 147-48 &

n.10-11, 150-51. According to the Majority, the panel opinion "undertook a wide-ranging fact-finding review of state antitrust statutes … ." (Slip Op. at 29.) That description is puzzling, however, because there was no fact-finding involved. The review of state law was just that: a review of law. The panel opinion took the very ordinary approach of examining the laws on which the plaintiffs purported to base their claims, including state antitrust laws. The opinion also stated:

> We are certainly not saying that nuanced differences among state laws will prevent the certification of a class, nor are we suggesting that a state-by-state cataloguing of differences in state law is necessary every time a multi-jurisdiction class is certified. We are saying that the difference between having an antitrust claim under state law and having none is no mere nuance and cannot be solved by any reconfiguration of the nationwide class short of changing it from a nationwide class to one or more classes that exclude those who have no claim.

*Sullivan*, 613 F.3d at 148 n.12. Both the Majority and the Concurring Opinions claim that it is wrong for us to pay attention to the differences in state law because, as the Concurrence puts it, "trial courts would be obligated at the settlement class certification stage to decide which state's law would govern … ." (Concurrence Slip Op. at 9.) It bears repeating, then, that nothing said by the panel opinion or in this dissent would entail the cataloguing of differences in state law in the mine run of cases. However, when, as in this

20

Nevertheless, the Majority declares that those class members whose claims purportedly arise in states that preclude indirect purchaser recovery can still be part of the indirect purchaser class. The Majority offers two arguments in support of that conclusion. First, noting that indirect purchasers lack only statutory standing under *Illinois Brick*, rather than Article III standing, the Majority asserts that "statutory standing is simply another element of proof for an antitrust claim, rather than a predicate for asserting a claim in the first place." (Slip Op. at 59.) The Majority does not cite any authority to support that assertion, and there is reason to doubt it.[14] But, in any event, it misses the point. Even if the

case, an objection has been raised pointing out that there is a body of claims that are undeniably impermissible under the law of the state which governs them, we are not free to shirk the responsibility of separating those unfounded claims from the class.

[14] It is not clear, to begin with, that the Majority's "statutory standing" label accurately describes the substantive law of the several states denying a claim to indirect purchasers. That aside, and although a dismissal for lack of statutory standing may be viewed as akin to a dismissal under Federal Rule of Civil Procedure 12(b)(6), *see Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 73 (3d Cir. 2011) (noting that "[a] dismissal for lack of statutory standing is effectively the same as a dismissal for failure to state a claim"), compelling authority teaches that the absence of statutory standing can also implicate the court's power to adjudicate a dispute under Article III, s*ee Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 89 (1998) ("Dismissal for lack of subject-matter jurisdiction because of the adequacy of the federal claim is proper … when the claim is

21

so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy." (internal quotation marks omitted)).  We have suggested this ourselves, *see Malaysia Int'l Shipping Corp. v. Sinochem Int'l Co. Ltd.*, 436 F.3d 349, 359 (3d Cir. 2006) (stating that "non-Article III jurisdictional issues like statutory standing" fit within a category of cases somewhere between cases that have "jurisdictional issues that cannot be bypassed because Article III of our Constitution requires that they be addressed" and cases "with merits-related issues, which cannot be reached without first verifying jurisdiction" (internal citations and quotation marks omitted)), *rev'd on other grounds*, 549 U.S. 422 (2007), and other circuits have held the same, *see Crawford v. Lamantia*, 34 F.3d 28, 32 (1st Cir. 1994) (statutory standing under ERISA) ("[W]e note that the basis for '[s]tanding, since it goes to the very power of the court to act, must exist at *all stages* of the proceeding, and not merely when the action is initiated or during an initial appeal.'"); *Alexander v. Anheuser Busch Co.*, 990 F.2d 536, 538 (10th Cir. 1993) (statutory standing under ERISA) ("In reviewing Alexander's ERISA claims, we raise, sua sponte, the question whether he has standing to bring such claims.  The issue of standing is jurisdictional in nature."); *Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan*, 883 F.2d 345, 349 (5th Cir. 1989) (statutory standing under ERISA) ("We have recognized, however, that standing is essential to the exercise of jurisdiction, and that lack of standing can be raised at any time by a party or by the court."); *cf. Mainstreet Org. of Realtors v. Calumet City*, 505 F.3d 742, 747 (7th Cir. 2007) (Posner, J.) (describing lack of statutory standing under *Illinois Brick* as "not jurisdictional, at least in the

Majority's *ipse dixit* were true as to antitrust claims under federal law, there is no basis for saying it is so with respect to claims under the laws of the several states that have adopted the ultimate holding of *Illinois Brick*. Indeed, in several of those states, courts have indicated that indirect purchasers are barred from asserting a claim because they lack standing.[15] For instance, the Ohio Supreme Court has stated that "an indirect purchaser of goods may not assert a Valentine Act [, i.e., a state antitrust act] claim for alleged violations of Ohio antitrust law." *Johnson*, 834 N.E.2d at 798. Likewise, the New Jersey Supreme Court has held that "indirect

---

conventional sense[,]" but nonetheless "belong[ing] to an intermediate class of cases in which a court can notice an error and reverse on the basis of it even though no party has noticed it").

[15] Whether a party has standing under Article III is a distinct inquiry from whether the party may assert a cause of action under state or federal law. In *Bond v. United States*, 131 S. Ct. 2355, 2362 (2011), the Supreme Court made clear that a party may have standing under Article III, but fail to assert a cause of action under state law. *See id.* at 2362 ("Still, the question whether a plaintiff states a claim for relief 'goes to the merits' in the typical case, not the justiciability of a dispute, and conflation of the two concepts can cause confusion." (internal citation and quotation marks omitted)). However, even assuming indirect purchasers have standing under Article III, they have no claim under federal law and many of them lack standing to assert any claim under relevant state law. Because the proposed class includes such individuals, it cannot satisfy Rule 23(b)(3)'s commonality requirement.

purchasers … have no standing to assert a private right of action under the New Jersey Antitrust Act." *Wilson v. Gen. Motors Corp.*, 921 A.2d 414, 416 (N.J. 2007). The Connecticut Supreme Court has said the same, explaining that Connecticut law allows "only those consumers who purchase directly from the antitrust defendant to bring suit under our state antitrust law." *Vacco v. Microsoft Corp.*, 793 A.2d 1048, 1058 (Conn. 2002). Thus, it is clear that there are states that decidedly do treat statutory standing[16] as "a predicate for asserting a claim in the first place." (Slip Op. at 59.)

Second, the Majority asserts, using the Ohio Supreme Court's *Johnson* case as an example, that "although *Johnson* provides that an indirect purchaser lacking an antitrust claim under *Illinois Brick* cannot circumvent this limitation by relying upon the Ohio consumer protection statute, the Ohio Supreme Court did not, nor could it, preclude consumer protection claims predicated on fraud or deception." (*Id*. at 64 n.39.) The Majority then says that "claims settled here include allegations of fraud and deception separate from the antitrust allegations." (*Id*. at 64 n.39.) While the Majority is correct that Ohio does not "preclude consumer protection claims predicated on fraud or deception," it is not correct that such claims were brought in this case under the Ohio CPA – or under the CPA of any state following *Illinois Brick*. Of the seven complaints covered by the proposed class action settlement, only two made allegations referencing violations of the Ohio CPA, *Sullivan v. DB Investments, Inc.*, No. 04-cv-

---

[16] Again, assuming that "statutory standing" is the appropriate description of the principle under state law. *See supra* n.13.

24

02819 (D.N.J.) and *Null v. DB Investments, Inc.*, No. 05-L-209 (S.D. Ill.), and both of those complaints predicated their Ohio CPA claims on monopolistic pricing practices. In *Sullivan*, the only allegation with respect to the Ohio CPA is that "Defendants' contract, combination and conspiracy in unreasonable restraint of trade and to monopolize and defendants' monopolization constitute a violation of various state antitrust and/or consumer protection and deceptive and unfair business practices acts and laws." (App. at 652 ¶ 47.) Likewise, the allegations in *Null* are that the CPA "laws of the various states" were violated "through one or more of the following unfair and/or deceptive acts and/or practices: illegally and artificially restraining trade and increasing the price of diamonds by controlling inventory, limiting supply, restricting purchase and falsely advertising the scarceness of diamonds." (App. at 629 ¶ 61, 626 ¶ 45.) Thus, the only claims brought under the Ohio CPA in any of the class actions now at issue were "predicated upon monopolistic pricing practices," and, therefore, according to the highest court in Ohio, those claims are precluded. *Johnson*, 834 N.E.2d at 801.

Moreover, even if any of the complaints could be construed as raising claims for fraud under some state CPAs,[17] those claims were, it appears, never brought to the

---

[17] The Majority uses Ohio's CPA as an example and does not discuss whether fraud claims were brought under the CPAs of other states following *Illinois Brick*. Nonetheless, the pleading deficiency is the same for allegations involving the laws of other states. The *Sullivan* and *Null* complaints are the only complaints to invoke the CPAs of the states following *Illinois Brick* and, as discussed above, neither of

attention of, or considered by, the District Court, nor were they raised before the Panel.  As a result, the District Court made no findings with respect to fraud claims under state CPAs, including whether the elements of those claims could be proven by "evidence common to the class," as required by *Hydrogen Peroxide*, 552 F.3d at 325.  Of the five common questions identified by the District Court, none pertain to fraud.[18]  Thus, even if there were fraud claims for all class

those complaints allege fraud; they merely pin the "fraud" label on the price-fixing behavior at issue.  Consequently, there is no claim for fraud under the laws of any state adhering to *Illinois Brick*.

[18] Those questions are:

(a) Whether [D]efendants combined or conspired with others to fix, raise, stabilize and maintain the prices of polished diamonds;

(b) Whether [D]efendants monopolized or combined or conspired with others to monopolize the supply of polished diamonds;

(c) Whether [D]efendants' conduct caused the prices of polished diamonds to be maintained at higher levels than would exist in a competitive market;

(d) Whether [P]laintiffs and the Class[es] are entitled to injunctive relief; and

(e) Whether [D]efendants' conduct caused injury to the business or property of [P]laintiffs and the other [Class and] Subclass Members and, if so, the

members – which, for the reasons I have identified, there are not – there has been no finding of commonality and predominance with respect to those claims and, therefore, the District Court's class certification cannot rightly be affirmed on that basis.

The bottom line is that, as to those class members who purport to bring claims under the laws of states following *Illinois Brick*, the status of being an indirect purchaser is not only the gateway to membership in the class, it is what entirely disqualifies them from asserting any claim based on De Beers's price-fixing conduct. That is a straightforward application of state law.[19] The class thus includes members

---

> appropriate class-wide measure of damages.

(App. at 276.)

[19] In its effort to diminish the significance of the state laws denying a cause of action to indirect purchasers, the Majority likens those laws to pre-suit notice requirements or other issues of form that may vary from state to state. (Slip Op. at 65.) But we are not talking here about the niceties of notice. In a class action invoking the laws of multiple jurisdictions, there will often be variations in the law pertaining to how a particular claim is to be presented. Those variations may at times be framed as prerequisites to the bringing of a cause of action or restrictions on the manner in which the action is brought. Were the aggregated claims to be brought individually, those prerequisites would in all likelihood be met on a claim-by-claim basis, but, since the claims are aggregated, those prerequisites are appropriately

27

who are barred from asserting a claim in the first place. And, because those class members lack any claim, there are no questions common to all class members for which the answers "will resolve an issue that is central to the validity of each one of the claims." *Dukes*, 131 S.Ct. at 2551. Consequently, pursuant to long-standing principles of aggregate litigation, most recently reaffirmed in *Dukes*, there is neither commonality nor predominance under Rule 23.[20]

---

bypassed. They amount to nothing more than variations in form, not in kind, and neither the panel opinion in this case nor the objectors nor this dissent have advocated the elevation of form over substance. Differences in form are not at issue here; it is the very existence of any cause of action at all that is at stake. The distinction is crucial.

[20] I am not suggesting that no class of indirect purchasers could have been certified here. On the contrary, as the panel opinion noted,

> It may be that the antitrust and consumer protection statutes in a more limited number of states are sufficiently similar that common issues of law or fact would predominate with respect to plaintiffs in those jurisdictions. However, it was improper for the District Court to certify a nationwide class of plaintiffs based on state law when many states withhold antitrust standing from indirect purchasers and where the variability in consumer protection and unjust enrichment law in a context like this is extreme.

*Sullivan*, 613 F.3d at 153-54.

28

## IV. The Rules Enabling Act and Federalism

In addition to violating the terms of Rule 23, certifying this class violates the Rules Enabling Act and basic principles of federalism. The Rules Enabling Act authorizes the creation of "rules of practice and procedure," but states that "[s]uch rules shall not abridge, enlarge, or modify any substantive right." 28 U.S.C. § 2072(a), (b). In *Dukes*, the Supreme Court highlighted the role of the Rules Enabling Act in class certification decisions, holding that, "[b]ecause the Rules Enabling Act forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right,'" the proposed class could not be certified because it would have abridged Wal-Mart's statutory right to litigate certain defenses. 131 S.Ct. at 2561 (quoting 28 U.S.C. § 2072(b)). That point is consistent with the Court's past cautionary statements that an overly expansive reading of Rule 23 will violate the Rules Enabling Act. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845 (1999) ("The Rules Enabling Act underscores the need for caution. As we said in *Amchem*, no reading of the rule can ignore the Act's mandate that rules of procedure shall not abridge, enlarge, or modify any substantive right." (internal quotation marks omitted)); *Amchem*, 521 U.S. at 613 ("We therefore follow the path taken by the Court of Appeals, mindful that Rule 23's requirements must be interpreted in keeping with Article III's constraints, and with the Rules Enabling Act, which instructs that rules of procedure 'shall not abridge, enlarge or modify any substantive right.'" (quoting 28 U.S.C. § 2072(b))).

In this case, by approving certification of the indirect purchaser class, the Majority proceeds heedless of that advice and endorses the enlarging of substantive rights. Using the

29

Majority's example of a member of the indirect purchaser class asserting under Ohio law a claim based on De Beers's price-fixing, it is indisputable that the same member would, if he tried to bring his claim individually in an Ohio court, be immediately shown the exit.[21] Controlling law allows no

---

[21] The Majority tries to deny this, saying that a state court would only dismiss the invalid claim upon a motion by the defendant. (Slip Op. at 71 n.43.) But the procedural mechanism that prompts application of substantive law is irrelevant. Whether or not a motion brings to light a claim's fatal flaw, the flaw is there. To continue with the Ohio law example, there is clearly no colorable claim for an indirect purchaser, and that is true whether or not a defendant chooses to file a motion to dismiss. Ohio law does not depend on the whim of De Beers or any other defendant. It is telling that the Majority's rejoinder on this point is, in effect, "yes, the claimant could be tossed out of state court, but only if there were a motion." That seems a concession that the differing results that now obtain in this Circuit and in Ohio state courts reflect an expansion of substantive rights. As to the "there must be a motion" comment, irrelevant and of questionable accuracy though it may be, it prompts re-emphasis of this fact: there was a motion in this case, in the form of the objections to the nationwide settlement of the indirect purchaser class. Thus, the legal problem was squarely before the District Court, as it is now before us. It does not matter that the motion came from someone other than De Beers. The issue has been raised and cannot be dodged by saying no one brought it up. Nor can it be avoided by saying that De Beers could have settled an individual suit in Ohio. We are obviously not dealing with the settlement of a dispute between private parties in Ohio state court; we are dealing

30

result but dismissal of such a claim. But, under the Majority's class action certification theory, that individual now has a right to share in the settlement fund based on a claim he is otherwise forbidden to bring. If that is not an enlargement or modification of substantive rights, it is hard to know what would be. *Cf. Shady Grove Orthopedic Assocs.*, 130 S. Ct. at 1442 (stating that, for purposes of the Rules Enabling Act, a rule is substantive in nature if it alters the rules of decision by which courts adjudicate rights). The Majority seems to have a "no harm, no foul" feeling about dispensing new rights, but legitimate class members are harmed. If we enforced substantive law as we ought to, those who actually have claims would not be required to share the proceeds of a proper settlement with those who do not.[22]

---

with a class action settlement binding on absent parties and sanctioned by a federal court purporting to apply Ohio law.

[22] Herein lies a fundamental flaw in the Concurring Opinion as well, which takes the view that "[u]nder *Amchem* the significance of variations in state law is properly assessed in terms of the interests of absent class members[,]" and that here class members from states adhering to *Illinois Brick* "have lost nothing through inclusion in the class." (Concurrence Slip Op. at 10 n.7.) Very true. The problem here is not that some absent class members who deserve compensation are left out by the settlement. The problem is that some class members who deserve nothing are included in the settlement and hence are diluting the recovery of those who are entitled to make claims. That harm is real, and the cause of it, the overbreadth of the class, is akin to the problem in *Amchem*. *See Amchem*, 521 U.S. at 620 ("But other specifications of [Rule 23] – those designed to protect absentees by blocking unwarranted or overbroad class

31

Certifying the indirect purchaser class is, for the same reasons, contrary to principles of federalism. The policy decisions of the constituent states of our country are "fundamental aspect[s] of our federal republic and must not be overridden in a quest to clear the queue in court." *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1020 (7th Cir. 2002). When one of those states says to its citizens "you have no claim" – and the law covering many of the class members here is just that clear – but those under that edict nevertheless are joined in a class with people who do have a claim, by what logical process consistent with federalism can aggregating the "haves" and the "have-nots" imbue those "have-nots" with the very claim that the state has said is foreclosed to them? There is no sound answer to that question. There is only the Majority's and the Concurrence's policy preference, in derogation of controlling state law, for "global peace" through unfettered access to class action settlements.[23]

---

definitions – demand undiluted, even heightened, attention in the settlement context.").

[23] The Majority cites *Warfarin Sodium II* in an effort to justify its decision today, but we were careful to say in that case that "there may be situations where variations in state law are so significant so as to defeat commonality and predominance even in a settlement class." 391 F.3d at 529. That observation seems obvious and unassailable, and we are presented here with exactly that kind of situation. If we cannot bring ourselves to say plainly that the certification here was improper, one is forced to wonder what limit is left on the reach of Rule 23.

My colleagues in the Majority of course dispute that certifying this class implicates either the Rules Enabling Act or federalism. With respect to the Rules Enabling Act, they say that there has been a "voluntary settlement agreement between parties" (Slip Op. at 70 (quoting *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 593 (3d Cir. 2010)), and "a district court's certification of a settlement simply recognizes the parties' deliberate decision to bind themselves according to mutually agreed-upon terms without engaging in any substantive adjudication of the underlying causes of action" (*id*.). That may be so when a settlement involves only private parties who all participate in the settlement process, but it is not true in a class action settlement. In that latter context, the Federal Rules of Civil Procedure require district courts to be intimately involved, because the approval of a class action settlement gives the government's imprimatur to the terms of the settlement and binds absent parties.[24] As already discussed, a court is not supposed to certify a class without determining that there is a "genuine controversy" or, in other words, that there is at least some legal basis for class members to claim relief. If a district court credits potential

---

[24] The Majority also writes that, in *Prudential*, "we agreed with the district court that 'approval of a settlement under Rule 23 merely recognizes the parties' voluntary compromise of their rights and does not itself affect their substantive state law rights," and, therefore, held that "the proposed settlement could not violate the Rules Enabling Act." (Slip Op. at 70 (quoting *Prudential*, 148 F.3d at 324).) However, we also held in *Prudential* that the proposed settlement was not contrary to the cited state law, and, therefore, the Rules Enabling Act could not possibly have been implicated. *Prudential*, 148 F.3d at 324 & n.77.

class members with having a valid claim when the underlying state law says there is none, the court has, by definition, enlarged and modified those class members' rights.

Moreover, while De Beers is now pleased to stipulate to liability in all fifty states, and, for its own purposes, is willing to forego legal arguments that it could have raised about the substantive rights of class members, a defendant's willingness to waive an argument is not a reason to ignore it. It is rather the very reason that collusive settlements are a problem. No matter how much De Beers wants to bind everyone in America, and no matter how much the attorneys involved stand to gain from their percentage of the settlement, and no matter how laudatory the "global" resolution of a price-fixing case may be as policy matter, there are limits on the power of federal courts to facilitate settlements and bind absent class members and objectors. *Amchem* admonishes courts approving settlement classes to pay "undiluted, even heightened, attention" to issues of predominance as well as to the other requirements of Rule 23 to ensure that a certified class is not overbroad. 521 U.S. at 620. Approving a class certification that groups together plaintiffs who have claims with those who plainly do not results in such a class.

Furthermore, while the Majority speculates that the approach I suggest will seriously impede class action settlements, it is far from clear that limiting class certification to people who have legal claims would actually undermine the goal of global peace. Indeed, as the Concurrence acknowledges, similar concerns in other cases have proved largely unfounded. (Concurrence Slip Op. at 2.) But even if one assumes that the Majority's concerns about "global peace" have some merit, Rule 23 remains the sole benchmark

34

for determining whether a settlement class can be certified. In *Amchem*, the Supreme Court reiterated that point over Justice Breyer's criticism that the Court had given insufficient weight to the value of settlement. *See Amchem*, 521 U.S. at 629 ("Rule 23, which must be interpreted with fidelity to the Rules Enabling Act and applied with the interests of absent class members in close view, cannot carry the large load CCR, class counsel, and the District Court heaped upon it."); *id.* (Breyer, J., dissenting) ("I believe that the need for settlement of this mass tort case, with hundreds and thousands of lawsuits, is greater than the Court's opinion suggests."). In *Ortiz*, the Court rejected a settlement expressly designed for "total peace," 527 U.S. at 864-65, even as several justices acknowledged the need for a resolution to the "elephantine mass of asbestos cases," *id.* at 865 (Rehnquist, C.J., concurring). We are not free to rewrite the requirements of Rule 23 simply because it would allegedly advance the goal of global peace.

The Majority also dismisses any federalism concern, reasoning that the policy concerns behind *Illinois Brick* do not apply. As the Majority sees it, "*Illinois Brick*'s restriction on indirect purchaser recovery was motivated by prudential concerns for manageability; it does not reflect a categorical policy judgment that indirect purchasers do not merit antitrust protection." (Slip Op. at 72.) Thus, says the Majority, because the "District Court's certification order did not undermine these prudential concerns," the District Court did not "inappropriately subordinate[] state sovereignty in certifying the class." (Slip Op. at 74-75.) But regardless of the Majority's novel views about the policy judgments underlying *Illinois Brick* and whether "indirect purchasers … merit antitrust protection," the states which have chosen to

35

follow *Illinois Brick* have decided – and plainly stated – that indirect purchasers have no substantive right to recovery under their laws. Principles of federalism do not permit us to write our own exceptions into unambiguous state laws simply because we think that the states would see things differently if only they had our policy insights.[25] Somehow, though, the Majority thinks that "the class settlement posture of this case largely marginalizes the objectors' concern that state law variations undermine a finding of predominance." (Slip Op. at 49.) Once again, the promise of settlement trumps everything else, even variations in state laws as wide as "you have a claim" versus "you have none."

## V.  Conclusion

I cannot voice strongly enough my disagreement with this elevation of settlement to the status of ultimate and overriding good. (*See* Slip Op. at 66 ("[W]ere we to mandate that a class include only those alleging 'colorable' claims, we

---

[25] The Concurring Opinion's assertion that the settlement of a class action is merely "a contract between the parties" (Concurrence Slip Op. at 12) misses this point, though the opinion adds a reference to Rule 23 (*id.* at 12-13 n.8). The states have an interest in not having their laws strained beyond recognition or ignored entirely. A class action settlement, whether it involves a settlement or a litigation class, is not simply a private contract. If it were, it would not need court approval, and federal courts called upon to supervise class actions, including resulting settlements, are obligated to see that Rule 23 does not become a tool for modifying state law.

would effectively rule out the ability of a defendant to achieve 'global peace' by obtaining releases from all those who might wish to assert claims, meritorious or not."). It has been aptly observed that "[s]ocial peace is not the Article III mission." Paul D. Carrington & Derek P. Apanovitch, *The Constitutional Limits of Judicial Rulemaking: the Illegitimacy of Mass-Tort Settlements Negotiated Under Federal Rule 23*, 39 ARIZ. L. REV. 461, 475 (1997). Rather, we are to "decide cases or controversies." *Id.* Social peace becomes a natural and very welcome byproduct of focusing on that specific mission, "because for every carefully wrought judicial decision, there may be hundreds or thousands of matters that are privately resolved 'in the shadow' of the law." *Id.*

On its own terms, then, the Majority's decision is short-sighted and counterproductive. In the interest of short-term peace, it sacrifices long-term legitimacy and, with that, a more stable, lasting peace. By failing to enforce the limits of Rule 23, today's decision will encourage frivolous class action claims and have the predictable consequence of weakening the incentives – the sheltering shadow – under which non-frivolous disputes would otherwise be properly resolved.

In sum, when a federal court issues an order certifying that there are questions of fact or law common to all class members, it necessarily concludes, whether explicitly stated or not, that all class members have at least some colorable legal claim. When there are members of a putative class who do not, under the operative substantive law in a case, have a colorable claim, certification of the class enlarges the substantive rights of those members. Any such order is thus a violation of the Rules Enabling Act, and, when it occurs in a

class whose only claims are based in state law, it also violates core principles of federalism. The damage done by that judicial usurpation is not made better by invoking the benefits of social peace through litigation settlement. Private parties have a free hand in settling their own disputes, but class action settlements require federal courts to determine the rights and obligations of people who are not there to speak for themselves – hence the Supreme Court's insistence that class action settlements "demand undiluted, even heightened, attention … ," especially when there is a risk of "unwarranted or overbroad class definitions," *Amchem,* 521 U.S. at 620. That risk has been realized here.